Sealed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>PARTNERS IN HEALTH CARE ASSOCIATION, INC. (also d/b/a/ Partners In Health Care, Inc.),<br>GARY L. KIEPER (individually and as officer or director of Partners In Health Care Association, Inc.),<br>UNITED SOLUTIONS GROUP INC. (also d/b/a Debt Relief Experts, Inc.),<br>WALTER S. VARGAS (individually and as an officer or director of United Solutions Group Inc.),<br>CONSTANZA GOMEZ VARGAS (individually and as a director or manager of United Solutions Group Inc.),<br><br>    Defendants. | FILED by _____ D.C.<br>AUG 2 5 2014<br>STEVEN M. LARIMORE<br>CLERK U.S. DIST. CT.<br>S. D. of FLA. – MIAMI<br><br>Case No. **14-23109**<br><br>**CIV-SCOLA**<br><br><u>Filed Under Seal</u><br><br>COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint against Defendants Partners In Health Care Association, Inc., Gary L. Kieper, United Solutions Group Inc. also d/b/a Debt Relief Experts, Inc., Walter S. Vargas, and Constanza Gomez Vargas (collectively, "Defendants") alleges:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other

equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## SUMMARY OF THE CASE

2. This case concerns Defendants' bait-and-switch marketing scheme that sells medical discount cards to consumers under the pretense that they are actually selling health insurance. Defendants market their medical discount cards to consumers via telemarketing, Spanish-language radio advertisements, television advertisements, and the internet, and typically attract some of the most vulnerable consumers looking for health insurance, such as the unemployed, uninsured and those with pre-existing conditions. Defendants falsely claim that their supposed "health insurance plans" provide comprehensive medical insurance at low cost. Based upon such false representations, consumers pay Defendants an enrollment fee and a monthly payment, both ranging from approximately $99 to several hundred dollars. Only upon receipt of the written materials describing the purchased product—typically received after the time to obtain a refund has lapsed—do some consumers realize that Defendants actually sold them an unwanted medical discount card that is nothing akin to health insurance. Defendants' deceptive scheme has left thousands of consumers without health insurance, while defrauding millions of dollars from such consumers.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

4. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (3), (c)(1) and (2), (d), and 15 U.S.C. § 53(b).

2

**PLAINTIFF**

5.  Plaintiff, the FTC, is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act. 15 U.S.C. § 6102. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, which prohibits deceptive and abusive telemarketing acts or practices.

6.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), 6105(b).

**DEFENDANTS**

7.  As detailed below, this case involves two corporate defendants, as well as the respective control persons of each group. Partners In Health Care Association, Inc. sells a medical discount card (the "Discount Card") to consumers that believe they are purchasing health insurance. United Solutions Group Inc. is one of Partners In Health Care Association, Inc.'s most successful marketers.

**The Seller Defendants**

8.  Defendant Partners In Health Care Association, Inc. ("Partners In Health Care"), also doing business as Partners In Health Care, Inc., is a for-profit Wisconsin corporation with its principal place of business at 520 S. Westland Drive, Appleton, Wisconsin 54914. Partners In Health Care is at the center of the deceptive scheme alleged in this Complaint and sells the

Discount Card. Partners In Health Care is also responsible for, among other functions, providing sales fulfillment of consumer orders and customer service, and contracting with — and supervising — the various companies that market the Discount Card. Partners In Health Care transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Partners In Health Care has advertised, marketed, distributed, or sold the Discount Card to consumers throughout the United States.

9. Defendant Gary L. Kieper is the president and sole officer of Defendant Partners In Health Care. He resides in Oshkosh, Wisconsin, and in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. As the president of Partners In Health Care, Gary L. Kieper has orchestrated much of Partners In Health Care's business activities including, but not limited to, managing sales and marketing operations. At all times material to this Complaint, acting alone or in concert with others, Gary L. Kieper has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Partners In Health Care and the various marketers of the Discount Card, including the acts and practices set forth in this Complaint. Defendants Partners In Health Care and Gary L. Kieper are referred to herein, collectively, as the "Seller Defendants."

### The Marketer Defendants

10. Defendant United Solutions Group Inc. ("United Solutions Group"), also doing business as Debt Relief Experts, Inc. is a for-profit Florida corporation, with its principal place of business at 28 W. Flagler St., Suite 900, Miami, Florida 33130. United Solutions Group runs Spanish-language radio advertisements to market the bogus "health insurance plans" sold by Defendant Partners In Health Care. In addition, United Solutions Group is one of Partners In

Health Care's most successful inbound telemarketers of the Discount Card. United Solutions Group transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, United Solutions Group has advertised, marketed, or sold the Discount Card to consumers throughout the United States.

11.     Defendant Walter S. Vargas is president of and registered agent for Defendant United Solutions Group. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled or had the authority to control, or participated in the acts and practices of United Solutions Group, including the acts and practices set forth in this Complaint. Walter S. Vargas resides in Miami, Florida and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

12.     Defendant Constanza Gomez Vargas owns and operates Defendant United Solutions Group with Walter Vargas. She was United Solutions Group's "Marketing Director" in 2010 when the company, then known as Debt Relief Experts but already doing business as "United Solutions," entered into a marketing agreement with Defendant Partners In Health Care to sell its offerings. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled or had the authority to control, or participated in the acts and practices of United Solutions Group, including the acts and practices set forth in this Complaint. Constanza Gomez Vargas resides in Miami, Florida and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13.     Defendants United Solutions Group, Walter S. Vargas, and Constanza Gomez Vargas are referred to herein, collectively, as the "Marketer Defendants."

**COMMERCE**

14. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

15. Defendants offer to sell consumers traditional health insurance, or the equivalent of such insurance, that they claim will provide consumers with comprehensive health care insurance, which includes but is not limited to coverage for doctor visits, hospital stays, laboratory services, emergency room visits and prescription benefits. Rather than providing consumers with comprehensive health insurance, however, the Seller Defendants send them a nearly worthless medical discount card – *i.e.*, the Discount Card.[1]

16. As Defendant Partners In Health Care concedes in the fine-print of the written materials it typically sends to consumers along with the Discount Card, the Discount Card is nothing akin to the promised health insurance. Indeed, as described further below, consumers are unable to use the Discount Card for services typically covered by traditional health insurance plans.

17. Since at least 2010, Partners In Health Care has engaged in marketing by a plan, program, or campaign conducted by use of telephones, Spanish-language radio advertisements, television advertisements, and the internet to induce the purchase of the Discount Card. Partners In Health Care uses various marketers across the country, including the Marketer Defendants, which have been part of the scheme alleged in this Complaint since at least 2010.

---

[1] In conjunction with the filing of this Complaint, the FTC also moves for a temporary restraining order. The FTC incorporates into this Complaint the memorandum filed in support of that motion.

18. Partners In Health Care enters into Marketing Agreements with its various marketers, including the Marketer Defendants, which prohibit, *inter alia*, any and all marketing directly related to the Discount Card without Partners In Health Care's prior approval. In addition, the Marketing Agreements require the marketers, including the Marketer Defendants, to use phone and/or sales scripts provided by Partners In Health Care.

19. Partners In Health Care typically handles the billing of consumers whom its marketers, including the Marketer Defendants, enroll into the Discount Card program. Customer service relating to such consumers is handled by both Partners In Health Care and its marketers.

### Defendants Target Consumers In Need of Health Insurance.

20. Defendants' fraudulent scheme preys on consumers searching for health insurance. The consumers to whom Defendants pitch the supposed "health insurance plan" typically do not have health insurance, or pay very high premiums for their health insurance, because they have lost their jobs or have been diagnosed with pre-existing medical conditions.

21. Defendant Partners In Health Care's marketers use various methods to pitch the Discount Card to consumers. Many of the consumers initially submit their contact information to lead-generation websites that claim to provide consumers with information about health insurance plans. These consumers provide their contact information to the websites with the expectation of obtaining information about health insurance. Some of Partners In Health Care's marketers then make outbound calls to those consumers in response to the consumers' requests for information on health insurance.

22. Some consumers become aware of the Discount Card through Spanish-language radio advertisements run by the Marketer Defendants, which represent that "everyone qualifies" for the "health plan" and that "it doesn't matter, if you have papers or not, if you have an existing

7

illness or if you are getting old....You will also be able to see general practice physicians, specialists, access to laboratories, medicines, surgery and emergency care." The radio advertisements also falsely state or imply that the Discount Card is a qualified health insurance plan under the Patient Protection and Affordable Care Act (Pub. L. 111-148, 124 Stat. 119, H.R. 3590), sometimes referred to as "Obamacare."

23. Partners In Health Care's marketers, including the Marketer Defendants, tell consumers seeking health insurance who have seen the websites or heard the radio ads that they have what the consumer is seeking.

### Partners In Health Care's Marketers Make Material Misrepresentations to Induce Consumers to Purchase the Discount Card.

24. Partners In Health Care's marketers, including the Marketer Defendants, tell consumers that, for a one-time enrollment fee and a monthly payment, consumers will receive affordable health insurance that provides comprehensive medical coverage.

25. On many occasions, Partners In Health Care's marketers, including the Marketer Defendants, have referred to the monthly payments consumers must make as "premiums," or included other insurance terms of art in their sales pitches, such as "co-pay," "deductible," "coverage," and "pre-existing condition."

26. Partners In Health Care's marketers, including the Marketer Defendants, often pressure consumers to purchase the "health insurance plan" immediately, stating that it is available at low-cost for a limited time only or that the plan will be more expensive after "Obamacare" takes effect.

27. Partners In Health Care's marketers, including the Marketer Defendants, often tell consumers that the "health insurance plan" is widely accepted by doctors in the consumers' geographical areas, and in some instances, have even provided consumers a list of available

8

health care providers. But when consumers look for a provider after purchasing the "plan," they discover that the Discount Card is virtually worthless — many or all of the providers listed do not accept the Discount Card or are otherwise unavailable to the consumers.

28. Once consumers express interest in purchasing the "health insurance plan" — believing it to be, based on the telemarketers' misrepresentations, health insurance — Partners In Health Care's marketers, including the Marketer Defendants, arrange for payment by asking for the consumers' bank account or credit card information.

29. Partners In Health Care's marketers, including the Marketer Defendants, upload consumers' information into an internet-based customer-service interface to which the Seller Defendants also have access.

30. Partners In Health Care's marketers, including the Marketer Defendants, also guide consumers through a "verification" process that consists of a series of recorded yes-or-no questions. In some instances during the verification process, Partners In Health Care's marketers, including the Marketer Defendants, have hurriedly and nearly inaudibly asked consumers to acknowledge that they understand they are buying a medical discount plan and not health insurance or a "major medical" policy. When some consumers have objected to affirming this verification question, telemarketers have assured such consumers that the medical discount terminology is used only for the verification process, while re-affirming that the consumers are, in fact, purchasing a health insurance plan.

31. Partners In Health Care's marketers, including the Marketer Defendants, fail to disclose to consumers in a clear and conspicuous manner that, rather than buying health insurance, consumers are buying a medical discount card.

32. Following completion of the verification questions, Partners In Health Care's marketers, including the Marketer Defendants, tell consumers that they will receive information about their purchase in the mail.

33. After Partners In Health Care obtains the consumers' billing information from its marketers, including the Marketer Defendants, it charges the consumers' bank accounts or credit cards an enrollment fee and recurring monthly charges, which vary depending upon the plan purchased, both ranging from $99 to several hundred dollars. Partners In Health Care frequently waits, however, more than a week before shipping the Discount Card package to consumers.

34. Consumers typically receive a handbook and medical discount cards in the mail more than 10 days after the date of purchase.

35. Partners In Health Care pays its marketers, including the Marketer Defendants, a portion of the upfront and recurring fees it receives from consumers that purchase the Discount Card.

36. In contrast with the oral representations of its marketers, including the Marketer Defendants, the written materials Partners In Health Care sends to consumers state that the Discount Card is not health insurance. A careful review of these written materials reveals that the Discount Card merely purports to provide consumers with access to certain pre-negotiated discounts on healthcare services, sometimes coupled with other potential limited benefits, such as partial reimbursement for certain doctor and hospital visits. The cards also include the written disclaimer: "Not Insurance."

37. Most consumers who notice the "Not Insurance" language on the cards are surprised to learn that they purchased a medical discount card of little or no worth, and not medical insurance.

10

38. Once consumers learn that they are not, in fact, receiving health insurance, they discover that they will encounter significant obstacles to obtain a refund. When consumers call Partners In Health Care or the Marketer Defendants, Defendants tell consumers — for the first time — that they only had 10 days from the date of purchase to obtain a full refund. Neither Partners In Health Care nor its Marketer Defendants discloses the 10-day refund policy at the time of sale.

39. Partners In Health Care delays mailing the Discount Card and related materials so that consumers do not receive the Discount Card and related materials until after the undisclosed 10-day refund period has expired.

40. In many instances, consumers have informed Partners In Health Care representatives, including Gary L. Kieper himself, that the Marketer Defendants represented the Discount Card as health insurance. Similarly, consumer complaints filed with third parties, such as local branches of the Better Business Bureau, report that Partners In Health Care and its marketers, including the Marketer Defendants, have marketed the Discount Card as health insurance. These third parties have forwarded consumers' complaints to Partners In Health Care. Partners In Health Care and Gary L. Kieper know or consciously avoid knowing that the Marketer Defendants misrepresent central characteristics of Partners In Health Care's goods or services.

41. Consumers have been unable to use the Discount Card for services typically covered by health insurance.

## VIOLATIONS OF THE FTC ACT

42. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

43. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## Count I
### Misrepresentations in Violation of Section 5 of the FTC Act
### (As to All Defendants)

44. In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of the Discount Card, Defendants have represented, directly or indirectly, expressly or by implication, that the Discount Card is health insurance, or the equivalent of such insurance.

45. In truth and in fact, the Discount Card is not health insurance, or the equivalent of such insurance.

46. Therefore, Defendants' representations, as set forth in Paragraph 44, above, are false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TSR

47. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

48. Defendants are "seller[s]" and/or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §§ 310.2(aa), (cc), (dd).

49. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer.

12

16 C.F.R. § 310.3(a)(2)(iii). Likewise, the TSR prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

50.     The TSR prohibits persons from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in deceptive telemarketing acts or practices in violation of 16 C.F.R. §§ 310.3(a), (c) or (d) or § 310.4. 16 C.F.R. § 310.3(b).

51.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II
### Deceptive Telemarketing Calls in Violation of the TSR
### (As to Defendants Partners In Health Care and Gary L. Kieper)

52.     In numerous instances, in connection with the advertising, telemarketing, promoting, offering for sale, or sale of the Discount Card, Defendants Partners In Health Care and Gary L. Kieper have misrepresented, directly or indirectly, expressly or by implication, that the Discount Card is health insurance, or the equivalent of such insurance.

53.     The acts or practices of Defendants Partners In Health Care and Gary L. Kieper, as described in Paragraph 52, above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(iii) & (a)(4).

## Count III
### Assisting and Facilitating Deceptive Telemarketing Acts or Practices in Violation of the TSR
### (As to Defendants Partners In Health Care and Gary L. Kieper)

54. In numerous instances, Defendants Partners In Health Care and Gary L. Kieper provided substantial assistance or support to telemarketers of the Discount Card, whom Partners In Health Care and Gary L. Kieper knew, or consciously avoided knowing, were engaged in violations of the TSR set forth in Count III of this Complaint.

55. The acts or practices of Defendants Partners In Health Care and Gary L. Kieper, as described in Paragraph 54, above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

56. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their and their telemarketers' unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

57. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

58. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers or other persons resulting from Defendants' violations of the TSR, including the rescission and reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b; Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b); and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing Defendants' assets, appointment of a receiver, immediate access, and financial accounting.

B. Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint.

C. Enter a permanent injunction to prevent future violations of the FTC Act, the Telemarketing Act and the TSR by Defendants.

D. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the Telemarketing Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

  E. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: _____, 2014    Respectfully submitted,

              Jonathan E. Nuechterlein
              General Counsel

              */s/ Gary L. Ivens*
              Gary L. Ivens (Special Bar No. A5500671)
              Christopher E. Brown (Special Bar No. A5501993)
              FEDERAL TRADE COMMISSION
              600 Pennsylvania Avenue, NW, CC-8528
              Washington, DC  20580
              (202) 326-2330, givens@ftc.gov (Ivens)
              (202) 326-2825, cbrown3@ftc.gov (Brown)
              (202) 326-3395 (Fax)

              *Attorneys for Plaintiff*
               *FEDERAL TRADE COMMISSION*