# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

FILED by ___ D.C.

AUG 2 5 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. - MIAMI

FEDERAL TRADE COMMISSION,          )
                                    )
        Plaintiff,                  )   Case No. 14-23109
                                    )                CIV-SCOLA
        v.                          )   MEMORANDUM IN SUPPORT OF
                                    )   PLAINTIFF'S MOTION FOR AN *EX*
PARTNERS IN HEALTH CARE            )   *PARTE* TEMPORARY RESTRAINING
        ASSOCIATION, INC. *et al.*, )   ORDER
                                    )
        Defendants.                 )
                                    )

TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii-iv

I.    Introduction ...........................................................................................................1

II.   The Defendants ....................................................................................................2

III.  Statement of Facts. ..............................................................................................3

        A.   Defendants' Violative Business Practices. .............................................3

               1.   The Deceptive Sales Pitch ............................................................3

               2.   Defendants' "Verifications" of the Deceptive Sales ....................7

               3.   The Nearly Valueless PIHC Medical Discount Card .................8

               4.   Defendants Make Refunds Nearly Impossible to Obtain .........10

        B.   Other Law Enforcement Actions ..........................................................11

IV.   Argument. ...........................................................................................................12

        A.   This Court Has the Authority to Grant the Requested Relief. ............12

        B.   A Temporary Restraining Order is Appropriate and Necessary. .......13

               1.   The FTC is Likely to Succeed on the Merits ..............................13

                       a.   Defendants have Violated the FTC Act. .......................13

                       b.   PIHC and Kieper Have Violated the TSR .....................15

                       c.   The Individual Defendants Are Personally Liable for the
                            Unlawful Acts and Practices Alleged in the FTC's Complaint. ...........16

               2.   The Equities Tip Decidedly in the Public's Favor. ....................18

        C.   The Proposed *Ex Parte* TRO is Appropriate. ......................................18

V.    Conclusion ..........................................................................................................20

# TABLE OF AUTHORITIES

## Federal Cases

*AT&T Broadband v. Tech Commc'n, Inc.*, 381 F.3d 1309 (11th Cir. 2004) .............................. 12

*FTC v. 1st Guar. Mortgage Corp.*, No. 09-61840-Civ (S.D. Fla. Nov. 17, 2009)..................... 19

*FTC v. 7051620 Canada, Inc.*, Case No. 1:14-cv-22132 (S.D. Fla. June 12, 2014).................. 19

*FTC v. AFD Advisors, LLC*, Case 13-cv-6420 (N.D. Ill.)..................................................... 1

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999)......................................................... 17

*FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989) .......................................... 16, 17

*FTC v. Bay Area Bus. Council*, 423 F.3d 627 (7th Cir. 2005)................................................ 16

*FTC v. Consumer Health Benefits Association et al.*, 1:10-cv-03551 (E.D.N.Y) ........................ 1

*FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196 (9th Cir. 2006)................................................ 14

*FTC v. Fid. ATM, Inc.*, No. 06-81101-Civ (S.D. Fla. Nov. 29, 2006) ...................................... 19

*FTC v. First Universal Lending, LLC*, No. 09-82322-CIV (S.D. Fla. Nov. 19, 2009).............. 19

*FTC v. FMC Counseling Services, Inc.*, Case No. 0:14-cv-61545 (S.D. Fla. July 7, 2014)...... 19

*FTC v. FTN Promo., Inc.*, 2008 WL 821937 (M.D. Fla. March 26, 2008)................................ 16

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996)..................................................... 12, 19

*FTC v. Health Care One, LLC*, No. 8:10-cv-01161 (C.D. Cal.).................................................. 1

*FTC v. Home Assure, LLC*, 2009 U.S. Dist. LEXIS 32055 (M.D. Fla. Apr. 16, 2009)............ 13

*FTC v. IAB Marketing Associates, LP*, Case No. 0:12-cv-61830-RNS (S.D. Fla.)............... 1, 19

*FTC v. Integrity Mkt'g Team, Inc.*, No. 07-61152-Civ (S.D. Fla. Aug. 15, 2007) .................. 19

*FTC v. Jordan Ashley*, 1994 U.S. Dist. LEXIS 7494 (S.D. Fla. Apr. 5, 1994)........................... 17

*FTC v. Kirkland Young, LLC*, No. 09-23507-CIV (S.D. Fla. Nov. 19, 2009)........................... 19

*FTC v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011)................................................................... 13

*FTC v. People Credit First, LLC*, 244 Fed. Appx. 942 (11th Cir. 2011) .................................. 13

*FTC v. Platinum Health Plus, LLC*, Civ. No. 05-22465 (S.D. Fla.) ............................................ 1

*FTC v. Premier Precious Metals, Inc.*, Case No. 0:12-cv-60504 (S.D. Fla. Mar. 20, 2012)..... 19

*FTC v. Prime Legal Plans LLC*, Case No. 0:12-cv-61872 (S.D. Fla. Sept. 24, 2012).............. 19

*FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320 (M.D. Fla. 2010)................................ 14

*FTC v. Shopper Systems, LLC*, Case No. 0:12-cv-23919 (S.D. Fla. Oct. 31, 2012) ................ 19

*FTC v. SlimAmerica, Inc.*, 77 F. Supp.2d 1263 (S.D. Fla. 1999)..............................14

*FTC v. Southeast Trust, LLC*, Case No. 12-cv-62441 (S.D. Fla. Dec. 11, 2012) ...................19

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) .........................................14

*FTC v. Sun Ray Trading, Inc.*, No. 05-20402-Civ (S.D. Fla. Feb. 10, 2005)...........................19

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)..................................13, 14

*FTC v. U.S. Mortgage Funding, Inc.*, No. 11-CV-80155 (S.D. Fla. Feb. 20, 2011) ...............19

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984)......................................12, 19, 20

*FTC v. United States Benefits, LLC*, Civ. No. 3:10-0733 (M.D. Tenn.) ....................................1

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) ......................................13

*FTC v. USA Bevs., Inc.*, 2005 U.S. Dist. LEXIS 39075 (S.D. Fla. 2005) ...............13, 18, 19, 20

*FTC v. USA Fin., LLC*, 415 Fed. Appx. 970 (11th Cir. 2011) ....................................16

*FTC v. Wash. Data Res.*, 2009 U.S. Dist. LEXIS 116091 (M.D. Fla. Dec. 7, 2009) ................13

*FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) ..........................8

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) .........................................16

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ...............13, 18, 19

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ....................................16

*FTC v. World Wide Factors*, Ltd., 882 F.2d 344 (9th Cir. 1989) .........................13, 18

*FTC v. Your Yellow Pages, Inc.*, Case No. 1:14-cv-22129 (S.D. Fla. June 12, 2014) .............19

*FTC. v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) .............13, 14, 16, 19

*Leone Indus. v. Assoc. Packaging, Inc.*, 795 F. Supp. 117 (D.N.J. 1992)..................................19

*Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988)............................................16

*SEC v. First Fin. Group*, 645 F.2d 429 (5th Cir. 1981) .........................................20

## Federal Statutes

15 U.S.C. § 45(a)....................................................................................1

15 U.S.C. § 53(b)...................................................................................12

**Federal Regulations and Other Sources**

16 C.F.R. § 310.3(a)(4) ........................................................................... 15

16 C.F.R. § 310.3(b) ............................................................................... 15

16 C.F.R. §310.3(a)(2)(iii) ...................................................................... 15

Colin Gordon, Ph.D., *Not Your Father's Health Insurance:  Discount Medical Plans and the*

*Health Care Crisis* (The Iowa Policy Project, Dec. 2010) ...................................................... 1

Federal Rule of Civil Procedure 65(b) .................................................................... 19

## I.   INTRODUCTION

The Federal Trade Commission ("FTC") respectfully requests that the Court pull the plug on defendants' inimical health insurance scam that lures consumers with promises of affordable health insurance but actually provides nearly valueless "medical discount" cards.[1]  Based on defendants' misrepresentations that they are selling health insurance, consumers pay defendants an upfront enrollment fee and monthly payments ranging from approximately $99 to several hundred dollars, but remain uninsured. Over the course of the last few years, defendants have taken in millions of dollars from victimized consumers.[2]  Defendants' egregious marketing practices violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits deceptive and unfair acts or practices in or affecting commerce, as well as the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

Defendants have injured numerous consumers across the country, and continue to harm additional consumers on a daily basis.  To immediately halt their deceptive

---

[1] The FTC submits two volumes of exhibits in support of this Motion, including, among other exhibits:  (1) sworn declarations from 23 consumer victims of defendants' scheme; (2) transcripts of 12 undercover calls between FTC investigators – posing as consumers seeking to purchase health insurance – and defendants' representatives; and (3) documentary evidence that the FTC received from state agencies, financial institutions, and the Better Business Bureau.  References to exhibits appear as "Px. [number]."  Declarations are cited as "(Px. [number], [name] Dec.)," and, where appropriate, include citations to specific paragraphs ("¶") and pertinent attachments ("Att. [letter]").

[2] Sadly, defendants are not the first players in the health-insurance/medical-discount-card switcheroo industry, a scam that resulted in substantial consumer harm.  The FTC has brought a number of enforcement actions against sellers and marketers of medical discount plans such as those at issue here.  *See, e.g., FTC v. AFD Advisors, LLC,* Case No. 13-cv-6420 (N.D. Ill.); *FTC v. IAB Marketing Associates, LP,* Case No. 0:12-cv-61830-RNS (S.D. Fla.); *FTC and State of Tennessee v. United States Benefits, LLC,* Civ. No. 3:10-0733 (M.D. Tenn.); *FTC v. Health Care One, LLC,* No. 8:10-cv-01161 (C.D. Cal.); *FTC v. Consumer Health Benefits Association et al.,* 1:10-cv-03551 (E.D.N.Y); *FTC v. Platinum Health Plus, LLC,* Civ. No. 05-22465 (S.D. Fla.); *See also* Colin Gordon, Ph.D., *Not Your Father's Health Insurance:  Discount Medical Plans and the Health Care Crisis* (The Iowa Policy Project, Dec. 2010) (analysis of the controversial association benefits/medical discount plans industry), *available at* www.iowapolicyproject.org/2010docs/101216-discountplans.pdf (last visited Aug. 6, 2014).

injurious practices and preserve assets for potential redress to consumer victims, the FTC seeks an *ex parte* temporary restraining order ("TRO"), enjoining defendants from continuing their deceptive sales practices and ordering ancillary equitable relief, including: an asset freeze, the appointment of a temporary receiver, immediate access to business premises and records, financial reporting, limited expedited discovery, and an order to show cause why a preliminary injunction should not issue. These measures are necessary to prevent continued consumer injury, dissipation of assets, and destruction of evidence, thereby preserving this Court's ability to provide effective final relief to the victims of this scheme.

## II.     THE DEFENDANTS

This case involves two corporate and three individual defendants: PIHC and its principal Gary Kieper, as well as United Solutions Group Inc., one of PIHC's largest marketing partners, and its principals, Constanza Gomez Vargas and her son Walter Vargas.

*PIHC* is a for-profit Wisconsin corporation, formed in late 2005, with its principal office at 520 South Westland Drive, Appleton, Wisconsin.[3] *Gary Kieper* is its president and sole officer. There are no directors.[4] PIHC mails the "medical discount" cards to consumers who thought that they were purchasing health insurance.[5]

---

[3] The Better Business Bureau gives PIHC an "F-rating." Px. 30, Vera Dec. ¶ 16; Px. 43.

[4] Px. 41.

[5] Px. 1, Avelar Dec. ¶¶ 2, 4-5, 6, 8; Px. 2, Boertman Dec. ¶¶ 2-3, 6; Px. 3, Catania Dec. ¶¶ 3-4 (represented as Blue Cross/Blue Shield health insurance); Px. 4, Colon Dec. ¶¶ 6, 9, 15; Px. 5, Epp Dec. ¶¶ 2-3; Px. 6, Garcia Dec. ¶¶ 2-4; Px. 7, Keel Dec. ¶¶ 3-5, 8; Px. 8, Kemery Dec. ¶¶ 4-6, 8; Px. 9, Krahn Dec. ¶¶ 5, 10, 8; Px. 10, Krayer Dec. ¶¶ 2-3; Px. 11, Lewis Dec. ¶¶ 4-6; Px. 12, McCormick Dec. ¶¶ 3, 4, 7, 9; Px. 13, Monroe Dec. ¶¶ 4, 6; Px. 14, Dec. ¶¶ 3, 4, 6; Px. 15, Perez Dec. ¶¶ 2, ; Px. 16, Ramey Dec. ¶¶ 3-4, 9; Px. 17, Reyna Dec. ¶¶ 2-5, 7; Px. 18, Smith Dec. ¶¶ 3-4, 6; Px. 19, Sweetman Dec. ¶¶ 4, 6, 10; Px. 20, Webb Dec. ¶¶ 6, 8; Px. 21, Winters Dec. ¶¶ 3-5, 7; Px. 22, B. Sheffield Dec. ¶ 7; Px. 23, M. Sheffield Dec. ¶ 8.

*United Solutions Group Inc.* is a Florida for-profit corporation with its principal office at 28 West Flagler Street, Miami, Florida.[6] *Constanza Gomez Vargas* is active in United Solutions Group's management and operation[7] and her son, *Walter Vargas*, is its president.[8]  United Solutions Group runs Spanish-language radio advertisements offering consumers health insurance, but, through a contractual agreement with PIHC and Kieper, United Solutions Group actually sells PIHC's "medical discount" cards.[9]

## III.   STATEMENT OF FACTS

Defendants use a bait-and-switch marketing scheme to sell PIHC's medical discount cards to consumers under the pretense that consumer are actually buying health insurance.  Defendants falsely claim that their "health insurance plans" provide comprehensive coverage at low cost to needy and vulnerable consumers; in reality, consumers receive a nearly worthless medical discount card.

### A.   Defendants' Violative Business Practices

#### 1.   The Deceptive Sales Pitch

PIHC markets its medical discount cards through numerous third-party marketers that offer health insurance or other medical benefits "plans" to consumers via telemarketing, Spanish-language radio advertisements, television advertisements, and

---

[6] Px. 42.  United Solutions Group was formerly known as Debt Relief Experts Inc.  State of Florida corporate records show that the company changed its name in September 2013.  *Id.*

[7] In late 2010, Constanza Gomez Vargas, using the title "Marketing Director," signed the Marketing Agreement that established the relationship between United Solutions Group and PIHC.  *See* Px. 47 at pp. 6-7.  Similarly, in response to a consumer complaint about United Solutions Group forwarded to PIHC by the BBB, Gary Kieper wrote that United Solutions Group is "owned and operated by Constanza Vargas."  Px. 32, Kraemer Dec. ¶ 5; Px. 44.  She appears in the Spanish-language radio advertisement that United Solutions Group pays to broadcast across the country.  Px. 30, Vera Dec. ¶ 18; Px. 46 (transcript of the radio advertisement).

[8] Px. 42.

[9] *See* fn.7, *supra*.

the internet.[10]  PIHC oversees the methods used by its marketers, including United Solutions Group.  The marketing agreements between PIHC and its marketers state that "no sales, marketing or other promotional materials as they directly relate to the [PIHC] Program may be distributed without PIHC's prior approval, which approval shall not be unreasonably withheld."[11]  Similarly, the marketing agreement between PIHC and United Solutions Group requires the latter to use "phone and or sales scripts … provided by PIHC."[12]

United Solutions Group pays Spanish language radio stations to air advertisements that either directly state or heavily imply that consumers can meet Affordable Care Act requirements by purchasing the "health plans" United Solutions Group offers and PIHC sells.[13]  United Solutions Group's telemarketers frequently repeat these representations to consumers who call the telephone number in the advertisements.[14]  Other PIHC marketers use leads that they obtain from websites into

---

[10]  Px. 1, Avelar Dec. ¶ 2 (radio ad); Px. 2, Boertman Dec. ¶ 2 (received an automated telemarketing call); Px. 3, Catania Dec. ¶¶ 3-4 (TV ad); Px. 4, Colon Dec. ¶ 4 (telemarketing call after internet search); Px. 6, Garcia Dec. ¶ 2 (radio ad); Px. 7, Keel Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 8, Kemery Dec. ¶¶ 3-4 (telemarketing call after internet search); Px. 9, Krahn Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 10, Krayer Dec. ¶ 2 (television ad); Px. 11, Lewis Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 12, McCormick Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 13, Monroe Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 14, OlginDec. ¶¶ 2-3 (telemarketing call after internet search); Px. 15, Perez Dec. ¶ 2 (radio ad); Px. 16, Ramey Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 17, Reyna Dec. ¶ 2-3 (radio ad); Px. 18, Smith Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 20, Webb Dec. ¶¶ 2-3 (telemarketing call after internet search); Px. 21, Winters Dec. ¶ 3 (telemarketing call after internet search); Px. 22, B. Sheffield Dec. ¶ 3 (telemarketing call after internet search).

[11]  Px. 30, Vera Dec. ¶ 20.  An investigator employed by Wisconsin's Department of Agriculture, Trade and Consumer Protection interviewed Kieper while investigating complaints from Wisconsin consumers about PIHC's medical-discount plans.  Kieper also provided some marketing agreements to her.  *Id.*

[12]  Px. 47.

[13]  Px. 15, Perez Dec. ¶ 2.

[14]  Px. 1, Avelar Dec. ¶ 5; Px. 15, Perez Dec. ¶¶ 2-3; Px. 17, Reyna Dec. ¶¶ 4, 6.

which consumers enter their contact information after having searched for information about buying health insurance.[15]

Sometimes, PIHC's marketers expressly tell consumers that the "plan" they are selling is a "health insurance policy," "health plan," or satisfies requirements under "Obamacare."[16]  At other times, PIHC's marketers are less explicit,  referring to the monthly payments consumers must make as "premiums," or including other insurance terms of art in their sales pitches, such as "co-pay," "deductible," "coverage," and "pre-existing condition."[17]

PIHC's marketers uniformly leave consumers with the impression and expectation that they are purchasing health insurance that provides coverage for every aspect of health care, including, but not limited to, doctor visits, hospital stays, laboratory services, emergency room visits and prescription benefits.[18]  Some consumers have even cancelled their *bona fide* health insurance plans based upon defendants' false representations that they sell health insurance.[19]  Based upon such

---

[15]  *See* fn.10, *supra.*

[16]  Px. 1, Avelar Dec. ¶¶ 2, 4-5; Px. 2, Boertman Dec. ¶¶ 2-3; Px. 3, Catania Dec. ¶¶ 3-4; Px. 4, Colon Dec. ¶¶ 6, 9; Px. 5, Epp Dec. ¶ 2; Px. 6, Garcia Dec. ¶¶ 2-3; Px. 7, Keel Dec. ¶¶ 3-5; Px. 8, Kemery Dec. ¶¶ 4-; Px. 9, Krahn Dec. ¶¶ 5, 10; Px. 10, Krayer Dec. ¶¶ 2-3; Px. 11, Lewis Dec. ¶¶ 4, 6; Px. 12, McCormick Dec. ¶¶ 3, 4, 9; Px. 13, Monroe Dec. ¶ 4; Px. 14, Olgin Dec. ¶¶ 3, 4, 6; Px. 15, Perez Dec. ¶ 2, ; Px. 16, Ramey Dec. ¶¶ 3-4; Px. 17, Reyna Dec. ¶¶ 2-5; Px. 18, Smith Dec. ¶¶ 3-4; Px. 19, Sweetman Dec. ¶¶ 4, 6; Px. 20, Webb Dec. ¶ 6; Px. 21, Winters Dec. ¶¶ 3-5; Px. 22, B. Sheffield Dec. ¶ 5; Px. 23, M. Sheffield Dec. ¶ 6.

[17]  Px. 3, Catania Dec. ¶ 3; Px. 4, Colon Dec. ¶¶ 7, 9; Px. 6, Garcia Dec. ¶ 3; Px. 7, Keel Dec. ¶ 3; Px. 9 Krahn Dec. ¶¶ 5; Px. 10, Krayer Dec. ¶ 4; Px. 11, Lewis Dec. ¶ 3; Px. 12, McCormick Dec. ¶ 3; Px. 13, Monroe Dec. ¶ 4; Px. 14, Olgin Dec. ¶ 3; Px. 15, Perez Dec. ¶ 3; Px. 16, Ramey Dec. ¶ 4; Px. 18, Smith Dec. ¶ 3; Px. 19, Sweetman Dec. ¶ 4; Px. 20, Webb Dec. ¶ 6; Px. 21, Winters Dec. ¶ 5.

[18]  Pxs. 1-23, *passim.*

[19]  Px. 20, Webb Dec. ¶¶ 3-6, 12 (cancelled his Blue Cross/Blue Shield plan and is uninsured while he waits for another open season); Px. 22, B. Sheffield Dec. ¶¶ 3-4, 6 (requested that his employer cancel his work-sponsored health insurance after purchasing PIHC's product because PIHC led him and his wife to believe he was purchasing insurance; fortunately for the declarant, he learned that PIHC was not in fact, selling health insurance before his employer entered his cancellation request, Px. 22, B. Sheffield Dec. ¶ 9).

false representations, consumers agree to pay PIHC's marketers an enrollment fee and monthly payment, both ranging from $99 to several hundred dollars, to obtain health insurance.[20]  In reality, defendants sell consumers a virtually worthless medical discount card.

Two undercover calls made by FTC investigators confirm consumers' experiences.  A Spanish-speaking FTC investigator recently made an undercover buy from United Solutions Group.  The United Solutions Group telemarketer assured the investigator that she was purchasing insurance that would allow her to "call your doctor specifically," and which included a "free" dental plan, vision plan and hearing plan as additional benefits to the "basic care" offering.[21]  The telemarketer said that the "basic services" offered include "emergency health care, planned health care, access to hospitalization and surgery, ... [and] all types of lab tests: Pap-test, x-rays, tomography, for all of this, you will have coverage."[22]  The telemarketer later told the investigator that her co-pay for general doctor visits would be "about $15" and for specialists, "$20 to $25," and that the plan covered "75% to 80%" of the cost for hospitalization and surgery.[23]  In another undercover call, the United Solutions Group telemarketer told an English-speaking FTC investigator that the "health plan" would have co-pays ranging from $10 to $30 and would cover emergencies, lab tests, x-rays and "everything," and assuring her that "if you have a doctor, ... you still can go to your doctor."[24]

---

[20]  Px. 1, Avelar Dec. ¶ 6; Px. 2, Boertman Dec. ¶ 5; Px. 3, Catania Dec. ¶ 4; Px. 4, Colon Dec. ¶ 10; Px. 5, Epp Dec. ¶ 2; Px. 6, Garcia Dec. ¶ 3; Px. 7, Keel Dec. ¶ 6; Px. 8, Kemery Dec. ¶ 6; Px. 9, Krahn Dec. ¶ 7; Px. 10, Krayer Dec. ¶¶ 3; Px. 11, Lewis Dec. ¶ 4; Px. 12, McCormick Dec. ¶ 6; Px. 13, Monroe Dec. ¶ 5; Px. 14, Olgin Dec. ¶ 4; Px. 15, Perez Dec. ¶ 3; Px. 16, Ramey Dec. ¶ 4; Px. 17, Reyna Dec. ¶ 6; Px. 18, Smith Dec. ¶ 5; Px. 19, Sweetman Dec. ¶ 6; Px. 20, Webb Dec. ¶ 6; Px. 21, Winters Dec. ¶ 6; Px. 22, B. Sheffield Dec. ¶ 5; Px. 23, M. Sheffield Dec. ¶¶ 6.

[21]  Px. 38 at p. 6, lines 1-13; p. 8, lines 2-4.

[22]  Px. 38 at p. 6, lines 13-18.

[23]  Px. 38 at p. 11, lines 18-20.

[24]  Px. 33 at p. 17, lines 16-18; p. 26, lines 2-13; p. 6, lines 22-24; p. 16, line 25 – p. 17, line 1.

### 2.    Defendants' "Verifications" of the Deceptive Sales

PIHC's marketers employ a taped verification in which the consumer supplies a payment method and agrees to the enrollment fee and monthly charges.  In response to Better Business Bureau ("BBB") complaints, Kieper submitted to the BBB a few selected verification recordings.  In one of the recordings, among the rapid-fire description of the "plan's" features and listing of disclosures, a guttural, nearly inaudible statement to the effect that the "plan's" benefits are not insurance policies can be heard.[25]  In another, the telemarketer refers to the charges for the "plan" as "premiums."[26]  When some consumers have objected to affirming this verification question, telemarketers have assured such consumers that the medical discount terminology is used only for the verification process, while re-affirming that the consumers are, in fact, purchasing a health insurance plan.[27]

During the undercover verification call with the Spanish speaking Investigator, the United Solutions Group telemarketer failed to disclose that the Investigator was not, in fact, purchasing the promised insurance.[28]  And the telemarketer only once used the term "medical discount plan."[29]  In the undercover verification call with the English speaking Investigator, the United Solutions Group telemarketer begins the verification by disclosing (in English) that she will be verifying the "health plan," but then she launches into a rapid-fire Spanish monologue, at the beginning of which she states, "Usted ha cogido el plan United Solutions, no es seguro médico, which translates to: "You have chosen the United Solutions plan, it is not medical insurance."[30]  The telemarketer never translates the "disclosure" to the English-speaking Investigator.

---

[25]  Px. 30, Vera Dec. ¶ 19.

[26]  *Id.*

[27]  Px. 1, Avelar Dec. ¶ 5.

[28]  Px. 38.

[29]  Px. 38 at p. 22, lines 18-20.

[30]  Px. 33 at p. 30, lines 5-10.

Even if Defendants made clear disclosures during the "verification" calls, which they do not, these "verifications" cannot "unring the bell." The initial sales representation is for health insurance. Even if the verification disclosure were clear and conspicuous, the damage has been done by the defendants' initial representations in the advertisements and the telemarketing sales scripts that the consumer would be buying health insurance.[31]

### 3.    The Nearly Valueless PIHC Medical Discount Card

Only upon receipt and review of the written materials describing the PIHC medical benefits discount card — almost always received after the time to obtain a refund has lapsed — do some consumers realize that the telemarketer actually sold them a medical benefits discount card that is nothing like health insurance.[32]  A careful review of the written documents sent to consumers along with the discount card reveals that the defendants only purport to provide consumers with access to certain pre-negotiated discounts on healthcare services, sometimes coupled with other potential limited benefits, such as partial reimbursement for certain doctor visits and hospital confinements.[33]

Some consumers attempt to use the medical discount card, either because they do not read the text on the card indicating that it "is Not Insurance," provides only "certain pre-negotiated discounts on healthcare services," or because they want to obtain some value from their purchase.  Those consumers report that, when they tried

---

[31] *See, e.g., FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1274-75 (M.D. Fla. 2012) (citing cases).

[32] Px. 1, Avelar Dec. ¶ 8; Px. 2, Boertman Dec. ¶ 6; Px. 4, Colon Dec. ¶ 15; Px. 5, Epp Dec. ¶ 3; Px. 6, Garcia Dec. ¶ 4; Px. 7, Keel Dec. ¶ 8; Px. 8, Kemery Dec. ¶ 8; Px. 9, Krahn Dec. ¶ 8; Px. 11, Lewis Dec. ¶ 5; Px. 12, McCormick Dec. ¶ 7; Px. 13, Monroe Dec. ¶ 6; Px. 15, Perez Dec. ¶ 4; Px. 16, Ramey Dec. ¶ 9; Px. 17, Reyna Dec. ¶ 7; Px. 18, Smith Dec. ¶ 6; Px. 19, Sweetman Dec. ¶ 10; Px. 20, Webb Dec. ¶ 8; Px. 21, Winters Dec. ¶ 7.

[33] *See, e.g.,* Px. 4, Colon Dec. ¶ 14 and Att. B.

to use the card, medical service providers would not accept the card or provide any discount for services typically covered by traditional health insurance plans.[34]

The PIHC packages sent to the undercover FTC investigators after purchasing PIHC's product, like those sent to consumers, contain cards and materials revealing that the discount cards are nothing akin to health insurance.  After receiving the PIHC package, the Spanish speaking Investigator called PIHC to complain that the discount card was not the health insurance she was promised and to seek a refund.[35]  In an attempt to save the sale, the PIHC representative told her that, "This is a medical benefit and discount plan that works like insurance, but we can't, we can't call it insurance, okay?"[36]  The PIHC representative further stated that the plan "is the same as the Obamacare, because … you don't sign a contract … [a]nd if you have a pre-existing condition you are accepted anyway.  Because they don't give you a, a medical checkup.  The same as Obamacare, they don't give you a medical checkup either, okay?"[37]  Later in the call, the PIHC representative offered to email the undercover investigator a list of pediatricians, clinics, and general physicians located near her undercover identity's home address that accepted the "plan."[38]  The Investigator accepted the offer and received the list at her undercover email account.[39]  The Investigator called all of the providers on the list.[40]  None of the providers on the list had either heard of PIHC or accepted PIHC's (or any other) medical discount card for services.[41]

---

[34] Px. 1, Avelar Dec. ¶ 8; Px. 3, Catania Dec. ¶ 5; Px. 9, Krahn Dec. ¶ 9; Px. 12, McCormick Dec. ¶ 7; Px. 13, Monroe Dec. ¶ 8-9; Px. 17, Reyna Dec. ¶ 8.

[35] Px. 30, Vera Dec. ¶ 10 and Att. C; Px. 31, Esparza Dec. ¶ 6.

[36] Px. 39 at p. 36, lines 13-15.

[37] Px. 39 at p. 53, lines 10-12.

[38] Px. 31, Esparza Dec. ¶ 12 and Att. B.

[39] Px. 31, Esparza Dec. ¶ 13.

[40] Px. 31, Esparza Dec. ¶ 13.

[41] *Id.*

### 4. Defendants Make Refunds Nearly Impossible to Obtain.

When consumers seek refunds, defendants inform them, for the first time, that they can only receive a refund within 10 days of purchase, adding insult to consumers' injury. Records that defendant Kieper supplied to the BBB in support of denying refunds show that PIHC waits several days after the marketer enters the consumer's order to ship the medical-discount card.[42] Consumers who purchase the medical discount card almost always receive the PIHC package more than 10 days after paying.[43]

The FTC investigators' undercover buys also reflect the impossibility of obtaining a refund under PIHC's refund policy.[44] The postmark on the Spanish speaking Investigator's PIHC package shows that PIHC mailed it 9 days after purchase.[45] It arrived 13 days after purchase.[46] When she called seeking a refund, the PIHC representative told her that she was past the 10-day limit to receive a refund:

> GRACIELA [PIHC]: That won't be returned to you, this is non-refundable, because unfortunately, you only have ten days to cancel, after you have signed up for the program. So--

---

[42] Both PIHC and its marketers received, and had access to, consumer complaints. Kieper's responses to the BBB and the State of Wisconsin indicate that both PIHC and its marketers have access to the internet-based customer-service software and can read each other's entries, including those that show the consumer's complaint(s). Kraemer Dec. ¶ 6. In addition, many consumers who have complained to the FTC, BBB, and others have stated that they raised their complaints both with PIHC and the PIHC marketer who sold the package. *See, e.g.,* Px. 1, Avelar Dec. ¶¶ 11-12; Px. 8, Kemery Dec. ¶¶ 6, 9; Px. 16, Ramey Dec. ¶¶ 6-8 (spoke to Kieper himself).

[43] Px. 2, Boertman Dec. ¶ 7; Px. 4, Colon Dec. ¶ 12; Px. 7, Keel Dec. ¶ 10; Px. 9, Krahn Dec. ¶ 11; Px. 11, Lewis Dec. ¶ 6; Px. 12, McCormick Dec. ¶ 7; Px. 13, Monroe Dec. ¶ 6; Px. 17, Reyna Dec. ¶ 9; Px. 18, Smith Dec. ¶ 6; Px. 20, Webb Dec. ¶ 10.

[44] Px. 30, Vera Dec. ¶ 9; Px. 31, Esparza Dec. ¶ 5, 20.

[45] Px. 31, Esparza Dec. ¶ 5 and Att. A.

[46] *Id.*

MS. ESPARZA [SPANISH SPEAKING FTC INVESTIGATOR]: Yes, but I received it after, after like 15 days. I received it very late.

GRACIELA: I understand you, I perfectly understand you, but the fact of the matter is that this is what happens. It's only ten days. I know that they don't tell you that when you sign up, but I am telling you.[47]

When the English speaking Investigator's PIHC package arrived 13 days after purchase (also post-marked nine days after she made the undercover buy), she called PIHC to obtain a refund.[48] The United Solutions Group telemarketer told her for the first time that, in order to receive a refund, she was required to cancel within 10 days of enrollment.[49] After she explained that she did not receive the package until 13 days after the date of purchase, the telemarketer told her to return the package to PIHC for a refund.[50] She returned the package to PIHC and has not received a refund, despite including a letter to defendant Kieper noting that she thought she was purchasing health insurance, not a medical discount plan, during the sales call with the United Solutions Group telemarketer.[51]

**B.     Other Law Enforcement Actions**

In addition to Wisconsin's investigation of PIHC's practices after complaints from consumers in that State,[52] the Commissioner of Insurance for the State of Washington recently issued an Order to Cease and Desist prohibiting PIHC and Kieper from conducting business in that State. The Commissioner found that, although they had been selling medical discount plans in Washington, neither PIHC nor Kieper "is authorized to transact insurance in Washington and neither is licensed in Washington

---

[47] Px. 40 at p. 40, lines 21-25; Px. 40 at p. 41, lines 1-10.

[48] Px. 30, Vera Dec. ¶ 9.

[49] *Id.*

[50] Px. 30, Vera Dec. ¶ 9; Px. 34.

[51] Px. 30, Vera Dec. ¶¶ 10, 12-13  and Att. C

[52] *See* fn.11, *supra.*

as a discount medical plan organization."[53]  The Order to Cease and Desist also required PIHC and Kieper to notify Washington residents who purchased a medical discount plan of their right to void the plan and receive a refund.[54]

## IV.     ARGUMENT

The FTC seeks an *ex parte* TRO halting Defendants' ongoing violations of the FTC Act and the TSR.  Additionally, it respectfully requests that the Court:  (1) freeze Defendants' assets to preserve them for potential restitution to victims; (2) appoint a temporary receiver over the corporate defendants to help preserve assets and manage the affairs of the corporate defendants and ascertain whether either of the corporate defendants engages in any lawful, profitable activities; (3) grant the FTC immediate access to the corporate defendants' business premises and records; (4) require defendants to disclose their assets; and (5) allow for expedited discovery.

### A.     This Court Has the Authority to Grant the Requested Relief.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this Court to grant, preliminary and permanent injunctive relief enjoining violations of Section 5 of the FTC Act and "any ancillary relief necessary to accomplish complete justice."[55]  The Court may also enter a temporary restraining order, or other preliminary relief, to preserve the possibility of providing effective final relief.[56]  Such ancillary relief may include an asset freeze to preserve assets for restitution to victims and the appointment of a receiver.[57]

---

[53] Px. 30, Vera Dec. ¶ 17; Px. 45.

[54] Px. 45.

[55] *AT&T Broadband v. Tech Commc'n, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004) (citations omitted).

[56] *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468-69 (11th Cir. 1996); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).

[57] *U.S. Oil & Gas*, 748 F.2d at 1432-34; *AT&T Broadband*, 381 F.3d at 1316.

**B.      A Temporary Restraining Order is Appropriate and Necessary.**

In considering a TRO or preliminary injunction under Section 13(b), this Court must:  (1) determine the likelihood that the FTC will ultimately succeed on the merits; and (2) balance the equities.[58]  The FTC, unlike private litigants, need not prove irreparable injury, which is presumed.[59]  Further, "because irreparable injury is presumed in a statutory enforcement action, the district court need only find some chance of probable success on the merits."[60]  In balancing the equities, "the public interest should receive greater weight" than any private interest.[61]  As demonstrated below, an application of the two prong test to this case warrants the issuance of a temporary restraining order against the Defendants.

**1.      The FTC is Likely to Succeed on the Merits.**

**a.      Defendants Have Violated the FTC Act.**

The voluminous evidence attached to this Motion demonstrates that defendants have violated Section 5(a) of the FTC Act, which prohibits unfair or deceptive practices. An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.[62] "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material."[63]  In determining whether a

---

[58]  *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991).

[59]  *Id.* at 1218.

[60]  *FTC v. Wash. Data Res.*, No. 8:09-cv-2309, 2009 U.S. Dist. LEXIS 116091, *26 (M.D. Fla. Dec. 7, 2009) (citing *FTC v. World Wide Factors*, Ltd., 882 F.2d 344, 347 (9th Cir. 1989)).

[61]  *World Wide Factors, Ltd.*, 882 F.2d at 347; *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. Home Assure, LLC*, 8:09-cv-547-T-23TBM, 2009 U.S. Dist. LEXIS 32055, *3 (M.D. Fla. Apr. 16, 2009); *FTC v. USA Bevs., Inc.*, No. 05-cv-61682, 2005 U.S. Dist. LEXIS 39075, *21-22 (S.D. Fla. Dec. 5, 2005).  *See also FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) ("The public interest in ensuring the enforcement of federal consumer protection law is strong.").

[62]  *FTC v. People Credit First, LLC*, 244 Fed. Appx. 942, 944 (11th Cir. 2011) (following *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003))

[63]  *FTC. v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007).

solicitation is likely to mislead consumers, courts consider the overall "net impression" it creates.[64] "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."[65] Finally, the FTC need not prove actual reliance to establish materiality.[66]

As demonstrated in the Statement of Facts and the evidence attached hereto, Defendants' telemarketers falsely represent to consumers, expressly or by implication, that the nearly worthless medical discount card they sell consumers is major or traditional health insurance, or the equivalent of such insurance.[67] The numerous and pervasive deceptive telemarketing calls include, among others, material misrepresentations about: (1) the very nature of the product (*i.e.*, providing consumers the so-called "medical discount" card as opposed to the promised health insurance); and (2) the acceptance of the "medical discount" card by medical providers. Such misrepresentations are presumed to be material as they are "used to induce the purchase of a particular product or service."[68] As reflected by the attached consumer declarations and the complaints that consumer victims filed with law enforcement agencies and the Better Business Bureau, the misrepresentations have induced consumers to pay significant sums for what Defendants tricked them to believe was traditional health insurance or the equivalent of such insurance.[69]

Thus, there is a strong likelihood that the FTC will succeed in proving that defendants' deceptive practices violate Section 5(a) of the FTC Act.

---

[64] *FTC v. RCA Credit Servs.*, LLC, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010) (citing *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009)).

[65] *Id.* (quoting *FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)).

[66] *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266-67.

[67] *See, supra*, Section III.A.1-4.

[68] *RCA Credit Servs.*, F. Supp. 2d at 1329 (citing *Tashman*, 318 F.3d at 1277); *see also FTC v. SlimAmerica, Inc.*, 77 F. Supp.2d 1263, 1272 (S.D. Fla. 1999).

[69] *See* Section III.A., *supra*.

b.    PIHC and Kieper Have Violated the TSR.

The evidence submitted with this Motion demonstrates that PIHC and Kieper have violated the TSR, which prohibits deceptive and abusive telemarketing acts or practices by telemarketers and sellers.  PIHC and Kieper's false representations – that the nearly worthless medical discount card sold to consumers is health insurance or the equivalent of such insurance – violate Part 310.3(a)(4) of the TSR, which prohibits any "false or misleading statement to induce any person to pay for goods or services ...."[70]

Similarly, PIHC and Kieper have violated the TSR's assisting and facilitating provision by "provid[ing] substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule."[71]  PIHC and Kieper engage telemarketers who misrepresent that they are selling health insurance when, in fact, they are selling nearly worthless "medical discount" cards.  As noted above, such misstatements violate Section 310.3(a)(4) of the TSR.[72]  The misstatements also violate Section 310.3(a)(2)(iii) of the TSR, which prohibits misrepresentation of any "material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."[73]  PIHC and Kieper provide substantial assistance to these telemarketers by, among other things, providing fulfillment — the "medical discount" packages that the telemarketers offer and sell — and providing customer support services on the telemarketers' behalf.  Consumer complaints to Kieper and PIHC, Kieper's responses to the BBB and to the

---

[70]  United Solutions Group and its principals are not included in the TSR Counts because consumers place inbound telemarketing calls to them in response to general advertisements. 16 C.F.R. § 310.6(b)(5).  PIHC and Kieper are included in these Counts because they also utilize outbound telemarketers whose activities fall squarely within the TSR's coverage.

[71]  16 C.F.R. § 310.3(b).

[72]  16 C.F.R. § 310.3(a)(4).

[73]  16 C.F.R. §310.3(a)(2)(iii) .

State of Wisconsin, among other evidence, show that PIHC and Kieper know that these telemarketers are misrepresenting that they are selling insurance when, in fact, they sell nearly worthless medical discount cards.  Thus, PIHC and Kieper have violated the assisting and facilitating provisions of the TSR.

There is, therefore, a strong likelihood that the FTC will succeed in proving that PIHC and Kieper have violated, and continue to violate, the TSR.

> c.   The Individual Defendants Are Personally Liable for the Unlawful Acts and Practices Alleged in the FTC's Complaint.

An individual defendant is liable for injunctive relief and monetary restitution under the FTC Act if the Court finds (1) that he or she participated directly in or had some measure of control over a corporation's deceptive practices and (2) that he or she had actual or constructive knowledge of the practices.[74]  "'Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.'"[75]  Bank signatory authority or acquiring services on behalf of a corporation also evidences authority to control.[76]

The knowledge element does not require the FTC to prove subjective intent to defraud; it may be satisfied by a showing of knowledge of material misrepresentations, reckless indifference to such misrepresentations, or an awareness of a high probability of deception along with an intentional avoidance of the truth.[77]  In addition,

---

[74] *World Media Brokers*, 415 F.3d at 764; *FTC v. Bay Area Bus. Council*, 423 F.3d 627, 636 (7th Cir. 2005); *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989).

[75] *FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995) (quoting *Amy Travel Servs.*, 875 F.2d at 573.); *see also Transnet Wireless Corp.*, 506 F. Supp.2d at 1270 ("An individual's status as a corporate officer gives rise to a presumption of ability to control small, closely-held corporation.").

[76] *FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 974-75 (11 th Cir. 2011).

[77] *USA Fin., LLC*, 415 Fed. Appx. at 974 (11th Cir. 2011) (*citing Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1368 (11th Cir. 1988)); *see also FTC v. FTN Promo., Inc.*, No. 8:07-CV-1279, 2008 WL
*(footnote continues …)*

participation in corporate affairs is probative of knowledge.[78]

Section II of this Memorandum details the role of each individual defendant in the scheme. Gary L. Kieper, for example, is PIHC's president and sole officer. Constanza Gomez Vargas is active in the management of United Solutions Group and her son, Walter Vargas is its president. The individual defendants' ownership of, and executive and managerial positions in, the corporate defendants prove that they each have participated in this scheme and controlled the entities through which it is executed. Through their respective roles in the closely held corporate defendants, they also have gained knowledge of the violations at issue. Moreover, both PIHC and its marketers received, and had access to, consumer complaints. Kieper's responses to the BBB and the State of Wisconsin indicate that both PIHC and its marketers have access to the internet-based customer-service software and can read each other's entries, including those that show the consumer's complaint(s).[79] In addition, many consumers who have complained to the FTC, BBB, and others have stated that they raised their complaints with both PIHC and the PIHC marketer who sold the package.[80]

Thus, the FTC will likely succeed in proving that the individual defendants should be enjoined from continuing the unlawful acts and practices alleged in the Complaint and that the individual defendants are monetarily liable for the consumer injury they have caused.

---

(... *continued footnote*)
821937, *2 (M.D. Fla. March 26, 2008); *FTC v. Jordan Ashley*, No. 93-2257, 1994 U.S. Dist. LEXIS 7494, *11 (S.D. Fla. Apr. 5, 1994).

[78] *FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999); *Amy Travel*, 875 F.2d 564.

[79] *See, e.g.*, Px. 32, Kraemer Dec. ¶ 6.

[80] *See* fn.42, *supra*.

### 2.   The Equities Tip Decidedly in the Public's Favor.

"[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight."[81]  The public interest in this case is compelling – halting Defendants' unlawful and injurious conduct and preserving assets that may be used for restitution to Defendants' numerous victims. Defendants, by contrast, have no legitimate interest in continuing to engage in unlawful acts and practices.[82]

In sum, as the voluminous evidence attached hereto demonstrates that the FTC is likely to succeed on the merits, and the equities tip decidedly in the public's favor, a TRO is warranted.

### C.   The Proposed *Ex Parte* TRO is Appropriate.

The FTC filed this action in order to stop defendants' unlawful acts and practices and to obtain restitution for their victims.  Defendants are engaged in an egregious scheme that has significantly injured numerous consumers across the country.  If defendants receive advance warning of the FTC's action, there is a substantial risk that they will dissipate assets or destroy evidence, which will frustrate the Court's ability to grant the final relief sought.  To preserve the possibility of effective final relief, including victim restitution, the proposed *ex parte* TRO would:  (1) immediately halt the deceptive and unfair conduct; (2) freeze defendants' assets; (3) appoint a temporary receiver over the corporate defendants; (4) grant the FTC and the temporary receiver immediate access to the corporate defendants' premises, records and information; and (5) require defendants to disclose information about the nature and location of their assets.  The TRO with asset freeze is particularly appropriate in this case because all

---

[81] *World Wide Factors*, 882 F.2d at 347; *World Travel Vacation Brokers*, 861 F.2d at 1029; *USA Bevs.*, No. 05-61682, 2005 U.S. Dist. LEXIS 39075, *15.

[82] *See World Wide Factors*, 882 F.2d at 347 ("no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment").

defendants have been made aware of their unlawful practices by consumers, the BBB, and other sources, and the State of Washington banned Kieper and PIHC from doing business there, yet defendants have continued the scheme unabated.[83]

The Eleventh Circuit has repeatedly upheld the authority of district courts to order an asset freeze to preserve the possibility of consumer redress.[84]  And district courts in Florida have frozen defendants' assets in numerous FTC enforcement actions.[85]  As the FTC is likely to succeed in showing that the individual defendants are personally liable for restitution, the asset freeze should extend to their assets as well.[86]

The appointment of the temporary receiver is of critical importance and is appropriate where, as here, there is "imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate."[87]  Where corporate defendants and their mangers and officers have been engaged in

---

[83]  *See also* declaration of Christopher Brown, Esq., pursuant to Federal Rule of Civil Procedure 65(b) , ¶¶ 10-11.

[84]  *See, e.g., Gem Merch. Corp.*, 87 F.3d at 469; *U.S. Oil & Gas Corp.*, 748 F.2d at 1433-34.

[85]  *See, e.g., FTC v. FMC Counseling Services, Inc.*, Case No. 0:14-cv-61545 (S.D. Fla. July 7, 2014) (*ex parte* temporary restraining order with asset freeze, appointment of a receiver, immediate access, and other equitable relief); *FTC v. 7051620 Canada, Inc.*, Case No. 1:14-cv-22132 (S.D. Fla. June 12, 2014) (temporary restraining order with asset freeze and other equitable relief); *FTC v. Your Yellow Pages, Inc.*, Case No. 1:14-cv-22129 (S.D. Fla. June 12, 2014) (temporary restraining order with asset freeze, appointment of a receiver, immediate access, and other equitable relief); *FTC v. Southeast Trust, LLC*, Case No. 12-cv-62441 (S.D. Fla. Dec. 11, 2012); *FTC v. Shopper Systems, LLC*, Case No. 0:12-cv-23919 (S.D. Fla. Oct. 31, 2012); *FTC v. Prime Legal Plans LLC*, Case No. 0:12-cv-61872 (S.D. Fla. Sept. 24, 2012); *FTC v. IAB Marketing Associates, LP*, Case No. 0:12-cv-61830-RNS (S.D. Fla. Sept. 18, 2012); *FTC v. Premier Precious Metals, Inc.*, Case No. 0:12-cv-60504 (S.D. Fla. Mar. 20, 2012); *FTC v. U.S. Mortgage Funding, Inc.*, No. 11-CV-80155 (S.D. Fla. Feb. 20, 2011); *FTC v. First Universal Lending, LLC*, No. 09-82322-CIV (S.D. Fla. Nov. 19, 2009) (same); *FTC v. Kirkland Young, LLC*, No. 09-23507-CIV (S.D. Fla. Nov. 19, 2009); *FTC v. 1st Guar. Mortgage Corp.*, No. 09-61840-Civ (S.D. Fla. Nov. 17, 2009); *FTC v. Integrity Mkt'g Team, Inc.*, No. 07-61152-Civ (S.D. Fla. Aug. 15, 2007); *FTC v. Fid. ATM, Inc.*, No. 06-81101-Civ (S.D. Fla. Nov. 29, 2006); *USA Bevs.*, No. 05-61682-Civ (S.D. Fla. Nov. 4, 2005); *Transnet Wireless Corp.*, No. 05-61559 (S.D. Fla. Sept. 27, 2005); *FTC v. Sun Ray Trading, Inc.*, No. 05-20402-Civ (S.D. Fla. Feb. 10, 2005)

[86]  *World Travel*, 861 F.2d at 1031; *see also Gem Merchandising*, 87 F.3d 466 (upholding use of individual defendants' assets for restitution).

[87]  *Leone Indus. v. Assoc. Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992).

deception, "it is likely that in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of the fraud's victims.[88]  The receiver will help prevent defendants from disposing of ill-gotten funds by identifying, securing and controlling the use of the corporate defendants' assets, as well as marshaling and preserving their records.  The receiver may also assist in determining the full extent of the fraud and identify additional victims.

## IV.   CONCLUSION

The FTC respectfully requests that the Court grant this Motion and issue a proposed temporary restraining order with asset freeze, the appointment of temporary receiver, and order defendants to show cause why a preliminary injunction should not issue to protect consumers from further harm and to help ensure the possibility of effective final relief for defendants' victims.

Respectfully submitted,

Gary L. Ivens (Special Bar No. A5500671)
Christopher E. Brown (Special Bar No. A5501993)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW, CC-8528
Washington, DC  20580
(202) 326-2330, givens@ftc.gov (Ivens)
(202) 326-2825, cbrown3@ftc.gov (Brown)
(202) 326-3395 (Fax)

*Attorneys for Plaintiff Federal Trade Commission*

---

[88] *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981); *see also U.S. Oil & Gas Corp.*, 748 F.2d at 1432 (affirming preliminary injunction that imposed an asset freeze and appointing a receiver); *USA Bevs.*, No. 05-61682, 2005 U.S. Dist. LEXIS 39075, 22-23, *22 ("Appointing a receiver for [the corporate defendant] is essential to ensure that [it] complies with the [court's order], and to prevent the destruction of evidence and the concealment or dissipation of assets.")