Sealed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION, )
)
Plaintiff, )
)
v. )
)
PARTNERS IN HEALTH CARE )
   ASSOCIATION, INC. (also d/b/a/ Partners )
   In Health Care, Inc.), )
GARY L. KIEPER (individually and as officer or )
   director of Partners In Health Care )
   Association, Inc.), )
UNITED SOLUTIONS GROUP INC. (also d/b/a )
   Debt Relief Experts, Inc.), )
WALTER S. VARGAS (individually and as an )
   officer or director of United Solutions Group )
   Inc.), )
CONSTANZA GOMEZ VARGAS (individually )
   and as a director or manager of United )
   Solutions Group Inc.), )
)
Defendants. )
)

FILED by _____ D.C.
AUG 25 2014
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

Case No. 14-23109

**Filed Under Seal**        CIV-SCOLA

CERTIFICATION OF
FEDERAL TRADE
COMMISSION COUNSEL
CHRISTOPHER E. BROWN
PURSUANT TO FED. R. CIV. P.
65(b)(1) IN SUPPORT OF *EX
PARTE* MOTION FOR A
TEMPORARY RESTRAINING
ORDER AND MOTION TO
TEMPORARILY SEAL THE
DOCKET AND ENTIRE FILE

I, Christopher E. Brown, hereby declare as follows:

1.    I am over twenty-one years of age and am a citizen of the United States. I am one of the attorneys representing the Federal Trade Commission (the "FTC") in this action against:

- Partners In Health Care Association, Inc. and Gary L. Kieper (collectively, the "Seller Defendants"); and

- United Solutions Group Inc. also d/b/a Debt Relief Experts, Inc., Walter S. Vargas, and Constanza Gomez Vargas (collectively, the "Marketer Defendants").

2.    I am a member in good standing of the bars of the Commonwealth of Virginia (Bar No. 72765) and the District of Columbia (Bar No. 1010993). My work address is Federal Trade Commission, Division of Marketing Practices, 600 Pennsylvania Avenue, N.W., Mail

Stop CC-8528, Washington, D.C. 20580. Unless indicated otherwise, I have personal knowledge of the facts stated herein and if called as a witness, would competently testify thereto.

3. I submit this certification pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1746 in support of the FTC's *Ex Parte* Motion for a Temporary Restraining Order ("TRO Motion") and in support of the FTC's request that the Temporary Restraining Order ("TRO") be issued without notice to Defendants. I also submit this certification in support of the FTC's Motion to Temporarily Seal the Docket and Entire File, filed contemporaneously with the TRO Motion.

4. Pursuant to Rule 65(b)(1), this Court may issue a TRO without notice to Defendants if "(A) specific facts in an affidavit … clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." For the reasons discussed below, the FTC has not provided Defendants with notice of the filing of this action or the TRO Motion. The interests of justice require that the Court consider the FTC's filings *ex parte*.

## DEFENDANTS' VIOLATIVE BUSINESS PRACTICES

5. The evidence set forth in the TRO Motion, and supporting 47 exhibits filed concurrently herewith, demonstrates that Defendants have engaged in a deceptive bait-and-switch marketing scheme that tricked consumers into buying a nearly worthless medical discount card ("Discount Card") they were told was traditional health insurance.

6. Furthermore, Defendants routinely delay mailing the package containing the Discount Card so that it arrives too late for consumers to qualify for a refund. Consumers learn of Defendants' 10-day refund policy for the first time upon receiving the Discount Card more than 10 days after the date of purchase.

7. Defendants' egregious business practices violate Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which prohibits deceptive practices in or affecting commerce, as well as the Telemarketing Sales Rule, 16 C.F.R. Part 310.

2

## THE PROPOSED TRO

8. The proposed TRO would: (1) immediately halt the deceptive conduct; (2) freeze defendants' assets for potential restitution to victims; (3) appoint a temporary receiver over the corporate defendants; (4) grant the FTC and the temporary receiver immediate access to the corporate defendants' premises, records and information; and (5) require defendants to disclose information about the nature and location of their assets.

## REASONS WHY *EX PARTE* FILING IS NECESSARY

9. There is ample evidence that Defendants have the motivation and opportunity to conceal and dissipate assets and destroy important documents, as demonstrated by, among other evidence, the deceptive nature of their scheme, their blatant disregard for the law and prior investigations of their fraudulent practices, and prior FTC experience with defendants facing financial liability for fraudulent business practices.

### A. Defendants' Disregard for the Law and Prior Investigations

10. As discussed in Section III.B of the TRO Memo, both the Wisconsin Better Business Bureau ("BBB") and Wisconsin Department of Agriculture, Trade and Consumer Protection have previously investigated the Seller Defendants due to numerous complaints from consumers about Defendants' bait-and-switch health insurance scheme. Indeed, Gary L. Kieper's own responses to the BBB and State of Wisconsin, among other evidence, show that the Seller Defendants know their marketers are misrepresenting Discount Cards as traditional health insurance.

11. In addition to Wisconsin's investigations of Defendants' scheme, the Commissioner of Insurance for the State of Washington also conducted an investigation and recently issued an Order to Cease and Desist that prohibits Partners In Health Care, Kieper and their affiliates from conducting business in that State. The Commissioner found that, although they had been selling medical discount plans in Washington, neither Partners In Health Care nor Kieper "is authorized to transact insurance in Washington and neither is licensed in Washington as a discount medical plan organization." The Order to Cease and Desist also required Partners

3

In Health Care, Kieper and their affiliates to notify Washington residents who purchased a medical discount plan of their right to void the plan and receive a refund.

12. As demonstrated by the voluminous evidence attached to the TRO Memo – including declarations from 23 consumer victims and transcripts of 12 undercover calls – the Defendants continue to engage in the same unlawful and prohibited conduct that gave rise to these prior investigations of their business practices.

13. The fact that Defendants have not changed their practices in response to state investigations demonstrates that *ex parte* relief and an order temporarily sealing the docket is needed to stop Defendants from engaging in their unlawful conduct.

14. In light of the fraudulent conduct outlined above and in the FTC's TRO motion, absent the requested *ex parte* relief and an order temporarily sealing the docket, it is reasonably likely that Defendants will destroy documents and dissipate or hide assets, thus putting at risk the Court's ability to render effective ultimate relief to the Defendants' victims.

### B. The FTC'S Experience in Other Actions Involving Fraudulent and Deceptive Practices

15. In the FTC's experience, Defendants involved in deceptive acts and practices who receive advance notice of the filing of an action by the FTC, or of the FTC's intent to file an action, often attempt to undermine the FTC's efforts to preserve the status quo by immediately dissipating or concealing assets or destroying documents. The following examples, provided on information and belief, illustrate the FTC's concern:

> a. In *FTC v. Prime Legal Plans*, No. 12061872 (S.D. Fla. 2012), this Court granted the FTC's motion for a temporary restraining order and asset freeze against the defendants. Nevertheless, defendants, after learning of the FTC's action but before the asset freeze had been fully implemented, immediately directed the transfer of approximately $1.7 million from corporate bank accounts and into accounts held by a relative, a spouse, and a girlfriend. Because this Court had issued an asset freeze, the bank was

4

      able to recover close to $1.5 million of that money, although $197,000 had been spent and was not recoverable.

b. In *FTC v. Khalilan*, No. 10-21788 (S.D. Fla. 2010), this Court granted the FTC's motion for a temporary restraining order and asset freeze, but the banks failed to implement it, and defendant withdrew approximately $72,000 shortly after a receiver took control of the defendants' company. The defendant then filed a police report claiming that a thief had stolen the money. Faced with a contempt action for violating the asset freeze, the defendant's attorney returned $30,000 of the missing money to the receiver, who was also able to recover approximately $14,000 from the banks that had allowed the unlawful withdrawals.

c. In *FTC v. American Entertainment Distributors, Inc.*, No. 04-22431 (S.D. Fla. 2004), this Court entered an asset freeze that froze assets of ten corporate and individual defendants. Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from his bank. Because asset freezes were in place, the FTC was able to compel the individual defendant to return the money.

d. In *FTC v. Transcontinental Warranty, Inc. et al.*, No. 09C 2927 (N.D. Ill. 2009), the Court granted the FTC's motion for a temporary restraining order freezing defendants' assets and appointing a receiver. However, when the receiver and counsel for the FTC arrived at the corporate defendant's premises pursuant to the court's order, hundreds of folders with labels indicating that they contained records of defendants' most recent transactions were found empty. In addition, five computers, including that of the corporate defendant's CFO, were allegedly stolen the night before the receiver and counsel for the FTC arrived at the premises, and various third-party trade debtors of the corporate defendant froze

5

payments due to the corporate defendant, which resulted in extensive litigation over these assets and ultimately cost the receivership estate tens of thousands of dollars.

e. In *FTC v. Global Mktg. Group, Inc. et al.*, No. 06 CV 2272 (M.D. Fla. 2006), the court granted the FTC's *ex parte* motion for a temporary restraining order with an asset freeze, which the FTC served on banks known to hold accounts of defendants. After being served with the order, one of the defendants successfully withdrew over $500,000 from accounts previously unknown to the FTC. Most of these funds were wired to offshore bank accounts. This defendant was ultimately held in contempt of court and fled the country after failing to appear at a show cause hearing.

f. In *FTC v. Dennis Connelly, et al.*, SACV06-701 (C.D. Cal. 2006), the court issued an asset freeze against defendant Dennis Connelly, but declined to grant the FTC's *ex parte* request for an asset freeze against the remaining individual defendants. Upon hearing of the lawsuit from defendant Connelly, the remaining individual defendants proceeded to withdraw almost $1 million from various corporate and personal bank accounts, and subsequently took a vacation to Hawaii.

g. In *FTC v. 4049705 Canada Inc., et al.*, No. 04-CV-4694 (N.D. Ill. 2004), Canadian authorities executed a search warrant on the business premises of Canadian defendants who were engaged in telemarketing fraud. Thereafter, the FTC filed a complaint and motion for a temporary restraining order with an asset freeze, providing notice to defendants. The FTC subsequently discovered that defendants had made several substantial money transfers after receiving notice of the FTC's action, but before the asset freeze was imposed.

6

h. In *FTC v. Unicyber Tech., Inc., et al.*, No. CV 04-1569 LGB (C.D. Cal. 2004), the court granted the FTC's *ex parte* application for a temporary restraining order with asset freeze and appointment of a receiver. Shortly after the FTC served the individual defendant with the TRO, he called his wife, who – at his direction –violated the asset freeze by transferring $405,000 of corporate funds to her father.

i. In *FTC v. Nat'l Consumer Counsel, et al.*, No. SAC CV 04-0474 (C.D. Cal. 2004), the court granted the FTC's *ex parte* application for a temporary restraining order with asset freeze and the appointment of a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer under the control of the corporate defendant that was not under the receivership.

j. In *FTC v. QT, Inc., et al.*, No. 03 CV 3578 (N.D. Ill. 2003), defendants violated a temporary restraining order that the court imposed on them by withdrawing and transferring more than two million dollars from bank account that were to be part of the asset freeze.

k. *In FTC v. Physicians Healthcare Dev., Inc.*, CV-02-2936 (C.D. Cal. 2002), after the court issued the TRO and served it on all counsel, including defense counsel, FTC staff served it on defendants by facsimile. The next day, FTC staff went to the defendants' offices to take control of business records. Staff found the computers and other business records had been removed from the premises and that documents had been shredded. Witnesses advised staff that, on the day of the hearing, they observed defendants' employees removing computers and other items from the business premises. The FTC was unable to recover the removed records.

16. In the FTC's experience, defendants may also learn about a case against them from a docket monitoring service. For example, in *FTC v. Wazzu Corp., et al.*, SAV CV 99-762 (S.D. Cal. 1999), when FTC staff arrived at defendants' business premises to serve a temporary restraining order, it learned that defendants had already learned about the action against them from a monitoring service to which their counsel subscribed. The monitoring service would not have learned of the action at the time of filing if the file and docket had been temporarily sealed.

## CONCLUSION

17. For all the above reasons, as contemplated by Fed. R. Civ. Pro. 65(b), there is good cause to believe that immediate and irreparable damage will result to consumers from the dissipation of assets, and from the concealment, transfer or destruction of Defendants' records, if Defendants receive advance notice of the FTC's Complaint and TRO Motion. Thus, it is in the interests of justice that this Court grant the FTC's *ex parte* TRO Motion and Motion for Temporary Seal of the Docket and Entire File.

18. The FTC has not made a previous application for similar relief in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 22, 2014 in Washington, DC.

Christopher E. Brown (Special Bar No. A5500671)
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-8528
Washington, DC 20580
(202) 326-2825
(202) 326-3395 (facsimile)
cbrown3@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*