## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO.: 1:14-cv-23109-RNS

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

PARTNERS IN HEALTH CARE
ASSOCIATION, INC., *et al.,*

     Defendants.

                               /

## PRELIMINARY REPORT OF RECEIVER

Peter D. Russin, in his capacity as temporary receiver (the "*Receiver*") of Partners in Health Care Association, Inc; United Solutions Group Inc.; and their subsidiaries, affiliates, successors and assigns (collectively the "*Receivership Entities*"), appointed pursuant to this Court's Temporary Restraining Order dated August 25, 2014 (the "*TRO*"), submits his Preliminary Report of Receiver:

### SUMMARY

This is a preliminary report, prepared and submitted by the Receiver to assist the Court and all parties in interest.  It is expressly subject to modification and amendment, as the Receiver has only been in place for shortly over a week..  The items and information set forth herein are to the best of the Receiver' information and belief.

The Receiver has taken control of the Receivership Entities, which, at his direction, have ceased operations. He has taken control of the Receivership Entities' known assets, and the known bank accounts have been frozen. The Receiver, either directly or through his counsel, has conducted initial interviews with various employees in the offices of the Receivership Entities.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/5522/5522-1/01496984.DOCX.}

While the Wisconsin defendants have largely cooperated, the Florida defendants have been generally non-cooperative, citing potential fifth amendment concerns and mostly focusing on their disagreement as to the Receiver's control over affiliate entity, Banestral Group USA, Inc.

## I.      BACKGROUND

On August 25, 2014, the Court found that there was good cause to believe that Walter S. Vargas, Constanza Vargas, Gary Kieper, United Solutions Group, Inc. ("*USGI*"), and Partners in Health Care Association, Inc. ("*PIHCAI*") (collectively the "*Defendants*") have engaged in practices violative of Section 5 of the FTC Act,  15 U.S.C. § 45(a), and the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("*TSR*"), 16 C.F.R. Part 310., and that the FTC is likely to prevail in this action for a permanent injunction (the "*Action*").

1.      As set forth in the TRO, Peter D. Russin was appointed as Receiver, and was vested with the full power of an equity receiver over the Receivership Entities.

2.      The Receiver was charged *inter alia* with the assumption of full control of the Receivership Entities; the taking of custody of the Receivership Entities' assets; and the management and preservation of such assets.

3.      As such, on August 27, 2014, the Receiver, the FTC, and local law enforcement agencies served the Defendants[1] with the TRO, and the Receiver began to execute his duties as set forth by the Court.

---

[1] Other than Gary Kieper, individually (*"Kieper"*). Kieper was served on August 28, 2014.

## II.    REPORT OF RECEIVER

A.    <u>Execution of TRO on Receivership Entities</u>.

On August 27, 2014, at 10:30 EDT, the Receiver[2] simultaneously executed the TRO upon the Receivership Defendants located in Florida and Wisconsin, and assumed control of the Receivership Entities, as follows:

*i.   Florida Receivership Entities.*

The Receiver's attorney, FTC representatives, the FTC's contracted forensic I.T. personnel, members of the Miami Police Department and a process server entered USGI's office at 28 W. Flagler, Miami, FL, Suite 900 (the "***Florida Facility***"), at 10:30 a.m., EDT. Defendants, Walter S. Vargas ("***W.S. Vargas***") and Constanza Gómez Vargas ("***C. Gomez***") were present at the Florida Facility soon thereafter. Non-party, Jaime Vargas (S. Vargas's father and C. Gomez's ex-husband) ("***J. Vargas***") was present. W.S. Vargas, C. Gomez and USGI are collectively referred to herein as the "***Florida Defendants***."

Upon local law enforcement securing the premises, the computers, servers, and telephones were immediately secured and the internet access was disconnected to prevent unauthorized remote access or any tampering with the computers or servers. A locksmith changed the locks at the direction of the Receiver.

The Florida Facility is the main office for both USGI and Banestral Group USA, Inc. ("***Banestral***"). Banestral is owned by W.S. Vargas, who is its president, vice-president, and registered agent. The Florida Facility is leased to Banestral,[3] which, according to an affidavit

---

[2] The Receiver was only able to do so with the help of local law enforcement in Wisconsin and Miami, each of which were incredibly professional and helpful.

[3] The lessee on the lease (the "***Lease***") is actually World Parcel Express Service Inc., which was Banestral's name until September 13, 2013, when it was changed to Banestral Group USA, Inc. A copy of the Lease is attached as **Exhibit A**. A copy of the name change amendment is attached as **Exhibit B**.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/5522/5522-1/01496984.DOCX.}

executed by J. Vargas, "gave" USGI a portion of the facility to operate.[4] The Lease (at least in part) is guaranteed by J. Vargas. The assets within the Florida Facility consist mostly of general business equipment, including computers, furniture and some artwork or memorabilia.

All employees (other than the principals) at the Florida Facility were separated into separate rooms, and were requested to sign in and fill out a short questionnaire. During and after the time that the questionnaires were being completed, the Receiver's attorneys conducted individual, initial interviews with the first-level supervisors of each company (Banestral and USGI), as well as group interviews with the Banestral employees, and individual initial interviews with all USGI personnel. According to those employees, approximately 80% of the employees present at the Florida Facility work for the Banestral Group.

J. Vargas, C. Gomez, W.S. Vargas and Ivan Gonzalez indicated that they had retained counsel, and largely refused to answer questions, but did, in part, fill out questionnaires. Attorney Jorge Calil was present at the Florida Facility and spoke with C.Vargas, W.S. Vargas and the Receiver's counsel and agent on-site, and attorney Edward Shohat appeared to have spoken with C.Vargas and W.S. Vargas by phone and did speak with the Receiver's counsel and agent by phone. At approximately noon, on advice of counsel, J. Vargas, C. Gomez, S. Vargas and Ivan Gonzalez left the Florida Facility.

a.   **USGI Initial Findings**.

W.S. Vargas is the 100% owner of USGI. He is also USGI's President and Registered Agent, according to filings with the Florida Secretary of State. A copy of USGI's most recent annual filing is attached as **Exhibit C**. C. Gomez is a *de facto* officer and controlling person. In preliminary interviews, the USGI employees explained that USGI places radio advertisements in

---

[4] While the J. Vargas Affidavit indicates that Banestral provides space within the Florida facility to USGI for no consideration, this has not been verified.

Spanish-speaking markets across the USA, primarily on the West coast of the United States. They explained that based on the advertising schedule, employees arrive and take calls at approximately the time the ads are scheduled to run. The employees describe the company's business as the sale of health plans, but repeatedly indicated that they do not sell health insurance. The employees and principals of USGI uniformly reiterated that all calls were recorded, and that they specifically tell prospective clients that the products being sold are not health insurance plans.

The salespeople use a script. Supervisors interviewed reported that a supervisor ensures that the employees stick to the script and is available to answer any questions concerning the plan. Once the sale closes, the salesperson writes down the information, which is given to an independent contractor or to C. Gomez to input into the system and "submit" to PIHCAI in Wisconsin. The employees stated that the plans are administered by PIHCAI, which collects all monthly payments from clients. USGI collects a commission for plans sold.

The Receiver temporarily halted USGI's operations, and all employees were instructed not to return to work until and unless notified.

      b.  **Banestral Initial Findings**.

Banestral is also owned by W.S. Vargas, who, according to filings with the Florida Secretary of State,[5] is its president. J. Vargas describes himself as Banestral's general manager. C. Gomez asserts she has no involvement in Banestral. W.S. Vargas, J. Vargas, and C. Gomez each have business cards with the logos of both Banestral and USGI printed on the back. A copy of the business cards are attached as **Exhibit D** ("Business Cards").

Based on preliminary interviews with employees, Banestral appears to have a similar structure to USGI, but may be operated independently. Employees and the Florida Defendants

---

[5] A copy of Banestral's most recent annual filing with the Florida Secretary of State is attached as **Exhibit E**.

indicate that Banestral uses a separate room in the building; has different phone numbers; has a different schedule; and has different employees than USGI. The Receiver, however, observed that (1) the officers and principals of each entity overlap; and (2) a Banestral employee list appears to identify all employees of both Banestral and USGI as Banestral employees, merely referencing the USGI employees under the department name "Salud." A copy of this Banestral employee list is attached as **Exhibit F**.

Banestral, which apparently does business as Mega Vacations or MV Club, is (according to those employees interviewed) engaged primarily in the sale of vacation packages to clients in Peru, Colombia, Mexico, and Chile. They indicate that prospective clients are generated primarily through television advertisements in those countries, as well as through social media such as facebook and twitter.

Certain Banestral employees have described their work as having nothing to do with USGI. For Banestral, employees known as assessors place and receive calls, and are generally responsible for sales. Reservations department employees make reservations with the various airlines, and customer service department employees take customer service calls from clients. Each department has a supervisor. Certain employees indicate that Banestral is run by both J. Vargas and W.S. Vargas. Ivan Gonzalez appears to have some sort of higher-level position as well.

Based on the Business Cards, shared office space, identity of ownership, common control, familial relationships and the similarity of the businesses, Banestral is an affiliate of USGI. When coupled with the failure to fully cooperate, at the direction of the Receiver, Banestral operations were ceased, given the terms of the TRO and the inability and

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/5522/5522-1/01496984.DOCX.}

unwillingness of USGI and Banestral to provide effective assurances that they would not violate the TRO. No such assurances have been provided to date.

*ii.   Wisconsin Receivership Entities and Initial Findings.*

The Receiver, representatives of the FTC, the FTC's contracted forensic I.T. personnel, Appleton, WI local law enforcement members and a process server entered the PIHCAI facility at 520 S Westland Dr., Appleton, WI, 54914 (the "**Wisconsin Facility**") on August 27, 2014 at 9:30 a.m. CDT.  The Wisconsin Facility is the main office for PIHCAI, as well as Tri Resource Group Ltd.; PIHC, Inc.; and Senior Advantage of Wisconsin Inc. (collectively the "**PIHC Entities**"). One or more of the PIHC Entities does business as "Health Center" or "Partners In Health." According to statements by employees during initial interviews, the PIHC Entities are engaged in a single enterprise, all of which is owned by Kieper. Kieper also owns and operates Allied Veterans Advisors, Inc. out of the Wisconsin Facility.[6]

Kieper was not present on August 27, 2014. Chris Francek, [7] Plan Administrator for Tri-Resource Group Ltd., identified himself as in-charge. The Receiver conducted initial interviews with the employees present, and all employees other than Kassina Reginetter, Administrative Assistant, and Deanna Moore, Accountant/HR, were sent home after some were briefly interviewed and all were requested to complete questionnaires. Ms. Reginetter and Ms. Moore were extremely cooperative, and enabled the Receiver to obtain necessary information concerning the PIHC Entities.

According to the employees interviewed, the employees of Tri-Resource Group, Ltd., are primarily customer service representatives, and provide customer service to members of a health

---

[6] It is unclear what the business of Allied Veterans Advisors, Inc. is at this time.
[7] Mr. Francek was, at least initially, belligerent—referring to the Receiver as "the Jew," and keeps a large, sheathed knife and an allegedly inert grenade on his desk. He ultimately generally cooperated.

discount plan.  The plans are either sold by third parties (including, but not limited to USGI) or directly sold by Senior Advantage of Wisconsin Inc. as "Health Center."

According to Brad Krolow, who describes his position as "Marketing and Sales" there are approximately 13 sales representatives. Employees interviewed indicated that Health Center receives leads from a company controlled by Paul Bellinger, which results in the employees' phones automatically dialing the phone number for the generated lead through the employee's personal computer. If the employee makes a sale, the employees indicate that handwritten notes are passed to the Verification Department, who enters the customers' information into a computer program known as "Enrollment 123" and who calls the prospective client to verify their information, obtain a credit card, answer any questions, and close the transaction. Members receive information about their membership through a mailing mailed to new members each Thurdsay. These employees are all paid an hourly wage plus an incentive rate per membership sold, which varies depending on the type of membership sold.

Based on the initial interviews with the Wisconsin employees, the PIHC entities appear to be growing their direct sales program through Health Center, and de-emphasizing their third-party marketing through companies such as USGI. Based on the interviews of Mr. Francek, there appeared to be a great number of chargebacks, stemming from the large proportion of customers who quickly cancel memberships soon after purchase. Mr. Francek's responsibilities include contesting chargebacks with the merchant account provider, Worldpay.

Based on the information provided by the employees, the Receiver obtained the QuickBooks files and general ledgers for the PIHC Entities. Additionally, the Receiver was given sufficient information to locate various PIHC Entities' bank accounts at Associated Bank (totaling approximately $180,000.00) and at North Shore Bank (totaling approximately

$18,000.00). While the PIHC Entities' were mostly cooperative, due to the Court's findings concerning violations of FTC regulations, the Receiver directed that the PIHC Entities cease operations until and unless they were able to provide effective assurances that they would not violate the TRO. No such assurances have been provides as yet.

      B.      <u>Subsequent Efforts.</u>

          *i.  Florida Receivership Entities.*

Following the execution of the TRO, the Receiver has continued to investigate the Receivership Entities and the Florida Defendants, in an attempt to take full control of the Receivership Entities' assets.

Alex Delgado, the Florida Receivership Entities' outside IT administrator, provided access to the Receiver and his designees. The FTC forensic IT contractors remained at the Florida Premises, and have fully mirrored the computer systems at that location.

Additionally, counsel for the Receiver has been in constant communication with various prospective counsel for the Florida Defendants. On a call on August 28, 2014, the Florida Defendants, through prospective counsel,[8] indicated that they needed to finalize their analysis as to whether the responses raised any Fifth Amendment issues, and would then be in a position to provide the information required under the TRO. Thus, they could not answer any substantive questions at that time.

On August 29, 2014, the Florida Defendants, through counsel, provided tax returns for C. Gomez, S. Vargas and USGI, as well as limited preliminary responses to the documents required to be produced pursuant to the TRO.  During a teleconference, the Florida Defendants agreed to shut down USGI, but disagreed as to whether Banestral was within the scope of the receivership.

---

[8] E. Shohat, Esq.

The Florida Defendants, through counsel,[9] did not provide any additional information. The Florida Defendants assert that Banestral is not an affiliate.

In an effort to distinguish Banestral from USGI, the Florida Defendants provided affidavits (in both draft and executed form) of W.S. Vargas[10] and J. Vargas which set forth the following: (1) USGI is C. Gomez's company; (2) Banestral is J. Vargas and S. Vargas's company; (3) the finances of the two companies are completely separate; (4) the companies operate completely separate and distinct businesses; and (5) W.S. Vargas's involvement with USGI was limited to "opening up" the company. The Affidavits of W.S. Vargas and J. Vargas are attached as **Exhibits G & H**.

Due to the Florida Defendants' limited cooperation thus far, the Receiver is unable to verify (3) and (4).   However, the claims of W.S. Vargas's limited connection to USGI are directly contradicted by filings with the Florida Secretary of State, which set forth that S. Vargas is the president of USGI, and W.S. Vargas's own admission that he is the 100% owner of USGI.

The term "affiliate" is not defined in the TRO. "The term 'affiliate,' however, has a common meaning or understanding. . . . The American Heritage College Dictionary defines affiliate as 'a person or an organization associated with another as a subordinate, subsidiary, or member.' Black's Law Dictionary . . . defin[es] it as 'a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation,' or 'one who controls, is controlled by, or is under common control with the issuer of a security." *League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298, 1317 (S.D. Fla. 2008) (internal citations omitted). In fact, in another FTC receivership case, in determining whether a separate company was within the scope of the TRO, the court held:

---

[9] B. Rogow, Esq.
[10] The affidavit of S. Vargas fails to mention that W.S. Vargas is the President and owner of both companies.

> The Court is not troubled by the fact that the TRO does not spell out the definition of "affiliate." If there was any question about the meaning of "affiliate" in the context of this case, there is an ordinary meaning. At the very least, "affiliate" means "closely connected." The extreme breadth of the definitional section of the TRO resolves any question about the meaning of "affiliate." The import of the definition of Defendants is that any related company is bound by the TRO. There is sufficient evidence in the record to establish the interrelatedness of the companies.

*F.T.C. v. Peoples Credit First, LLC*, 8:03-CV-2353-T-TBM, (M.D. Fla. Nov. 1, 2004). As yet, the information to which the Receiver has access appears to show (a) there is common ownership and control of Banestral and USGI; (b) the two companies are sister organizations; (c) there is at least some financial interdependence, as Banestral appears to allow USGI to operate within the same space it leases for no consideration.[11] Based on these considerations, USGI and Banestral are affiliates, as they are "closely connected" and are related both by shareholdings and common control. The Receiver has requested, but lacks sufficient evidence that would show that Banestral is not an affiliate of USGI. Thus, the Receiver believes Banestral is an affiliate of defendant USGI, and within the scope of the receivership as set forth in the TRO.

Because Banestral is within the scope of the receivership, the Receiver has determined that it cannot operate absent an effective plan to ensure it does not violate FTC telemarketing regulations. The Receiver has determined this because (1) Banestral engages in similar telemarketing practice to USGI, albeit in a different industry; (2) the Court has already found USGI has likely violated the FTC TSR; and (3) the Colombian government recently fined and suspended Banestral for deceptive trade practices.[12] Since the Receiver has not been provided

---

[11] This also appears to violate Banestral's lease.

[12] *Superindustria suspende temporalmente Registro Nacional de Turismo a MEGAVACACIONES por publicidad engaños,* http://www.sic.gov.co/drupal/noticias/superindustria-suspende-temporalmente-registro-nacional-de-turismo-a-megavacaciones-por-publicidad-enganosa

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/5522/5522-1/01496984.DOCX.}

with a plan to ensure that Banestral does not violate the TSR, the Receiver has determined that it is consistent with the Court's rulings in the TRO that Banestral remain closed.

ii. *Wisconsin Receivership Entities.*

Following the execution of the TRO, the PIHC Entities have continued to cooperate with the Receiver.  The Receiver has changed the locks to the Wisconsin Facility, and has coordinated with the landlord regarding continued occupancy pending rent due in mid-September. The Receiver has been in communication with the PIHC Entities' counsel.[13] With the exception of a plan to remediate the FTC TSR violations, the Receiver has timely received most necessary documentation from the PIHC Entities.

The Receiver has gained access to the a safe in the Wisconsin Facility, the contents of which were an engagement ring and title to G. Kieper's Mercedes automobile, both of which are being maintained in the Receiver's local counsel's office. Kieper continues to use the Mercedes, however. FTC investigators copied all documents in the Wisconsin Facility, which are in the process of being delivered electronically to the Receiver and are being analyzed by his counsel. Additionally, FTC contract IT staff imaged all computers at the Wisconsin Facility, including Kieper's and Frenzek's computers, which they both claimed to own personally.

The Receiver has gained access to a boat and shed in the parking lot of the Wisconsin Facility, which purportedly belong to Kieper.

C.    Required Financial Disclosures.

The financial statements and transfers statements required to be provided to the Receiver pursuant to Article VIII(A) and (B), respectively, and the foreign asset description pursuant to

---

[13] K. Grumer, Esq.

Article IX of the TRO were due on September 2, 2014.[14] None has been provided by any Defendant.

D.    Frozen Bank Accounts.

On August 29, 2014, the Receiver sent copies of the TRO with a demand for access to the accounts of the Receivership Entities and their affiliates at Associated Bank, Citibank, JP Morgan Chase Bank, North Shore Bank, RBS Citizens Bank, SunTrust Bank, Wells Fargo, Fox Communities Credit Union, Village Bank, Chesapeake Payment Services (the "**Banks**"). The Banks had previously been served with the TRO by the FTC.  The Receiver is currently taking steps to obtain access to these accounts so that they may be transferred to individual receivership accounts for each entity.

Per the Receiver's request, C. Gomez's safety deposit box access has been restricted by Bank of America. The Receiver has also frozen the Defendants' merchant account with Worldpay (the **"Merchant Account"**).

E.    Bond.

On August 26, 2014, Western Surety Company issued a bond on behalf of the Receiver, in favor of the United States District Court for the Southern District of Florida. *See* ECF No. 14.

F.    Retention of professionals.

The Receiver has engaged: a) Meland Russin & Budwick, P.A. as counsel; b) Steinhilber, Swanson, Mares, Marone & McDermott as Wisconsin local counsel; and c) KapilaMukamal as forensic accountants. Applications to employ *nunc pro tunc* will follow forthwith.

---

[14] Kieper's response is not due until September 3, 2014. The Florida Defendants sent non-final "drafts" on September 3, 2014, which the Receiver has not yet reviewed.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/5522/5522-1/01496984.DOCX.}

### III.     CONCLUSION

The Receiver has directed that all operations of the Defendants and their affiliates cease, until such time as a plan of remediation is presented by the Defendants which ensures no further violations of the FTC TSR will occur. The Receiver has, for the most part, taken control of all of the Receivership Entities' assets, but requires some additional information and cooperation to fully account for the same. The Receiver continues to investigate for possible sources of recovery for the Receivership Estate.

Dated: September 3, 2014.

By:

 s/ Peter D. Russin
Peter D. Russin, Receiver
prussin@melandrussin.com
200 South Biscayne Blvd., Ste. 3200
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*The Receiver*

--and--

 s/ Lawrence E.  Pecan
Lawrence E. Pecan, Esquire
Florida Bar No. 99086
lpecan@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
200 South Biscayne Blvd., Ste. 3200
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for Peter D. Russin, Receiver*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/5522/5522-1/01496984.DOCX.}