## LEASE SUMMARY

**Lease Date:**  February 3, 2012

**Landlord:**  **LeaseFlorida 28 Flagler LLC, a Florida Limited Liability Company** (hereinafter referred to as "Leaseflorida") whose address is: 28 West Flagler suite 1000 Miami Florida 33130

**Tenant:**  **World Parcel Express Service**

**Premises:**  Suite No. 901 approximately 1,152 rentable square feet in the mixed use building commonly known as Courthouse Plaza (the "**Building**"), and whose street address is 28 West Flagler Street, Miami, Florida. 33130

**Term:**  **Twelve (12) months**

**Lease Commencement : April 1, 2012**
:

| Annual Base Rent | MONTHLY |
|---|---|
| $16,128.00 | $1,344.00 plus FSTX |
| April 1, 2012 to March 14, 2013 | $1,344.00 monthly plus FSTX |

Thereafter the Base Rent shall increase 5% per annum. This Lease will automatically be extended at each one year anniversary for an additional one (1) year term unless terminated by either party by giving written notice by certified mail to the other party at least ninety (120) days prior to the end of the then current term.

Security Deposit:    $1,344.00 DUE AT LEASE SIGNING

Other Funds Due:    $1,344.00 FIRST MONTHS RENT + FSTX DUE AT LEASE SIGNING

Base rent, Tenant's Proportionate Share of Operating Costs, Tenant's share of Additional Rent, and all other sums that Tenant may owe to Landlord or otherwise be required to pay under the Lease.02% Which tenant agrees is not necessary based upon any square footage. Calculations and which is subject to adjustment as set forth in section 4(b) herein

Permitted Use:    General office use only.

Tenant's Proportionate .02%

Initial Liability Insurance Amount: $1,000,000.

The foregoing Lease Summary is incorporated into and made a part of the Lease identified above.  If any conflict exists between any Basic Lease Information and the Lease, then the Lease shall control.

EXHIBIT A

## OFFICE LEASE AGREEMENT

THIS Agreement (hereinafter referred to as the "Lease" is made this 3rd day of February  2012, by and between **LeaseFlorida 28 Flagler, LLC, a Florida Limited Liability Company** with its successors and assigns (hereinafter "Landlord"), having its principal offices at 28 West Flagler Street, Miami, Florida 33130 and   World Parcel Express Service  With its successors and assigns (hereinafter "Tenant"), having its principal offices at 25 W 79th Ave, Miami, Florida 33172

1.       **Definitions and Basic Provisions**.  The definitions and basic provisions set forth in the Lease Summary (the "**Lease Summary**") executed by Landlord and Tenant contemporaneously herewith are incorporated herein by reference for all purposes. Additionally, the following terms shall have the following meanings when used in this Lease: "**Affiliate**" means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the party in question; "**Building's Structure**" means the Building's exterior walls, roof, elevator shafts, footings, foundations, structural portions of load-bearing walls, structural floors and sub floor, and structural columns and beams; "**Building's Systems**" means the Building's HVAC, life-safety, plumbing, electrical, and mechanical systems; "**including**" means including, without limitation; "**Laws**" means all federal, state, and local laws, rules and regulations, all court orders, governmental directives, and governmental orders, and all restrictive covenants affecting the Building, and "**Law**" shall mean any of the foregoing; and "**Tenant**" means any of the following persons: Tenant; any assignees claiming by, through, or under Tenant; any subtenants claiming by, through, or under Tenant; and any of their respective agents, contractors, employees, and invitees.

2.       **Lease Grant**.  In consideration of the payments of Rent and such other charges as may be provided in this Lease and the terms, covenants and conditions hereinafter described, the Landlord does hereby Lease to Tenant the premises.

3.       **Tender of Possession**. Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant (NO WORK TO BE DONE BY LANDLORD, TENANT TAKING PREMISES IN AS IS CONDITION) on or about April  1, 2012,  (the "**Estimated Delivery Date**").  If Landlord is unable to tender possession of the Premises in such condition to Tenant by the Estimated Delivery Date, then (a) Landlord shall not be in default hereunder or be liable for damages therefore and (b) Tenant shall accept possession of the Premises when Landlord tenders possession thereof to Tenant. By occupying the Premises, Tenant shall be deemed to have accepted the Premises in their condition as of the date of such occupancy, subject to the performance of punch-list items that remain to be performed by Landlord, if any. Tenant shall execute and deliver to Landlord, within ten days after Landlord has requested the same, a letter substantially in the form of Exhibit E hereto confirming (1) the Commencement Date and the expiration date of the initial Term, (2) that Tenant has accepted the Premises, and (3) that Landlord has performed all of its obligations with respect to the Premises (except for punch-list items specified in such letter). Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the provisions of this Lease. *Lessee hereby accepts the Premises in its present "as-is" condition.* .  Tenant has inspected Premises and takes premises in "AS IS" "WHERE IS" Condition with NO EXCEPTIONS. Tenant must obtain their own Certificate of Use for their space.  Tenant must be responsible for all work and costs required to do so.  Landlord will not be responsible to perform any work whatsoever. Rent Commencement and Term begins upon execution of this Lease.


**NO ORAL REPRESENTATION**.  No representations, except those contained herein, have been made on the part of Lessor with respect to the order, repair or condition of the Premises, the Building or other Property.  Lessee will make no claim against Lessor on account of any representative of Lessor or which may be contained in any circular, prospectus or advertisement relating to the Premises, or otherwise, unless the same is specifically set forth in this Lease.

**NOW, THEREFORE,** it is mutually understood and agreed as follows:

**LANDLORD ,**

**ALL** terms and conditions of the lease agreement shall remain in full force and effect and shall equally be
Applicable in all.

**LANDLORD:**                                    **LeaseFlorida 28 Flagler, LLC,**
                                                  A Florida Limited Liability Company

                                                  By:_____
                                                  Name:_____
                                                  Title:_____
                                                  Date: _____

**WITNESS**                                      Print Name_____

                                                  Signature_____

**WITNESS**                                      Print Name_____

                                                  Signature_____

**TENANT:**                                      **World Parcel express service**

                                                  By:_____
                                                  Name: Ivan Gonzalez
                                                  Title: President.
                                                  Date: 2-3-12

**WITNESS**                                      Print Name Jeey Binsiwen

                                                  Signature_____

**WITNESS**                                      Print Name Ilene Revelo

                                                  Signature_____

4. **Rent**.

(a)      **Payment**.  Tenant shall timely pay to Landlord Rent, without notice, demand, deduction or set off (except as otherwise expressly provided herein), at Landlord's address provided for in this Lease or as otherwise specified by Landlord and shall be accompanied by all applicable state and local sales or use taxes.  Base Rent, adjusted as herein provided, shall be payable monthly in advance.  The first monthly installment of Base Rent shall be payable contemporaneously with the execution of this Lease; thereafter, Base Rent shall be payable on the first day of each month beginning on the first day of the second full calendar month of the Term.  The monthly Base Rent for any partial month at the beginning of the Term shall equal the product of 1/365 of the annual Base Rent in effect during the partial month and the number of days in the partial month from and after the Commencement Date, and shall be due on the Commencement Date.  As used in this Lease, "Rent" shall mean collectively the Base Rent and "Additional Rent".  Additional Rent shall mean all sums due and payable to Landlord in accordance with Paragraph 4(b) and all sums due by Tenant under this Lease other than the Base Rent.

(1)      Notwithstanding any other provision to the contrary, Landlord may agree in the course of negotiation to provide such benefits upon Tenant as Landlord may deem appropriate.  Such benefits, hereinafter referred to as "concessions" are outlined in the attached Exhibit "E" hereto.

(b)      **Additional Rent**.  Beginning on the first anniversary of the Commencement Date or, if the Commencement Date shall not be the first day of a calendar month, then on the first day of the month following the month in which the first anniversary of the Commencement Date occurs, and during each calendar year or partial calendar year of the Term, Tenant shall pay to Landlord, in advance concurrently with each monthly installment of Base Rent, an amount equal to 1/12 of the estimated increase in Tenant's Proportionate Share (as defined below) of both Real Estate Taxes and of Operating Expenses (each calculated separately) over those Operating Expenses and Real Estate Taxes for the calendar year 2012 ("Base Year") as projected by Landlord.  If the first and/or last years of the Term of this Lease shall not coincide with a calendar year, the Tenant' obligation for Operating Expenses and Real Estate Taxes attributable to the partial calendar year shall be pro rated on the basis of the ratio between the number of days of such partial calendar year and 365.  Landlord may make a good faith estimate of the Additional Rent to be due by Tenant for any calendar year or part thereof during the Term. From time to time, Landlord may estimate and re-estimate the Additional Rent to be due by Tenant and deliver a copy of the estimate or re-estimate to Tenant.  Thereafter, the monthly installments of Additional Rent payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the Additional Rent as estimated by Landlord.  Any amounts paid based on such an estimate shall be subject to adjustment as herein provided when actual Operating Costs are available for each calendar year.  Landlord reserves the right to adjust Tenant's Proportionate Share if Landlord, in its reasonable discretion, determines that Tenant, or another tenant in the Building, is using a disproportionate share of the utilities or any other item which contributes to Operating Expenses.

(c)      The term "**Operating Costs**" shall mean all expenses and disbursements (subject to the limitations set forth below) that Landlord incurs in connection with the ownership, operation, and maintenance of the Building, determined in accordance with sound accounting principles consistently applied, including the following costs: (A) wages and salaries (including management fees) of all on-site employees at or below the grade of senior building manager engaged in the operation, maintenance or security of the Building (together with Landlord's reasonable allocation of expenses of off-site employees at or below the grade of senior building manager who perform a portion of their services in connection with the operation, maintenance or security of the Building), including taxes, insurance and benefits relating thereto; (B) all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Building; (C) costs for improvements made to the Building which, although capital in nature, are expected to reduce the normal operating costs (including all utility costs) of the Building, as amortized using a commercially reasonable interest rate over the time period reasonably estimated by Landlord to recover the costs thereof taking into consideration the anticipated cost savings, as determined by Landlord using its good faith, commercially reasonable judgment, as well as capital improvements made in order to comply with any Law hereafter promulgated by any governmental authority or any interpretation hereafter rendered with respect to any existing Law, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion; (D) cost of all utilities which are not separately metered to a tenant; (E) insurance expenses; (F) Taxes (hereinafter defined); (G) repairs, replacements, and general maintenance of the Building; and (H) service or maintenance contracts for the operation, maintenance, repair, replacement, or security

of the Building (including alarm service, window cleaning, and elevator maintenance). **"Taxes"** shall mean taxes, assessments, and governmental charges or fees whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing or by others, subsequently created or otherwise, and any other taxes and assessments (including non-governmental assessments for common charges under a restrictive covenant or other private agreement that are not treated as part of Operating Costs) now or hereafter attributable to the Building (or its operation), excluding, however, penalties and interest thereon and federal and state taxes on income (if the present method of taxation changes so that in lieu of the whole or any part of any Taxes, there is levied on Landlord a capital tax directly on the Rents received therefore or a franchise tax, assessment, or charge based, in whole or in part, upon such Rents for the Building, then all such taxes, assessments, or charges, or the part thereof so based, shall be deemed to be included within the term "Taxes" for purposes hereof). Taxes shall include the costs of consultants retained in an effort to lower taxes and all costs incurred in disputing any taxes or in seeking to lower the tax valuation of the Building. For property tax purposes, Tenant waives all rights to protest or appeal the appraised value of the Premises, as well as the Building, and all rights to receive notices of reappraisement.

Operating Costs shall not include costs for (i) capital improvements made to the Building, other than capital improvements described in Section 4.(b)(2)(C) and except for items which are generally considered maintenance and repair items, such as painting of common areas, replacement of carpet in elevator lobbies, and the like; (ii) repair, replacements and general maintenance paid by proceeds of insurance or by Tenant or other third parties; (iii) interest, amortization or other payments on loans to Landlord; (iv) depreciation; (v) leasing commissions; (vi) legal expenses for services, other than those that benefit the Building tenants generally (e.g., tax disputes); (vii) renovating or otherwise improving space for occupants of the Building or vacant space in the Building; and (viii) federal income taxes imposed on or measured by the income of Landlord from the operation of the Building.

5.     **Outstanding Balances**. In the event that Tenant's outstanding balance on any rental due shall remain unpaid for five (5) days after its due date Tenant shall be required to pay Landlord a late fee equal to 5% of the outstanding balance. Further, in the event that Tenant shall pay Landlord via check or other negotiable instrument and such instrument shall be refused or returned unpaid, Tenant shall pay to Landlord, in addition to all other remedies which may be available, liquidated damages, the greater of either Fifty ($50.00) dollars or five percent (5%) of the face amount of the instrument to compensate Landlord for expenses associated with the failure of Tenant to timely make payment. Additionally, Landlord shall have the right upon the refusal or non-payment of any given negotiable instrument to demand payment of Rent or any other amounts due by guaranteed funds.

6.     **Security Deposit**. Contemporaneously with the execution of this Lease, Tenant shall pay to Landlord the Security Deposit, which shall be held by Landlord to secure Tenant's performance of its obligations under this Lease. The Security Deposit is not an advance payment of Rent or a measure or limit of Landlord's damages upon an Event of Default (as defined herein). Landlord may, from time to time following an Event of Default and without prejudice to any other remedy, use all or a part of the Security Deposit to perform any obligation Tenant fails to perform hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. Provided that Tenant has performed all of its obligations hereunder, Landlord shall, within 30 days after the Term ends, return to Tenant the portion of the Security Deposit which was not applied to satisfy Tenant's obligations. The Security Deposit may be commingled with other funds, and no interest shall be paid thereon. If Landlord transfers its interest in the Premises and the transferee assumes Landlord's obligations under this Lease, then Landlord may assign the Security Deposit to the transferee and Landlord thereafter shall have no further liability for the return of the Security Deposit.

7.     **Landlord's Obligations**.
        (a)     **Services**. Landlord shall use all reasonable efforts to furnish to Tenant (1) water at those points of supply provided for general use of tenants of the Building; (2) heated and refrigerated air conditioning (**"HVAC"**) as appropriate, at such temperatures and in such amounts as are standard for comparable buildings in the vicinity of the Building; (3) elevator for ingress and egress to the floor on which the Premises are located, in common with other tenants; and (4) electrical current during normal business hours for equipment that does not require more than 110 volts and whose electrical energy consumption does not exceed normal office usage. Landlord shall maintain the common areas of the Building in reasonably good order and condition, except for damage caused by a Tenant Party. If Tenant desires any of the services specified in Section 7.(a)(2): (A) at any time other than between 8 a.m. and 6 p.m. on weekdays and between 9 a.m. and 1 p.m. on Saturday (in each case other than holidays), or (B) on

Sunday or holidays, then such services shall be supplied to Tenant upon the written request of Tenant delivered to Landlord before 3:00 p.m. on the business day preceding such extra usage, and Tenant shall pay to Landlord the cost of such services within 30 days after Landlord has delivered to Tenant an invoice therefore. The costs incurred by Landlord in providing after-hour HVAC service to Tenant shall include costs for electricity, water, sewage, water treatment, labor, metering, filtering, and maintenance reasonably allocated by Landlord to providing such service. Such amounts due and owing by Tenant, in the event of Tenant's failure to pay as invoices are provided, shall be considered Rent.

(b)    **Excess Utility Use**.  Landlord shall not be required to furnish electrical current for equipment that requires more than 110 volts or other equipment whose electrical energy consumption exceeds normal office usage.  If Tenant's requirements for or consumption of electricity exceed the electricity to be provided by Landlord as described in Section 7.(a), Landlord shall, at Tenant's expense, make reasonable efforts to supply such service through the then-existing feeders and risers serving the Building and the Premises, and Tenant shall pay to Landlord the cost of such service within 30 days after Landlord has delivered to Tenant an invoice therefore.  Landlord may determine the amount of such additional consumption and potential consumption by any verifiable method, including installation of a separate meter in the Premises installed, maintained, and read by Landlord, at Tenant's expense.  Tenant shall not install any electrical equipment requiring special wiring or requiring voltage in excess of 110 volts or otherwise exceeding Building capacity unless approved in advance by Landlord.  The use of electricity in the Premises shall not exceed the capacity of existing feeders and risers to or wiring in the Premises.  Any risers or wiring required to meet Tenant's excess electrical requirements shall, upon Tenant's written request, be installed by Landlord, at Tenant's cost, if, in Landlord's judgment, the same are necessary and shall not cause permanent damage to the Building or the Premises, cause or create a dangerous or hazardous condition, entail excessive or unreasonable alterations, repairs, or expenses, or interfere with or disturb other tenants of the Building.  If Tenant uses machines or equipment in the Premises which affect the temperature otherwise maintained by the air conditioning system or otherwise overload any utility, Landlord may install supplemental air conditioning units or other supplemental equipment in the Premises, and the cost thereof, including the cost of installation, operation, use, and maintenance, shall be paid by Tenant to Landlord within 30 days after Landlord has delivered to Tenant an invoice therefore.

(c)    **Restoration of Services; Abatement**.  Landlord shall use reasonable efforts to restore any service required of it that becomes unavailable; however, such unavailability shall not render Landlord liable for any damages caused thereby, be a constructive eviction of Tenant, constitute a breach of any implied warranty, or, except as provided in the next sentence, entitle Tenant to any abatement of Tenant's obligations hereunder.  If, however, Tenant is prevented from using the Premises for more than 15 consecutive business days because of the unavailability of any such service and such unavailability was not caused by a Tenant Party, then Tenant shall, as its exclusive remedy be entitled to a reasonable abatement of Rent for each consecutive day (after such 15-day period) that Tenant is so prevented from using the Premises.

8.    **Improvements; Alterations; Repairs; Maintenance**.

(a)    **Improvements; Alterations**.  Improvements to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications which have been previously submitted to and approved in writing by Landlord, which approval shall be governed by standards in the following sentence.  No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent, which shall not be unreasonably withheld. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all Laws; Landlord's consent to or approval of any alterations, additions or improvements (or the plans therefore) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance and shall indemnify, hold harmless and agree to defend Landlord for any manner of action arising therefore

(b)    **Repairs; Maintenance**.  In a clean, safe, and operable condition, and shall not permit or allow to remain any waste or damage to any portion of the Premises.  Tenant shall repair or replace, subject to Landlord's direction and supervision, any damage to the Building caused by a Tenant Party.  If Tenant fails to make such repairs or replacements within 15 days after the occurrence of such damage, then Landlord may make the same at

Tenant's cost and any such additional cost shall be promptly due and payable by Tenant and shall be deemed Rent. If any such damage occurs outside of the Premises, then Landlord may elect to repair such damage at Tenant's expense, rather than having Tenant repair such damage. The cost of all repair or replacement work performed by Landlord under this Section 8 shall be paid by Tenant to Landlord within 30 days after Landlord has invoiced Tenant therefore and shall be considered additional Rent.

       (c)    **Performance of Work**.  All work described in this Section 8 shall be performed only by Landlord or by contractors and subcontractors approved in writing by Landlord. Tenant shall cause all contractors and subcontractors to procure and maintain insurance coverage naming Landlord as an additional insured against such risks, in such amounts, and with such companies as Landlord may reasonably require. All such work shall be performed in accordance with all Laws and in a good and workmanlike manner so as not to damage the Building (including the Premises, the Building's Structure and the Building's Systems). All such work which may affect the Building's Structure or the Building's Systems must be approved by the Building's engineer of record, at Tenant's expense, at Landlord's election, must be performed by Landlord's usual contractor for such work.

       (d)    **Mechanic's Liens**.  Tenant shall not permit any mechanic's liens to be filed against the Premises or the Building for any work performed, materials furnished, or obligation incurred by or at the request of Tenant. If such a lien is filed, then Tenant shall, within ten (10) days after Landlord has delivered notice of the filing thereof to Tenant (or such earlier time period as may be necessary to prevent the forfeiture of the Building or any interest of Landlord therein or the imposition of a civil or criminal fine with respect thereto), either (1) pay the amount of the lien and cause the lien to be released of record, or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord. If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within ten days after Landlord has invoiced Tenant therefore with no right of Tenant to contest its obligation to pay such lien claim. All material man, contractors, artisans, mechanics, laborers and any other persons now or hereafter contracting with Tenant or any contractor or subcontractor of Tenant for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises, at any time from the date hereof until the end of the Term, are hereby charged with notice that they look exclusively to Tenant to obtain payment for same. Nothing herein shall be deemed a consent by Landlord to any liens being placed upon the Building or Landlord's interest therein due to any work performed by or for Tenant.

       9.    **Use**.  Tenant shall continuously occupy and use the Premises only for the Permitted Use and shall comply with all Laws relating to the use, condition, access to, and occupancy of the Premises. The Premises shall not be used for any use which is disreputable, creates extraordinary fire hazards, or results in an increased rate of insurance on the Building or its contents, or for the storage of any Hazardous Materials (other than typical office supplies [e.g., photocopier toner] and then only in compliance with all Laws).  If, because of a Tenant Party's acts, the rate of insurance on the Building or its contents increases, then such acts shall be an Event of Default, Tenant shall pay to Landlord the amount of such increase on demand, and acceptance of such payment shall not waive any of Landlord's other rights. Tenant shall conduct its business and control each other Tenant Party so as not to create any nuisance or unreasonably interfere with other tenants or Landlord in its management of the Building. Additionally, Tenant shall at all times material hereto comply with all rules, regulations, ordinances, laws and be solely responsible therefore including but not limited to the Americans with Disabilities Act. Tenant further agrees to indemnify, defend, and hold harmless Landlord from all manner of claims whatsoever arising out of Tenant's violation of any of the above.

      10.    **Assignment and Subletting**.

(a)    **Transfers**.  Except as otherwise provided herein, Tenant shall not, without the prior written consent of Landlord, which shall not unreasonably be withheld, (1) assign, transfer, or encumber this Lease or any estate or interest herein, whether directly or by operation of law, (2) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (3) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current control of Tenant, (4) sublet any portion of the Premises, (5) grant any license, concession, or other right of occupancy of any portion of the Premises, or (6) permit the use of the Premises by any parties other than Tenant (any of the events listed in Section 10.(a)(1) through 10.(a)(6) being a "**Transfer**").

(b)    **Assumption of Obligations**.  In the event Landlord consents to a proposed Transfer, then the proposed transferee shall deliver to Landlord a written agreement whereby it expressly assumes Tenant's obligations hereunder; however, any transferee of less than all of the space in the Premises shall be liable only for obligations under this Lease that are properly allocable to the space subject to the Transfer for the period of the Transfer.  No Transfer shall release Tenant from its obligations under this Lease, but rather Tenant and its transferee shall be jointly and severally liable therefore.  Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers.  If an Event of Default occurs while the Premises or any part thereof are subject to a Transfer, then Landlord, in addition to its other remedies, may collect directly from such transferee all Rents becoming due to Tenant and apply such to any outstanding balance.  Tenant authorizes its transferees to make payments of Rent directly to Landlord upon receipt of notice from Landlord to do so following the occurrence of an Event of Default hereunder.  Tenant shall pay for the cost of any demising walls or other improvements necessitated by a proposed subletting or assignment.

11.    **Insurance; Waivers; Subrogation; Indemnity**.

(a)    **Tenant's Insurance**.  Tenant shall maintain throughout the Term the following insurance policies: (1) commercial general liability insurance in amounts of $1,000,000 per occurrence or, following the expiration of the initial Term, such other amounts as Landlord may from time to time reasonably require (and, if the use and occupancy of the Premises include any activity or matter that is or may be excluded from coverage under a commercial general liability policy [e.g., the sale, service or consumption of alcoholic beverages], Tenant shall obtain such endorsements to the commercial general liability policy or otherwise obtain insurance to insure all liability arising from such activity or matter [including liquor liability, if applicable] in such amounts as Landlord may reasonably require), insuring Tenant, Landlord, Landlord's agents and such other persons or entities as may be requested by Landlord against all liability for injury to or death of a person or persons or damage to property arising from the use and occupancy of the Premises, (2) insurance covering the full value of Tenant's property and improvements, and other property (including property of others) in the Premises, (3) contractual liability insurance sufficient to cover Tenant's indemnity obligations hereunder (but only if such contractual liability insurance is not already included in Tenant's commercial general liability insurance policy), (4) business interruption insurance.  Tenant's insurance shall provide primary coverage to Landlord when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy.  Tenant shall furnish to Landlord certificates of such insurance and such other evidence satisfactory to Landlord of the maintenance of all insurance coverage's required hereunder, and Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least 30 days before cancellation or a material change of any such insurance policies.  All such insurance policies shall be in form, and issued by companies, reasonably satisfactory to Landlord.

(b)    **Landlord's Insurance**.  Throughout the Term of this Lease, Landlord shall maintain such insurance as Landlord, in Landlord's sole discretion shall deem appropriate and such insurance and the cost therefore shall be included in Operating Costs.  The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

(c)    **No Subrogation**.  Tenant waives any claim it might have against Landlord for any injury to or death of any person or persons or damage to or theft, destruction, loss, or loss of use of any property (a "**Loss**"), to the extent the Tenant is insured under any insurance policy that covers the Building, the Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured against under the terms

hereof, regardless of whether the negligence of Landlord caused such Loss or whether proceeds from such insurance shall be insufficient to cover such loss. Tenant shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party.

(d) **Indemnity**. Subject to Section 11.(c), Tenant shall defend, indemnify, and hold harmless Landlord and its representatives and agents from and against all claims, demands, liabilities, causes of action, suits, judgments, damages, and expenses (including attorneys' fees) arising from (1) any Loss arising from any occurrence on the Premises, or (2) Tenant's failure to perform its obligations under this Lease, even though caused or alleged to be caused by the negligence or fault of Landlord or its agents (other than a Loss arising from the gross negligence of Landlord or its agents), and even though any such claim, cause of action, or suit is based upon or alleged to be based upon the strict liability of Landlord or its agents. This indemnity is intended to indemnify Landlord and its agents against the consequences of their own negligence or fault as provided above when Landlord or its agents are jointly, comparatively, contributively, or concurrently negligent with Tenant. Subject to Section 11.(c), Landlord shall defend, indemnify, and hold harmless Tenant and its agents from and against all claims, demands, liabilities, causes of action, suits, judgments, and expenses (including attorneys' fees) for any Loss arising from any occurrence in the Building's common areas, even though caused or alleged to be caused by the negligence or fault of Tenant or its agents (other than a Loss arising from the sole or gross negligence of Tenant or its agents), and even though any such claim, cause of action, or suit is based upon or alleged to be based upon the strict liability of Tenant or its agents. This indemnity is intended to indemnify Tenant and its agents against the consequences of their own negligence or fault as provided above when Tenant or its agents are jointly, comparatively, contributively, or concurrently negligent with Landlord. The indemnities set forth in this Section 11(d) shall survive termination or expiration of this Lease and shall not terminate or be waived, diminished or affected in any manner by any abatement or apportionment of Rent under any provision of this Lease. If any proceeding is filed for which indemnity is required hereunder, the indemnifying party agrees, upon request therefore, to defend the indemnified party in such proceeding at its sole cost utilizing counsel satisfactory to the indemnified party subject to the requirements of any involved or covering insurance policy.

12. **Subordination; Adornment; Notice to Landlord's Mortgagee**.

(a) **Subordination**. This Lease shall be subordinate to any deed of trust, mortgage, or other security instrument (each, a "**Mortgage**"), or any ground lease, master lease, or primary lease (each, a "**Primary Lease**"), that now or hereafter covers all or any part of the Premises (the mortgagee under any such Mortgage, beneficiary under any such deed of trust, or the lesser under any such Primary Lease is referred to herein as a "**Landlord's Mortgagee**"). Any Landlord's Mortgagee may elect, at any time, unilaterally, to make this Lease superior to its Mortgage, Primary Lease, or other interest in the Premises by so notifying Tenant in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, in confirmation of such subordination, Tenant shall execute and return to Landlord (or such other party designated by Landlord) within ten days after written request therefore such documentation, in recordable form if required, as a Landlord's Mortgagee may reasonably request to evidence the subordination of this Lease to such Landlord's Mortgagee's Mortgage or Primary Lease (including a subordination, non-disturbance and atonement agreement) or, if the Landlord's Mortgagee so elects, the subordination of such Landlord's Mortgagee's Mortgage or Primary Lease to this Lease.

(b) **Atonement**. Tenant shall at torn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, upon such party's request, and shall execute such agreements confirming such atonement as such party may reasonably request.

13. **Rules and Regulations**. Tenant shall comply with the rules and regulations of the Building which are attached hereto as Exhibit C. Landlord may, from time to time, change such rules and regulations for the safety, care, or cleanliness of the Building and related facilities, provided that such changes are applicable to all tenants of the Building, will not unreasonably interfere with Tenant's use of the Premises and are enforced by Landlord in a non-discriminatory manner. Tenant shall be responsible for the compliance with such rules and regulations by each Tenant Party.

14.     **Condemnation**.

(a)     **Total Taking**.  If the entire Building or Premises are taken by right of eminent domain or conveyed in lieu thereof (a "**Taking**"), this Lease shall terminate as of the date of the Taking.

(b)     **Partial Taking - Tenant's Rights**.  If any part of the Building becomes subject to a Taking and such Taking will prevent Tenant from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Taking for a period of more than 180 days, then Tenant may terminate this Lease as of the date of such Taking by giving written notice to Landlord within 30 days after the Taking, and Base Rent and Additional Rent shall be apportioned as of the date of such Taking.  If Tenant does not terminate this Lease, then Rent shall be abated on a reasonable basis as to that portion of the Premises rendered untenantable by the Taking.

(c)     **Partial Taking - Landlord's Rights**.  If any material portion, but less than all, of the Building becomes subject to a Taking, or if Landlord is required to pay any of the proceeds arising from a Taking to a Landlord's Mortgagee, then Landlord may terminate this Lease by delivering written notice thereof to Tenant within 30 days after such Taking, and Base Rent and Additional Rent shall be apportioned as of the date of such Taking.  If Landlord does not so terminate this Lease, then this Lease will continue, but if any portion of the Premises has been taken, Rent shall abate as provided in the last sentence of Section 14.(b).

(d)     **Award**.  If any Taking occurs, then Landlord shall receive the entire award or other compensation for the Land, the Building, and other improvements taken; however, Tenant may separately pursue a claim (to the extent it will not reduce Landlord's award) against the condemnor for the value of Tenant's personal property which Tenant is entitled to remove under this Lease, moving costs, loss of business, and other claims it may have.

15.     **Fire or Other Casualty**.

(a)     **Repair Estimate**.  If the Premises or the Building are damaged by fire or other casualty (a "**Casualty**"), Landlord shall, within 60 days after such Casualty, deliver to Tenant a good faith estimate (the "**Damage Notice**") of the time needed to repair the damage caused by such Casualty.

(b)     **Tenant's Rights**.  If a material portion of the Premises is damaged by Casualty such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Casualty and Landlord estimates that the damage caused thereby cannot be repaired within 270 days after the Casualty (the "**Repair Period**"), then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.

(c)     **Landlord's Rights**.  If a Casualty damages the Premises or a material portion of the Building and (1) Landlord estimates that the damage to the Premises cannot be repaired within the Repair Period, (2) the damage to the Premises exceeds 50% of the replacement cost thereof (excluding foundations and footings), as estimated by Landlord, and such damage occurs during the last two years of the Term, (3) regardless of the extent of damage to the Premises, Landlord makes a good faith determination that restoring the Building would be uneconomical, or (4) Landlord is required to pay any insurance proceeds arising out of the Casualty to a Landlord's Mortgagee, then Landlord may terminate this Lease by giving written notice of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.

(d)     **Repair Obligation**.  If neither party elects to terminate this Lease following a Casualty, then Landlord shall, within a reasonable time after such Casualty, begin to repair the Premises and shall proceed with reasonable diligence to restore the Premises to substantially the same condition as they existed immediately before such Casualty; however, Landlord shall only be required to reconstruct the Premises to the extent of any improvements existing therein on the date of the damage that were installed by Landlord as part of the List of Work (if any) pursuant to Exhibit D ("**Landlord's Contribution**"), and Landlord's obligation to repair or restore the Premises shall be limited to the extent of the insurance proceeds actually received by Landlord for the Casualty in question.  Tenant shall be responsible for repairing or replacing its furniture, equipment, fixtures, alterations and other improvements which

Landlord is not obligated to restore, and shall use the proceeds of its insurance for such purpose. (**"Tenant's Contribution"**). Prior to Landlord's commencement of reconstruction, Tenant shall place Landlord's estimate of Tenant's Contribution in escrow with Landlord (or furnish Landlord other commercially reasonable assurances of payment thereof).

(e)     **Abatement of Rent**.  If the Premises are damaged by Casualty, Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of Landlord's repairs (or until the date of termination of this Lease by Landlord or Tenant as provided above, as the case may be), unless a Tenant Party caused such damage, in which case, Tenant shall continue to pay Rent without abatement.

16.     **Personal Property Taxes**.  Tenant shall be liable for all taxes levied or assessed against personal property, furniture, or fixtures placed by Tenant in the Premises.  If any taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of such personal property, furniture or fixtures and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord, within 30 days following written request, the part of such taxes for which Tenant is primarily liable hereunder; however, Landlord shall not pay such amount if Tenant notifies Landlord that it will contest the validity or amount of such taxes before Landlord makes such payment, and thereafter diligently proceeds with such contest in accordance with Law and if the non-payment thereof does not pose a threat of loss or seizure of the Building or interest of Landlord therein or impose any fee or penalty against Landlord.

17.     **Events of Default**.  Each of the following occurrences shall be an **"Event of Default"**:

(a)     **Payment Default**.  Tenant's failure to pay Rent within five days after Landlord has delivered written notice to Tenant that the same is due; however, an Event of Default shall occur hereunder without any obligation of Landlord to give any notice if Tenant fails to pay Rent when due and, during the 12 month interval preceding such failure, Landlord has given Tenant written notice of failure to pay Rent on one or more occasions;

(b)     **Abandonment**.  Tenant (1) abandons or vacates the Premises or any substantial portion thereof or (2) fails to continuously operate its business in the Premises;

(c)     **Estoppels**  Tenant fails to provide any estoppels certificate after Landlord's written request therefore pursuant to Section 25(e) and such failure shall continue for five days after Landlord's second written notice thereof to Tenant;

(d)     **Other Defaults**.  Tenant's failure to perform, comply with, or observe any other agreement or obligation of Tenant under this Lease and the continuance of such failure for a period of more than 30 days after Landlord has delivered to Tenant written notice thereof; and

(e)     **Insolvency**.  The filing of a petition by or against Tenant (the term **"Tenant"** shall include, for the purpose of this Section 17(e), any guarantor of Tenant's obligations hereunder) (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; or (4) for the reorganization or modification of Tenant's capital structure; however, if such a petition is filed against Tenant, then such filing shall not be an Event of Default unless Tenant fails to have the proceedings initiated by such petition dismissed within 90 days after the filing thereof.
Any notice periods provided for under this Section 17 shall run concurrently with any statutory notice periods and any notice given hereunder may be given simultaneously with or incorporated into any such statutory notice.

18.     **Remedies**.  Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take any one or more of the following actions:

(a)     **Termination of Lease**.  Terminate this Lease by giving Tenant written notice

thereof, in which event Tenant shall immediately surrender possession of the Premises to Landlord for Landlord's account, and pay to Landlord the sum of (1) all accrued Rent and other sums hereunder required to be paid through the date of termination, and (2) all amounts due under Section 19.(a);

(b)    **Termination of Possession**.  Terminate Tenant's right to possess the Premises without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall immediately surrender possession of the Premises to Landlord for Tenant's account and pay to Landlord (1) all Rent and other amounts accrued hereunder to the date of termination, (2) all amounts due from time to time under Section 19(a), and (3) all Rent and other net sums required hereunder to be paid by Tenant during the remainder of the Term, diminished by any net sums thereafter received by Landlord through relenting the Premises during such period, after deducting all costs incurred by Landlord in relenting the Premises.  If Landlord elects to proceed under this Section 18(b), Landlord may remove all of Tenant's property from the Premises and store the same in a public warehouse or elsewhere at the cost of, and for the account of, Tenant, without becoming liable for any loss or damage which may be occasioned thereby. Landlord shall use reasonable efforts to relent the Premises on such terms as Landlord in its sole discretion may determine (including a term different from the Term, rental concessions, and alterations to, and improvement of, the Premises); however, Landlord shall not be obligated to relent the Premises before leasing other portions of the Building. Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or to collect Rent due for such reletting. Tenant shall not be entitled to the excess of any consideration obtained by relenting over the Rent due hereunder.  Reentry by Landlord in the Premises shall not affect Tenant's obligations hereunder for the unexpired Term; rather, Landlord may, from time to time, bring an action against Tenant to collect amounts due by Tenant, without the necessity of Landlord's waiting until the expiration of the Term. Unless Landlord delivers written notice to Tenant expressly stating that it has elected to terminate this Lease, all actions taken by Landlord to dispossess or exclude Tenant from the Premises shall be deemed to be taken under this Section 18(b).  If Landlord elects to proceed under this Section 18(b), it may at any time elect to terminate this Lease under Section 18(a); or

(c)    **Acceleration**.  Accelerate and declare all Rent and other sums due and to become due under this Lease immediately due and payable, and bring suit for the collection thereof and for the applicable damages as described in Section 19(a), without entering into possession of the Premises or terminating this Lease.

19.    **Payment by Tenant; Non-Waiver; Cumulative Remedies**.

(a)    **Payment by Tenant**.  Upon any Event of Default, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses of any kind at all stages including but not limited to pre-litigation, litigation, and post-litigation) in (1) obtaining possession of the Premises, (2) removing and storing Tenant's or any other occupant's property, (3) repairing, restoring, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant, (4) if Tenant is dispossessed of the Premises and this Lease is not terminated, reletting all or any part of the Premises (including brokerage commissions, cost of tenant finish work, and other costs incidental to such relenting), (5) performing Tenant's obligations which Tenant failed to perform, and (6) enforcing, or advising Landlord of, its rights, remedies, and recourses arising out of the Event of Default.  To the full extent permitted by law, Landlord and Tenant agree the federal and state courts of the state in which the Premises are located shall have exclusive jurisdiction over any matter relating to or arising from this Lease and the parties' rights and obligations under this Lease.

(b)    **No Waiver**.  Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default.  No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such term.  Landlord's acceptance of any partial payment of Rent shall not waive Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

(c)    **Cumulative Remedies**.  Any and all remedies set forth in this Lease: (1) shall be in addition to any and all other remedies Landlord may have at law or in equity, (2) shall be cumulative, and (3) may be pursued

successively or concurrently as Landlord may elect.  The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

       20.   **Landlord's Lien**.  In addition to any statutory landlord's lien, now or hereafter enacted, Tenant grants to Landlord, to secure performance of Tenant's obligations hereunder, a security interest in all goods (including equipment and inventory), fixtures, and other personal property of Tenant situated on the Premises, and all proceeds thereof (the "**Collateral**"), and the Collateral shall not be removed from the Premises without the prior written consent of Landlord (other than in Tenant's ordinary course of business) until all obligations of Tenant have been fully performed.  Upon the occurrence of an Event of Default, Landlord may, in addition to all other remedies, without notice or demand except as provided below, exercise the rights afforded to a secured party under the Uniform Commercial Code of the state in which the Premises are located (the "**UCC**").  To the extent the UCC requires Landlord to give to Tenant notice of any act or event and such notice cannot be validly waived before a default occurs, then five-days' prior written notice thereof shall be reasonable notice of the act or event.  Tenant grants to Landlord a power of attorney to execute and file any financing statement or other instrument necessary to perfect Landlord's security interest under this Section 20, which power is coupled with an interest and is irrevocable during the Term.  Landlord may also file a copy of this Lease as a financing statement to perfect its security interest in the Collateral.  Within ten days following written request therefore, Tenant shall execute financing statements to be filed of record to perfect Landlord's security interest in the Collateral.

             **GUARANTOR.**  If a Guarantor is required, Guarantor is liable for all sums due under this Agreement, any Extensions, any Addenda executed contemporaneously with this Agreement and for any other sums due from Lessee to Lessor, no matter when or how incurred.  Lessor does not have to attempt collection from Lessee before proceeding against Guarantor.  Guarantor will not be released unless Lessor specifically releases Guarantor in a writing signed by Lessor.  Landlord shall not be required to give a demand notice to a guarantor.  No notice shall be required.

21.   **Surrender of Premises**.  No act by Landlord shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord.  At the expiration or termination of this Lease, Tenant shall deliver to Landlord the Premises with all improvements located therein in good repair and condition, free of Hazardous Materials placed on the Premises during the Term, broom-clean, reasonable wear and tear (and condemnation and Casualty damage not caused by Tenant, as to which Sections 14 and 15 shall control) excepted, and shall deliver to Landlord all keys to the Premises.  Provided that Tenant has performed all of its obligations hereunder, Tenant may remove all unattached trade fixtures, furniture, and personal property placed in the Premises or elsewhere in the Building by Tenant (but Tenant may not remove any such item which was paid for, in whole or in part, by Landlord or any wiring or cabling unless Landlord requires such removal).  Additionally, at Landlord's option, Tenant shall remove such alterations, additions, improvements, trade fixtures, personal property, equipment, wiring, cabling, and furniture as Landlord may request; however, Tenant shall not be required to remove any addition or improvement to the Premises if Landlord has specifically agreed in writing that the improvement or addition in question need not be removed.  Tenant shall repair all damage caused by such removal.  All items not so removed shall, at Landlord's option, be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord with notice to Tenant and without any obligation to account for such items; any such disposition shall not be considered a strict foreclosure or other exercise of Landlord's rights in respect of the security interest granted under Section 20.  The provisions of this Section 21 shall survive the end of the Term. .

       22.   **Holding Over**.  If Tenant fails to vacate the Premises at the end of the Term, then Tenant shall be a tenant at sufferance and, in addition to all other damages and remedies to which Landlord may be entitled for such holding over, (a) Tenant shall pay, in addition to the other Rent, Basic Rent equal to the greater of (1) 200% of the Basic Rent payable during the last month of the Term, or (2) 150% of the prevailing rental rate in the Building for similar space, whichever is greater and (b) Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease.  The provisions of this Section 22 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law.  If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees and

costs at all stages including but not limited to pre litigation, litigation and post litigation) and liability resulting from such failure, including any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits to Landlord resulting therefore.

      23.    **Certain Rights Reserved by Landlord**.  Provided that the exercise of such rights does not unreasonably interfere with Tenant's occupancy of the Premises, Landlord shall have the following rights:

      (a)    **Building Operations**.  To decorate and to make inspections, repairs, alterations, additions, changes, or improvements, whether structural or otherwise, in and about the Building, or any part thereof; to enter upon the Premises (after giving Tenant reasonable notice thereof, which may be oral notice, except in cases of real or apparent emergency, in which case no notice shall be required) and, during the continuance of any such work, to temporarily close doors, entryways, public space, and corridors in the Building; to interrupt or temporarily suspend Building services and facilities; to change the name of the Building; and to change the arrangement and location of entrances or passageways, doors, and doorways, corridors, elevators, stairs, restrooms, or other public parts of the Building;

      (b)    **Security**.  To take such reasonable measures as Landlord deems advisable for the security of the Building and its occupants; evacuating the Building for cause, suspected cause, or for drill purposes; temporarily denying access to the Building; and closing the Building after normal business hours and on Sundays and holidays, subject, however, to Tenant's right to enter when the Building is closed after normal business hours under such reasonable regulations as Landlord may prescribe from time to time;

      (c)    **Prospective Purchasers and Lenders**.  To enter the Premises at all reasonable hours to show the Premises to prospective purchasers or lenders; and

      (d)    **Prospective Tenants**.  At any time during the last 6 months of the Term (or earlier if Tenant has notified Landlord in writing that it does not desire to renew the Term) or at any time following the occurrence of an Event of Default, to enter the Premises at all reasonable hours to show the Premises to prospective tenants.

      24.  **Substitution Space**.  Landlord may, at Landlord's expense, relocate Tenant within the Building to space which is comparable in size, utility and condition to the Premises.  If Landlord relocates Tenant, Landlord shall reimburse Tenant for Tenant's reasonable out-of-pocket expenses for moving Tenant's furniture, equipment, and supplies from the Premises to the relocation space and for reprinting Tenant's stationery of the same quality and quantity as Tenant's stationery supply on hand immediately before Landlord's notice to Tenant of the exercise of this relocation right.  Upon such relocation, the relocation space shall be deemed to be the Premises and the terms of the Lease shall remain in full force and shall apply to the relocation space.

      25.  **Miscellaneous**.

      (a)    **Landlord Transfer**.  Landlord may transfer any portion of the Building and any of its rights under this Lease.  If Landlord assigns its rights under this Lease, then Landlord shall thereby be released from any further obligations hereunder arising after the date of transfer, provided that the assignee assumes Landlord's obligations hereunder in writing.

      (b)    **Landlord's Liability**.  The liability of Landlord (and its partners, shareholders or members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Building shall be limited to Tenant's actual direct, but not consequential, damages therefore and shall be recoverable

only from the interest of Landlord in the Building, and Landlord (and its partners, shareholders or members) shall not be personally liable for any deficiency.

(b1)    **NO BROKERS**.  Lessor and Lessee represent and warrant to each other that no brokerage commissions are due to any real estate broker in relation to this Lease except <u>Harding Realty Inc.</u>, and Related Cervera Realty Services, whose commission shall be paid exclusively by Lessor, and agree to indemnify and hold each other harmless for any damages, costs or legal fees which may be incurred as a result of any claims for such commissions in contravention of the representations in this Paragraph.  No commission is paid on any renewal period(s).  Such commission amount and terms, which is negotiated through a separate agreement

(b2)    **AMBIGUITIES**.  Lessee has had an opportunity to read this Agreement and to ask questions.  If Lessee later asserts any ambiguities in the Agreement, those ambiguities will be interpreted in favor of Lessor.

(c)    **Force Majure**    Other than for Tenant's obligations under this Lease that can be performed by the payment of money (e.g., payment of Rent and maintenance of insurance), whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations, or restrictions, or any other causes of any kind whatsoever which are beyond the control of such party.

(d)    (e)    **Estoppels Certificates**.    From time to time, Tenant shall furnish to any party designated by Landlord, within ten days after Landlord has made a request therefore, a certificate signed by Tenant in a form suitable for Landlord's purposes, confirming and containing such factual certifications and representations as to this Lease as Landlord may reasonably request.

(f)    **Notices**.  All notices and other communications given pursuant to this Lease shall be in writing and shall be (1) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the parties hereto at the address specified below:, (2) hand delivered to the intended address, (3) sent by a nationally recognized overnight courier service, or (4) sent by facsimile transmission during normal business hours followed by a confirmatory letter sent in another manner permitted hereunder.  All notices shall be effective upon delivery to the address of the addressee.  The parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

FOR THE LESSOR:    LeaseFlorida LLC
6001 NW 153rd Street, Suite#110
Miami Lakes, FL  33014
alan@leaseflorida.com

WITH A COPY TO:    Law Offices of Richard Waserstein
1124 Kane Concourse
Bay Harbor, FL 33154
SLW@WNFLAW.COM

With A Copy TO:    LeaseFlorida 28 Flagler LLC
Courthouse Plaza
28 W.Flagler St
Miami, Fl. 33130
Teresa@leaseflorida.com

FOR THE LESSEE:

Name _____

Address _____

_____

_____

EMAIL _____

TEL. _____

FAX. _____

**(f1.) HURRICANE PREPARDNESS.** In the event of a hurricane watch/warning it is the Tenants responsibility to secure their unit, install hurricane shutters and protect the premises.   If Tenant does not secure the unit within 24-hours of the hurricanes approach the Landlord has the option to secure the premises at the Tenants sole cost and expense.

(g)      **Reparability**. If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby and in lieu of such clause or provision, there shall be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

(h)      **Amendments; Binding Effect**.  This Lease may not be amended except by instrument in writing signed by Landlord and Tenant. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord, and no custom or practice which may evolve between the parties in the administration of the terms hereof shall waive or diminish the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms hereof.  The terms and conditions contained in this Lease shall inure to the benefit of and be binding upon the parties hereto, and upon their respective successors in interest and legal representatives, except as otherwise herein expressly provided.  This Lease is for the sole benefit of Landlord and Tenant, and, other than Landlord's Mortgagee, no third party shall be deemed a third party beneficiary hereof.

(i)      **Quiet Enjoyment**.  Provided Tenant has performed all of its obligations hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, but not otherwise, subject to the terms and conditions of this Lease.

(j)      **No Merger**.  There shall be no merger of the leasehold estate hereby created with the fee estate in the Premises or any part thereof if the same person acquires or holds, directly or indirectly, this Lease or any interest in this Lease and the fee estate in the leasehold Premises or any interest in such fee estate.

(k)      **No Offer**.  The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

(l)      **Entire Agreement**.  This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto.  Except for those set forth in this Lease, no representations, warranties, or agreements have been made by Landlord or Tenant to the other with respect to this Lease or the obligations of Landlord or Tenant in connection therewith.   It is acknowledged by the parties that each party has had an opportunity to seek counsel of its choosing and fairly negotiate all of the terms of this lease.  The normal rule of construction that any ambiguities be resolved against the drafting party shall not apply to the interpretation of this Lease or any exhibits or amendments hereto.

(m)      **Waiver of Jury Trial**.  To the maximum extent permitted by law, Landlord and Tenant each waive right to trial by jury in any litigation arising out of or with respect to this Lease.

(n)      **Governing Law**.  This Lease shall be governed by and construed in accordance with the laws of the state in which the Premises are located and any action arising out of or related directly or indirectly to the terms of this lease shall be brought in the County or Circuit Court of Miami-Dade County, Florida.

(o)   **Recording**.  Tenant shall not record this Lease without the prior written consent of Landlord, which consent may be withheld or denied in the sole and absolute discretion of Landlord.

(p)   **Joint and Several Liability**.  If Tenant is comprised of more than one party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease.  All unperformed obligations of Tenant at the end of the Term shall survive.

(p1)   **Lien** Lessor may file a lien in the public record for any amount that is due and owing by the tenant, and may file this lien against the tenant and guarantor, and shall be authorized to pull credit reports at will.

(r)   **Landlord's Fees**.  Whenever Tenant requests Landlord to take any action not required of it hereunder or give any consent required or permitted under this Lease, Tenant will reimburse Landlord for Landlord's reasonable, out-of-pocket costs payable to third parties and incurred by Landlord in reviewing the proposed action or consent, including reasonable attorneys', engineers' or architects' fees, within 30 days after Landlord's delivery to Tenant of a statement of such costs.  Tenant will be obligated to make such reimbursement without regard to whether Landlord consents to any such proposed action. . Lessee may not use the deposit as last month's rent.  Lessee will be charged a $75 cleanup charge and a $50 re-keys charge upon expiration of lease.

(r1) **LEASE TERMINATION FEE**.  The Lessor will charge a lease termination fee of at least 2 months rent on a yearly lease, even if the unit does not remain empty for two months after vacated. If the premises remain vacant for more than 2 months, then the Lessor will charge the Tenant for the time the unit remains vacant.

(s)   **Telecommunications**.  Tenant or its telecommunications companies, including local exchange telecommunications companies and alternative access vendor services companies, shall have no right of access to and within the Building, for the installation and operation of telecommunications systems, including voice, video, data, Internet, and any other services provided over wire, fiber optic, microwave, wireless, and any other transmission systems ("**Telecommunications Services**"), for part or all of Tenant's telecommunications within the Building and from the Building to any other location without Landlord's prior written consent.  All providers of Telecommunications Services shall be required to comply with the rules and regulations of the Building, applicable Laws and Landlord's policies and practices for the Building.  Tenant acknowledges that Landlord shall not be required to provide or arrange for any Telecommunications Services and that Landlord shall have no liability to any Tenant Party in connection with the installation, operation or maintenance of Telecommunications Services or any equipment or facilities relating thereto.  Tenant, at its cost and for its own account, shall be solely responsible for obtaining all Telecommunications Services.

(t)   **Confidentiality**.  Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent or by Order of a Court of competent jurisdiction.  The consent by Landlord to any disclosures shall not be deemed to be a waiver  on the part of Landlord of any prohibition against any future disclosure.

(u)   **Notice Concerning Radon Gas**.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a structure in sufficient quantities, may present health risks to persons who are exposed to it.  Levels of radon that exceed Federal and State guidelines have been found in buildings in the State of Florida.  Additional information regarding radon and radon testing may be obtained from the county public health unit.  Landlord makes no representation to Tenant concerning the presence or absence of radon gas in the Premises or the Building at any time or in any quantity.  By executing this Lease, Tenant expressly releases Landlord from any loss, claim, liability, or damage now or hereafter arising from or relating to the presence at any time of such substances in the Premises or the Building.

(v)      **No Right to Terminate**.  Tenant hereby waives the remedies of termination and rescission and hereby agrees that Tenant's sole remedies for Landlord's default hereunder and for breach of any promise or inducement shall be limited to a suit for damages and/or injunction.

(w)      **Authority**.  Tenant (if a corporation, partnership or other business entity) hereby represents and warrants to Landlord that Tenant is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Tenant has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Tenant is authorized to do so.  Landlord hereby represents and warrants to Tenant that Landlord is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Landlord has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Landlord is authorized to do so.

(x)      **Hazardous Materials**.  The term "**Hazardous Materials**" means any substance, material, or waste which is now or hereafter classified or considered to be hazardous, toxic, or dangerous under any Law relating to pollution or the protection or regulation of human health, natural resources or the environment, or poses or threatens to pose a hazard to the health or safety of persons on the Premises or in the Building.  Tenant shall not use, generate, store, or dispose of, or permit the use, generation, storage or disposal of Hazardous Materials on or about the Premises or the Building except in a manner and quantity necessary for the ordinary performance of Tenant's business, and then in compliance with all Laws.  If Tenant breaches its obligations under this Section 25.(x), Landlord may immediately take any and all action reasonably appropriate to remedy the same, including taking all appropriate action to clean up or remediate any contamination resulting from Tenant's use, generation, storage or disposal of Hazardous Materials. Tenant shall defend, indemnify, and hold harmless Landlord and its representatives and agents from and against any and all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses (including reasonable attorneys' fees and cost of clean up and remediation) arising from Tenant's failure to comply with the provisions of this Section 25.(x). This indemnity provision shall survive termination or expiration of this Lease.

(x1)     Mold of all varieties are types of fungusus.  They can be found in all everyday environments including the space you are leasing. People  exposed to molds may develop a variety of illnesses, some of which can be quiet serious.  The space is being taken in "as is " condition so the Landlord suggests that the Tenant make arrangements to cure any potential problems.  If any mold is found it is not to be disturbed without first notifying the landlord.

(x2)     Asbestos is usually found in everyday environments, older buildings , including the space you are leasing. People exposed to Asbestos may develop a variety of illnesses, some of which can be quiet serious.  The space is being taken in "as is " condition so the Landlord suggests that the Tenant make arrangements to cure any potential problems.  If any asbestos is found it is not to be disturbed without first notifying the landlord.

(y)      **No Liability.**   Notwithstanding any other provision of this agreement to the contrary, it is understood and agreed between the parties that Landlord shall not in any event, whether caused by Landlord's negligence or otherwise, be liable for any failure of water supply, electric current, heating or air conditioning, elevator service, or any other service, nor be liable for any loss, damage or injury to the Lessee, Lessee's agents, servants, employees, or visitors, or the Lessee's property, for any damage or injury caused by or from the bursting or leaking of boilers of water, any other water source, sewer, steam or gas pipes or from electricity, water, rain or dampness which may leak or flow from any part of the Building or from the exterior thereof, or by fire or theft or by other other tenants or persons on the property or resulting from the operation or non-operation of elevators, heating or air conditioning or light apparatus or from falling ceiling tiles or plaster, or from electric wires, equipment or fixtures, or from gas odors or plumbing fixtures, or from the elements, or from any cause whatsoever, except in case of the willful neglect of the Landlord.  All goods or property or personal effects stored or placed by the Tenant in or about the property shall be at the sole risk of the Tenant.

(z)      **List of Exhibits**.  All exhibits and attachments attached hereto are incorporated herein by this reference.

Exhibit A -      Outline of Premises
Exhibit B -      Description of the Land

Exhibit C -    Building Rules and Regulations
Exhibit D -    List of Work to Be Performed
Exhibit E-     Concessions
Exhibit F-     Confirmation of Commencement Date

LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSE, AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, DEMAND, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

[THIS SECTION INTENTIONALLY LEFT BLANK]

**LANDLORD:**                          **LeaseFlorida 28 Flagler, LLC,**
                                        A  Florida Limited Liability Company

Witness_____
Name:_____             By: _____

Witness_____
Name:_____             Name:_____

                                        Title:_____
                                        Date: _____

**TENANT:**                            World Parcel Express Service

Witness_____
Name:_____             By: _____

Witness_____             Name: Juan Gonzalez
Name:_____
                                        Title: President
                                        Date: 2-8-17

**Guarantor:**

                                        By:_____

                                        Name:_____

WITNESS:
Sign: _____
Print: Jenny Dunsimon

**EXHIBIT A**

**OUTLINE OF PREMISES**

**EXHIBIT B**

**DESCRIPTION OF THE LAND**

**OFFICE BUILDING LOCATED IN THE CENTER OF DOWNTOWN**

**Legal Description:** All that part of Lot 3, block 123 North, CITY OF MIAMI, according to the Plat thereof, recorded in Plat Book "B", Page 41,of the Public Records of Miami-Dade County, Florida lying West of the following described line; COMMENCE at the Northeast corner of said Lot 3; thence run West along the North line of said Lot 3, said point being the POINT OF BEGINNING of the aforesaid line; thence run South parallel to and 0.17 feet East of the West line of said Lot3, 21.48 feet to a point; thence deflect 90 degrees in the right and run 0.17 feet to a point on the West line of said Lot3; thence deflect to the left 90 degrees and run South along the West line of said Lot, 46.69 feet to a point; thence deflect left 90 degrees and run 5.28 feet to a point; thence run South 25.62 feet to a point 5.22 feet East of the West line of said Lot3; thence run West along a line That is a right angles to the West line of said Lot3, for 5.22 feet to a point on the West line of said Lot3; thence run South along the West line of said Lot 3, 26.20 feet, more or less, to the Southwest corner of said Lot 3 and the POINT OF TERMINATION of the above described line, AND

All of Lot 4, and the East 3 feet of Lot 5, in Block 123 North, CITY OF MIAMI, according to the Plat thereof, as recorded in Plat book "B", Page 41, of the Public records of Miami-Dade County, Florida.

(THE  REMAINDER  OF  THIS  PAGE  IS  BEING  LEFT  BLANK  INTENTIONALLY)

## EXHIBIT C

## BUILDING RULES AND REGULATIONS

The following rules and regulations shall apply to the Premises, the Building and the appurtenances thereto and are incorporated into the Lease terms in their entirety:

The following Rules and Regulations, hereby accepted by Tenant, are prescribed by Landlord to enable Landlord to provide, maintain, and operate, to the best of Landlord's ability, orderly, clean and desirable premises, Building and parking facilities for the Tenants therein at as economical a cost as reasonably possible and in as efficient a manner as reasonably possible, to assure security for the protection of Tenants as far as reasonably possible, and to regulate conduct in and use of said Premises, Building and parking facilities in such manner as to minimize interference by others in the proper use of same by Tenant.

1.   Tenant, its officers, agents, servants and employees shall not block or obstruct any of the entries, passages, doors, elevators, elevator doors, hallways or stairways of Building or garage, or place, empty or throw any rubbish, litter, trash or material of any nature into such areas, or permit such areas to be used at any time except for ingress or egress of Tenant, its officers, agents, servants, employees, patrons, licenses, customers, visitors or invitees.

2.   The movement of furniture, equipment, machines, merchandise or materials within, into or out of the Leased Premises, Building or parking facilities shall be restricted to time, method and routing of movement as determined by Landlord upon request from Tenant and Tenant shall assume all liability and risk to property, Premises and Building in such movement. Tenant shall not move furniture, machines, equipment, merchandise or materials within, into or out of the Building, Leased Premises or garage facilities without having first obtained a written permit from Landlord twenty-four (24) hours in advance. Safes, large files, electronic data processing equipment and other heavy equipment or machine shall be moved into Leased Premises, Building or parking facilities only with Landlord's written consent and placed where directed by Landlord.

3.   No sign, door plaque, advertisement or notice shall be displayed, painted or affixed by tenants, its officers, agents, servants, employees, patrons, licensees, customers, visitors, or invitees in or on any part of the outside or inside of the Building, garage facilities or Leased Premises without prior written consent of Landlord and then only of such color, size, character, style and materials and in such places as shall be approved and designated by Landlord. Signs on doors and entrances to Leased Premises shall be placed thereon by a contractor designated by Landlord and paid for by Tenant.

4.   Landlord will not be responsible for lost or stolen property, equipment, money or any article taken from Leased Premises, Building or parking facilities regardless of how or when loss occurs.

5.   No additional locks shall be placed on any door or changes made to existing locks in Building without the prior written consent of Landlord. Landlord will furnish two keys to each lock on the doors in the Leased Premises and Landlord, upon request of Tenant, shall provide additional duplicate keys at Tenant's expense. Landlord may at all times keep a pass key to the Leased Premises. All keys shall be returned to Landlord promptly upon termination of this Lease.

6.  Tenant, its officers, agents, servants or employees shall do no painting or decorating in Leased Premises, or mark, paint or cut into, drive nails or screw into or in any way deface any part of Leased Premises or Building without the prior written consent of Landlord.  If Tenant desires signal, communication, alarm or other utility or service connection installed or changed, such work shall be done at expense of Tenant, with the approval and under the direction of Landlord.

7.  Landlord reserves the right to: (i) close the Building at 6:00 P.M., subject, however, to Tenant's right to admittance under regulations prescribed by Landlord, and to require the persons entering the Building to identify themselves and establish their right to enter or to leave the Building; (ii) close all parking areas between the hours of 9:00 P.M. and 7:00 A.M., during week days; (iii) close all parking areas on weekends and holidays.

8.  Tenant, its officers, agents, servants and employees shall not permit the operation of any musical or sound producing instruments or device which may be heard outside Leased Premises, Building or parking facilities, or what may emanate electrical waves which will impair radio or television broadcasting or reception from or in Building.

9.  Tenant, its officers, agents, servants, and employees shall, before leaving Leased Premises unattended, close and lock all doors and shut off all utilities; damage resulting from failure to do so shall be paid by tenant.  Each Tenant before the closing of the date and leaving the said Leased Premises shall see that all blinds and/or draperies are pulled and drawn.

10.  All plate and other glass now in Leased Premises or Building which is broken through cause attributable to Tenant, its offices, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall be placed by and at expense of Tenant under the direction of Landlord.

11.  Tenant shall give Landlord prompt notice of all accidents to or defects in air conditioning equipment, plumbing, electric facilities or any part or appurtenance of Leased Premises.

12.  The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substances of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose officers, employees, agents, servants, patrons, customers, licensees, visitors or invitees shall have caused it.

13.  All contractors and/or technicians performing work for Tenant within the Leased Premises, Building or parking facilities shall be referred to Landlord for approval before performing such work.  This shall apply to all work including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and all installations affecting floors, walls, windows, doors, ceiling, equipment or any other physical feature of the Building, Leased Premises or parking facilities.  None of this work shall be done by Tenant without Landlord's prior written approval.

14.   No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, nor placed in the halls, corridors or vestibules without the prior written consent of Landlord.

15.   Glass panel doors that reflect or admit light into the passageways or into any place in the Building shall not be covered or obstructed by the Tenant, and Tenant shall not permit, erect, and/or place drapes, furniture, fixtures, shelving, display cases or tables, lights or signs and advertising devices in front of or in proximity of interior and exterior windows, glass panels, or glass doors providing a view into the interior of the Leased Premises unless same have first been approved in writing by Landlord.

16.   Canvassing, soliciting and peddling in the Building or parking facilities is prohibited and each Tenant shall cooperate to prevent the same.  In this report, Tenant shall promptly report such activities to the Building Manager's office.

17.   There shall not be used in any space, or in the public halls of the Building, either by any Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

18.   The work of Landlord's janitors or cleaning personnel shall not be hindered by Tenant after 5:30 P.M. and such work may be done at any time when the offices are vacant.  The windows, doors and fixtures may be cleaned at any time.  Tenant shall provide adequate waste and rubbish receptacles, cabinets, bookcases, map cases, etc., necessary to prevent unreasonable hardship on Landlord in discharging its obligation regarding cleaning service.  In this regard, Tenant shall also empty all glasses, cups and other containers holding any type of liquid whatsoever.

19.   In the event Tenant must dispose of crates, boxes, etc., which will not fit into office wastepaper baskets, it will be the responsibility of Tenant with Landlord's assistance to dispose of same.  In no event shall Tenant set such items in the public hallways or other areas of Building or parking facilities, excepting Tenant's own Premises, for disposal.

20.   Tenants are cautioned in purchasing furniture and equipment that the size is limited to such as can be placed on the elevator and will pass through the doors of the Leased Premises.  Large pieces should be made in part and set up in the Leased Premises.  Landlord reserves the right to refuse to allow to be placed in the Building any furniture or equipment of any description which does not comply with the above conditions.

21.   Tenant will be responsible for any damage to the Leased Premises, including carpeting and flooring, as a result of rust or corrosion of file cabinets, roller chairs, metal objects or spills of any type of liquid.

22.   If the Premises demised to any Tenant becomes infested with vermin, such Tenant, as its sole cost and expense, shall cause its premises to be exterminated from time to time, to the satisfaction of Landlord, and shall employ such exterminators therefore as shall be approved by Landlord.

23.  Tenant shall not install any antenna or aerial wires, or radio or television equipment, or any other type of equipment, inside or outside of the Building, without Landlord's prior approval in writing, and upon such terms and conditions as may be specified by Landlord in each and every instance.

24.  Tenant shall not advertise the business, profession or activities of Tenant in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining thereto, or use the name of the Building for any purpose other than that of the business address of Tenant or use any letterheads, envelopes, circulars, notices, advertisements, containers or wrapping material, without Landlord's express consent in writing.

25.  Tenant, its officers, agents, employees, servants, patrons, customers, licensees, invitees and visitors shall not solicit business in the Building's parking facilities or Common Areas, nor shall Tenant distribute any handbills or other advertising matter in automobiles parked in the Building's parking facilities.

26.  Tenant shall not conduct its business in such manner as to create any nuisance, or interfere with, annoy or disturb any other tenant in the Building, or Landlord in its operation of the Building or commit waste or suffer or permit waste to be committed in the Leased Premises, Building or parking facilities.  In addition, Tenant shall not allow its officers, agents, employees, servants, patrons, customers, licensees and visitors to conduct themselves in such manner as to create any nuisance or interfere with, annoy or disturb any other tenant in the Building or Landlord in its operation of the Building or commit waste or suffer or permit waste to be committed in the Leased Premises, Building or parking facilities.

27.  Tenant, its officers, agents, servants and employees shall not install or operate any refrigerating, heating or air conditioning apparatus or carry on any mechanical operation or bring into the Leased Premises, Building or garage facilities any inflammable fluids or explosives without written permission of Landlord.

28.  Tenant, its officers, agents, servants or employees shall not use Leased Premises, Building or garage facilities for housing, lodging or sleeping purposes or for the cooking or preparation of food without the prior written consent of Landlord.

29.  Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall not bring into garage facilities, Building or Leased Premises or keep on the Leased Premises any fish, fowl, reptile, insect, or animal or any bicycle or other vehicle without the prior written consent of Landlord, wheelchairs and baby carriages excepted.

30.  Neither Tenant nor any officer, agent, employee, servant, patron, customer, visitor, license or invitee of any Tenant shall go upon the roof of the Building without the written consent of the Landlord or the authorization of the Heliport administration.

31.   Tenant's employing laborers or others outside of the Building shall not have their employees paid in the Building, but shall arrange to pay their payrolls elsewhere.

32.   Tenant shall not use or bring into the Leased Premises any hazardous substances or toxic materials.

33.   In the event that Tenant loses, damages or does not return access cards to the building, then Landlord shall charge a $30.00 per card fee.

**(THE REMAINDER OF THIS PAGE IS BEING LEFT BLANK INTENTIONALLY)**

**EXHIBIT D**

**LIST OF WORK TO BE PERFORMED**

1. Tenant will take office as is
2. Tenant will hire a contractor at his own expense to make a door from existing office to 902

(THE  REMAINDER  OF  THIS  PAGE  IS  BEING  LEFT  BLANK  INTENTIONALLY)

**EXHIBIT E**
**CONCESSIONS**

1.          Rent for the period of March 1, thru March 31, 2012 will be abated.


**(THE   REMAINDER   OF   THIS   PAGE   IS   BEING   LEFT   BLANK   INTENTIONALLY)**

**EXHIBIT F**

**CONFIRMATION OF COMMENCEMENT DATE**

January 25, 2012

Landlord and Tenant agree as follows:

1.    **Condition of Premises**.  Tenant has accepted possession of the Premises pursuant to the Lease.  Any improvements required by the terms of the Lease to be made by Landlord have been completed to the full and complete satisfaction of Tenant.  Landlord has fulfilled all of its duties under the Lease with respect to such initial tenant improvements.  Furthermore, Tenant acknowledges that the Premises are suitable for the Permitted Use.

2.    **Commencement Date**.  The Commencement Date of the Lease is March 15, 2012.

3.    **Expiration Date**.  The Term is scheduled to expire on March 14, 2012.

4.    **Contact Person**.  Tenant's contact person in the Premises is:

     Attention: JENNY BENSIMON
     Telephone: 305-728-1940
     Telecopy: 305-779-5074

5.    **Ratification**.  Tenant hereby ratifies and confirms its obligations under the Lease, and represents and warrants to Landlord that it has no defenses thereto.  Additionally, Tenant further confirms and ratifies that, as of the date hereof, (a) the Lease is and remains in good standing and in full force and effect, and (b) Tenant has no claims, counterclaims, set-offs or defenses against Landlord arising out of the Lease or in any way relating thereto or arising out of any other transaction between Landlord and Tenant.

6.    **Binding Effect; Governing Law**.  Except as modified hereby, the Lease shall remain in full effect and this letter shall be binding upon Landlord and Tenant and their respective successors and assigns.  If any inconsistency exists or arises between the terms of this letter and the terms of the Lease, the terms of this letter shall prevail.  This letter shall be governed by the laws of the state in which the Premises are located.

     Please indicate your agreement to the above matters by signing this letter in the space indicated below and returning an executed original to us.

**LANDLORD:**                              **LeaseFlorida 22 Flagler, LLC,**

a Florida Limited Liability Company

By: _____

Name: _____

Title: _____
Date: _____

WITNESS:
Sign: _____
Print: _____

WINTESS:
Sign: _____
Print: _____

**TENANT:**

**World Parcel Express Inc**

By: _____

Name: Ivan Gonzalez

Title: President

WITNESS:
Sign: _____
Print: _____

WINTESS:
Sign: _____
Print: _____



1152 sqft

B    D

E

A    C

901

A =
B =
C =
D =
E =

Suite

28 WEST FLAGLER STREET
SUITE 902

CITY OF MIAMI
AS MEASURED SEPT. 14 , 2004