UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 1:14-cv-23109-SCOLA

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

PARTNERS IN HEALTH CARE
ASSOCIATION, INC., *et al.,*

    Defendants.
_____/

**RECEIVER'S REPLY IN SUPPORT OF RECEIVER'S MOTION FOR TURNOVER OF RECEIVERSHIP FUNDS TRANSFERRED TO GRUMER AND MACALUSO, P.A. AND FUNDS WITHDRAWN FROM THE TRI RESOURCE GROUP, LTD ACCOUNT**

Peter D. Russin, in his capacity as receiver (the "***Receiver***") of Partners in Health Care Association, Inc.; United Solutions Group Inc.; and their subsidiaries, affiliates, successors and assigns (collectively the "***Receivership Entities***"), appointed pursuant to this Court's Temporary Restraining Order dated August 25, 2014 [ECF No. 9] (the "***TRO***"); the Stipulated Preliminary Injunction Against United Solutions Group Inc., Constanza Gomez Vargas, and Walter S. Vargas [ECF No. 31] (the ***"USGI Preliminary Injunction"***); and the Corrected Preliminary Injunction Against Partners In Health Care Association, Inc., and Gary L. Kieper [ECF No. 36] (the ***"PIHC Preliminary Injunction"***) files this reply (the ***"Reply"***) in support of his Motion for turnover of receivership funds transferred to Grumer and Macaluso, P.A. and funds withdrawn from the Tri Resource Group, Ltd Account (the ***"Motion"***)[1] and states:

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the Motion.

1

## INTRODUCTION

Gary Kieper (*"**Kieper**"*) and Grumer & Macaluso (*"**G&M**"*, and collectively with Kieper, the *"**Respondents**"*) have filed a response [ECF No. 51] (the *"**Response**"*) and two declarations [ECF No. 50 & 52] (collectively the *"**Declarations**"*), which in essence, raise a single issue, that the Respondents claim that they did not know they were violating a court order. While the assertions that the Respondents did not know that Tri Resource Group, Ltd was an "affiliate" are demonstrably false, such an argument is a red herring because binding precedent sets forth that whether the violation of the TRO was willful is immaterial. As such, there is no need (at this point) for the Court to determine whether the violation was willful, and the Receiver requests this Court grant the Motion.

## REPLY

### A.  Respondents' Intent Is Irrelevant

1. "Since the purpose [of compensating the parties for violation of an order] is remedial, it matters not with what intent the defendant did the prohibited act." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S. Ct. 497, 499, 93 L. Ed. 599 (1949). "The absence of willfulness does not relieve from" liability.

2. In a case with analogous facts, *S.E.C. v. Comcoa Ltd.*, 887 F. Supp. 1521, 1526 (S.D. Fla. 1995), an attorney transferred funds from his trust account to his operating account in violation of the asset freeze provisions of a TRO in an S.E.C. Receivership case. Relying on *McComb*, the court determined that the funds must be returned "even if [the firm] believed, in good faith, that it held legal title to the funds at issue, and that its transfer of the funds was not in violation of the Court's orders." *Id.* at 1527.

3. In affirming, the Eleventh Circuit held that "proper course of conduct [was] to appeal." *Levine v. Comcoa, Ltd.*, 70 F.3d 1191, 1193 (11th Cir. 1995). In this case, G&M did not appeal. In fact, they did not even mention the transfers at issue until the Receiver discovered them, and even then, did not respond to the Receiver's letter, or even the Motion, until hours before this Court ordered their responses be filed. The same is true for Kieper.

4. Because the Respondents have not and cannot argue against the clear interpretation of the TRO and PIHC Injunction, as set forth in the Motion, there is no question of fact, and because Respondents' argument as to their intentions in violating the TRO and PIHC Injunction is meritless on its face, this Court should grant the Motion without the need for an evidentiary hearing.

> B. **Even if intent were relevant, the Response and Declarations are false or misleading, and the willful violation of the TRO and PIHC injunction is evident.**
>
> i. **Respondents could not have reasonably believed that Tri Resource Group, Ltd. was not an affiliate.**

5. In section 3 of the Response, G&M admits that it had received and "appreciated" the TRO before accepting the representation (and the wire transfer). As set forth in the Motion, and admitted in section 4 of the Response, it was clear that the TRO's asset freeze applied to "affiliates."

6. The term "affiliate" is not defined in the TRO. "The term 'affiliate,' however, has a common meaning or understanding. . . . The American Heritage College Dictionary defines affiliate as 'a person or an organization associated with another as a subordinate, subsidiary, or member.' Black's Law Dictionary . . . defin[es] it as 'a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation,' or 'one who controls, is controlled by, or is under common control with the issuer

3

of a security." *League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298, 1317 (S.D. Fla. 2008) (internal citations omitted). In fact, in another FTC receivership case, in determining whether a separate company was within the scope of the TRO, the court held:

> The Court is not troubled by the fact that the TRO does not spell out the definition of "affiliate." If there was any question about the meaning of "affiliate" in the context of this case, there is an ordinary meaning. At the very least, "affiliate" means "closely connected." The extreme breadth of the definitional section of the TRO resolves any question about the meaning of "affiliate." The import of the definition of Defendants is that any related company is bound by the TRO. There is sufficient evidence in the record to establish the interrelatedness of the companies.

*F.T.C. v. Peoples Credit First, LLC*, 8:03-CV-2353-T-TBM, (M.D. Fla. Nov. 1, 2004)

7. As of the date of the transfers and withdrawals at issue, Kieper, as principal of all the relevant companies, knew that Tri Resource Group, Ltd. was an affiliate of Partners in Health Care Association, Inc., due to his ownership of both and their participation in the same enterprise, which serviced the same customers and depended on the same revenue.

8. Similarly, G&M could easily have made the determination that (1) Tri Resource Group, Ltd. has common ownership with Partners In Health Care Association, Inc.; (2) the companies have a common location; (3) the companies have common control; (4) the companies have a common involvement in the medical discount plan industry; (5) the companies serviced the same customers upon which they were both dependent for revenue; and (6) the FTC and Receiver believed Tri Resource Group, Ltd. to be an affiliate, by virtue of the fact that Receiver directed that Tri Resource Group, Ltd. cease operations on August 27, 2014, and sent all of its employees home.

9. To somehow act surprised that Tri Resources Group Ltd. was an affiliate, and subject to the asset freeze provisions of the TRO, is not credible. Moreover, that some of the

transferred funds were used to pay Chris Francek and to pay Gary Kieper's living expenses is immaterial. The TRO makes no such carveout.

### ii.  The Declarations are inaccurate

10. In the Declaration of Keith Grumer, Grumer states that "the Receiver did not return our telephone call until the day after we were retained." Moreover, Grumer represents that the Receiver told Grumer that "TRI Resource Group would likely be able to continue its business operations [] and that Partners in Health would not be permitted to continue its operations." Both are false. In an email dated August 28, 2014 (the date of the retention), at 12:57 p.m., the Receiver memorialized their conversations as follows:

> Keith, nice speaking with you. As you stated you need the complaint and exhibits in this matter so I have attached the complaint in this email and will attach the exhibits in subsequent emails. It is my understanding you are being retained by Mr. Kieper and his companies. Please advise when you have time to discuss this matter tomorrow including compliance issues with the TRO and any proposal to allow the company to continue operating without violating the TRO. Thanks and I look forward to hearing from you.

(the *"8-28 Email"*). A copy of the 8-28 Email is attached as **Exhibit A.** The 8-28 Email documents the fact that the Receiver spoke to Mr. Grumer on August 28, 2014, contrary to Mr. Grumer's declaration[2] to the contrary.

11. Moreover, on August 29, 2014, the Receiver again wrote to Grumer:

> As for <u>servicing customers</u>,[3] I clearly explained to your client that the Court has found sufficient evidence to enter a TRO. I explained that I would be happy to consider a detailed plan of remediation that would have controls and assurances in place that the offending behavior would not continue. I have observed that your client simply relies on the "verification" process after the sales have been made

---

[2] Made under penalty of perjury pursuant to 28 U.S.C. § 1746. [ECF No. 52-1].
[3] As admitted by the Respondents, Tri Resource Group, Ltd.'s role within the organization was customer service.

> (which may be subject to the very misrepresentations the Court has found warranted the TRO). Relying on the "verification" process indicates a[] significant misunderstanding by your client of the FTC regulations. There can be no misrepresentations made to consumers at any point in the process. Additionally, I have significant concerns that the "verification" process has few if any controls to avoid violations of the FTC regulations. It is also clear that your client's retention rate of customers is extremely low which in and of itself is indicative of either (1) the products sold are being misrepresented and the customers therefore cancel within a few months and/or (2) the products are simply not of any value. Mr. Kieper did not even know what the retention rate was and it was not a factor he considered relevant to his business model. Instead it seems the business focuses on high pressure sales, receiving a month or a few months of fees paid by the customers, disputing chargebacks based on technicalities and simply having a steady stream of new short term customers to continue the business. Under such circumstances, I, as the Receiver, cannot allow the business to continue unless I am convinced, and frankly the Court is convinced, that there are adequate controls in place to prevent FTC violations. I have given you this detailed explanation so that you can try to assist your clients in understanding the issues that we need addressed.

(the **"8-29 Email"**) (emphasis added). A copy of the 8-29 Email is attached as **Exhibit B**.

12. Thus, the assertion that the Receiver did not "state that the business operations of Tri Resource Group were to cease" is belied by the 8-29 Email, which expresses quite the opposite position by the Receiver, contrary to Mr. Grumer's declaration.[4] No reasonable person could read the 8-29 Email and reasonably determine that the continued operation of any portion of the offending enterprise was possible, nor that any portion of the offending enterprise was outside the scope of the TRO. Moreover, it is contradicted by the Receiver's actions, in clearly and unequivocally directing that Tri Resource Group, Ltd. cease operations on August 27, 2014.

---

[4] Made under penalty of perjury. *See infra* note 2.

### C. It does not matter whether the funds are necessary to defend the Action.

13. Finally, Respondents argue, alternatively, that since the funds are necessary for defense of the Action, the Transfers should be permitted, even if violative of the TRO. The same arguments were raised and rejected in *Comcoa*, which was affirmed by the Eleventh Circuit. In *Comcoa*, the court rejected such an argument, and held that:

> In imposing a freeze of assets, there is no requirement that the court exempt sufficient assets for the payment of legal fees. See *SEC v. Cherif*, 933 F.2d 403, 416–17 (7th Cir.1991), cert. denied, 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992). Indeed, the use of frozen assets for attorney's fees has been disallowed in circumstances more extreme than in the instant case. See, e.g., *Caplin & Drysdale Chartered v. United States*, 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) (criminal forfeiture statute) (defendant paid attorney $25,000.00 in violation of restraining order); *United States v. Monsanto*, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (criminal forfeiture statute) (defendant's motion to vacate restraining order to permit use of frozen assets to retain attorney denied); *United States v. One Residential Property Located at 501 Rimini Road*, 733 F.Supp. 1382 (S.D.Cal.1990) (civil forfeiture statute) (no constitutional right to civilly forfeitable assets for payment of legal fees). Moreover, in other contexts, attorneys have been required to disgorge nonrefundable retainers. See, e.g., *In re Mondie Forge Co.*, 154 B.R. 232, 239 (N.D.Ohio 1993) (bankruptcy case); *United States v. Harvey*, 814 F.2d 905, 913, 918 (4th Cir.1987) (RICO/CCE action). In all of these cases, the courts have essentially held that a defendant has no right to spend another's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain counsel of his choice. *See Property Located at 501 Rimini Road*, 733 F.Supp. at 1386 (*quoting Caplin & Drysdale*, 491 U.S. at 625, 109 S.Ct. at 2652).

*Comcoa,* 887 F. Supp. at 1526.

14. As such, there is clearly no right to carve out attorney fees from an asset freeze. Accordingly, this Court should decline to do so.

## CONCLUSION

In conclusion, there is no merit to Respondent's arguments. Their state of mind in authorizing and accepting the transfers at issue is immaterial. But even if it were not, the Respondents clearly knew that Tri Resource Group Ltd was an affiliate and subject to the asset freeze. Moreover, there is no reason why this Court should allow the victims of this enterprise to bankroll Kieper's defense. The Motion should be granted. Moreover, if this Court deems appropriate, the Court should enter an order to show cause why the Respondents should not be held in contempt for their clear violations of the TRO.

Dated: October 7, 2014.

                                            s/ Lawrence E.  Pecan
                                            Lawrence E. Pecan, Esquire
                                            Florida Bar No. 99086
                                            lpecan@melandrussin.com
                                            MELAND RUSSIN & BUDWICK, P.A.
                                            200 South Biscayne Blvd., Ste. 3200
                                            Miami, Florida  33131
                                            Telephone: (305) 358-6363
                                            Telecopy: (305) 358-1221
                                            *Attorneys for Peter D. Russin, Receiver*

## **CERTIFICATE OF SERVICE**

  I hereby certify that on October 7, 2014, the foregoing is being delivered to the following parties via transmission of Notices of Electronic Filing.

                  s/ Lawrence E. Pecan
                  Lawrence E. Pecan, Esquire

Gary L. Ivens
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
202-326-2230
Fax: 326-3395
Email: givens@ftc.gov

Christopher E. Brown
U.S. Federal Trade Commission
600 Pennsylvania Ave NW
Mail Stop CC-8509
Washington, DC 20580
202-326-2825
Email: cbrown3@ftc.gov

Keith Thomas Grumer
Grumer & Macaluso PA
1 East Broward Boulevard
Suite 1501
Fort Lauderdale, FL 33301
954-713-2700
Fax: 954-713-2713
Email: kgrumer@grumerlaw.com

Bruce S. Rogow
Bruce S. Rogow PA
500 East Broward Boulevard
Suite 1930
Fort Lauderdale, FL 33394
954-767-8909
Fax: 954-764-1530
Email: brogow@rogowlaw.com

Tara A Campion
Bruce S. Rogow, P.A.
500 East Broward Blvd.
Suite 1930
Fort Lauderdale, FL 33394
(954) 767-8909
Fax: (954) 764-1530
Email: tcampion@rogowlaw.com

**From:** Peter Russin [mailto:prussin@melandrussin.com]
**Sent:** Thursday, August 28, 2014 12:57 PM
**To:** Keith Grumer
**Subject:** FTC v. PiHC and Kieper

Keith, nice speaking with you. As you stated you need the complaint and exhibits in this matter so I have attached the complaint in this email and will attach the exhibits in subsequent emails. It is my understanding you are being retained by Mr. Kieper and his companies. Please advise when you have time to discuss this matter tomorrow including compliance issues with the TRO and any proposal to allow the company to continue operating without violating the TRO. Thanks and I look forward to hearing from you.

Peter D. Russin



Meland · Russin · Budwick
ATTORNEYS AT LAW

3200 Southeast Financial Center
200 South Biscayne Blvd. Miami, FL 33131
Tel: 305.358.6363 || Fax: 305.358.1221

Email: prussin@melandrussin.com

Web: http://www.melandrussin.com
View VCard | View Bio

TREASURY DEPARTMENT CIRCULAR 230 DISCLAIMER: To ensure compliance with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including any attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service. (The foregoing statement is made in accordance with Circular 230, 31 C.F.R. Part 10.)

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@melandrussin.com

EXHIBIT A

**Peter Russin**

| | |
|---|---|
| From: | Peter Russin |
| Sent: | Friday, August 29, 2014 5:46 PM |
| To: | 'Keith Grumer' |
| Cc: | May Macaluso; Sol Genet; Larry Pecan (lpecan@melandrussin.com) |
| Subject: | RE: Partners in Health |

Thanks Keith. As for payment of payroll, I must have court approval pursuant to the TRO and I need to decide who to pay. I am happy to discuss that with you now if you wish. As for servicing customers, I clearly explained to your client that the Court has found sufficient evidence to enter a TRO. I explained that I would be happy to consider a detailed plan of remediation that would have controls and assurances in place that the offending behavior would not continue. I have observed that your client simply relies on the "verification" process after the sales have been made (which may be subject to the very misrepresentations the Court has found warranted the TRO). Relying on the "verification" process indicates and significant misunderstanding by your client of the FTC regulations. There can be no misrepresentations made to consumers at any point in the process. Additionally, I have significant concerns that the "verification" process has few if any controls to avoid violations of the FTC regulations. It is also clear that your client's retention rate of customers is extremely low which in and of itself is indicative of either (1) the products sold are being misrepresented and the customers therefore cancel within a few months and/or (2) the products are simply not of any value. Mr. Kieper did not even know what the retention rate was and it was not a factor he considered relevant to his business model. Instead it seems the business focuses on high pressure sales, receiving a month or a few months of fees paid by the customers, disputing chargebacks based on technicalities and simply having a steady stream of new short term customers to continue the business. Under such circumstances, I, as the Receiver, cannot allow the business to continue unless I am convinced, and frankly the Court is convinced, that there are adequate controls in place to prevent FTC violations. I have given you this detailed explanation so that you can try to assist your clients in understanding the issues that we need addressed. I am more than happy to discuss this in greater detail and consider any detailed remediation plans your client may provide. Thanks. I may have time to talk in the afternoon tomorrow. 786-202-5400 is my cell.

**Peter D. Russin**



**Meland · Russin · Budwick**
ATTORNEYS AT LAW

3200 Southeast Financial Center
200 South Biscayne Blvd. Miami, FL 33131
Tel: 305.358.6363 || Fax: 305.358.1221

Email: prussin@melandrussin.com

Web: http://www.melandrussin.com

View VCard | View Bio

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@melandrussin.com

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 1:14-cv-23109-RNS

FEDERAL TRADE COMMISSION,

    Plaintiffs,

v.

PARTNERS IN HEALTH CARE
ASSOCIATION, INC., *et al*,

    Defendants.
_____/

## AFFIDAVIT OF PETER D. RUSSIN

STATE OF FLORIDA      )
                                      ) ss
COUNTY OF MIAMI-DADE  )

    Peter D. Russin, being duly sworn, deposes and says:

    1.    I am the duly appointed receiver in the above-captioned case, and I have personal knowledge of the matters set forth herein.

    2.    On August 27, 2014, I entered the offices of Partners in Health Care Association, Inc.; PIHC, Inc.; Senior Advantage of Wisconsin, Inc.; and Tri Resource Group, Ltd (collectively the **"Entities"** and each individually an **"Entity"**) in furtherance of my duties under the Court's Temporary Restraining Order (**"TRO"**) to take control over Partners in Health Care Association, Inc., and all of its affiliates and subsidiaries.

    3.    On August 27, 2014, upon my investigation and interviews of the employees of the Entities, I concluded that the Entities had common ownership and related business and were affiliates. I directed that all the Entities were within the scope of the Court's Temporary Restraining Order ("TRO") and would be shut down until and unless such time as both I and the Court were convinced any Entity could be operated without violation of the TRO.

**EXHIBIT C**

4. On August 27, 2014, I explained to Gary Kieper that the Court has found sufficient evidence to enter a TRO and that the Entities were shut down. I explained that I would be happy to consider a detailed plan of remediation that would have controls and assurances in place that the offending behavior would not continue. I explained that the Entities rely on the "verification" process after the sales have been made (which was subject to the very misrepresentations the Court has found warranted the TRO). I observed that relying on the "verification" process indicated a significant misunderstanding by Mr. Kieper of the FTC regulations. I stated to Mr. Kieper that no misrepresentations may be made to consumers at any point in the process. Additionally, I explained my concern that the "verification" process has few (if any) controls to avoid violations of the FTC regulations. I explained that the business focuses on high pressure sales, receiving a month or a few months of fees paid by the customers, disputing chargebacks based on technicalities and simply having a steady stream of new short term customers to continue the business. I explained that the retention rate of customers is extremely low, which indicated either (1) the products sold are being misrepresented and the customers therefore cancel within a few months and/or (2) the products are simply not of any value. At such time, Mr. Kieper did not even know what the retention rate was and indicated it was not a factor he considered relevant to his business model.

5. Furthermore, I explained that as the Receiver, I could not allow the business to continue.

6. On August 28, 2014 I informed Keith Grumer, counsel for Gary Kieper, that the Entities were shut down, and further explained the same matters set forth in paragraphs 4 and 5, above.

Affidavit of Peter D. Russin, Esquire
Page 3 of 3

7. The 8-28 and 8-29 Emails attached to the Reply are true and correct copies of my email conversations with Keith Grumer.

8. No plan of remediation was ever submitted to me.

9. Though, at my direction, Associated Bank was served with a copy of the TRO on or about August 29, 2014, the Tri Resource Ltd account at Associated Bank was not frozen until approximately September 10, 2014.

10. I first learned of the unauthorized Transfer and Withdrawals (as defined in the Receiver's Turnover Motion) on Friday, September 12, 2014, after serving Associated Bank with a subpoena.

11. On Monday, September 15, 2014, at my direction, my counsel wrote to Grumer & Macaluso, P.A., demanding return of the amounts transferred via wire transfer by September 19, 2014 (the *"Letter"*).

12. Neither I nor my counsel has received a response to the Letter, other than the Response [ECF No. 51] to the Motion for Turnover.

FURTHER AFFIANT SAYETH NAUGHT.

PETER D. RUSSIN

Sworn to and Subscribed before me on
October 1th, 2014.

Notary Public, State of Florida

My Commission Expires:
Melissa R. Blanco