UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

PARTNERS IN HEALTH CARE
ASSOCIATION, INC. et al.,

      Dependants.

**Case No. 14-cv-23109**

**OBJECTION TO THE FINAL ORDER
PERFMANENT INJUCTION AND
MONETARY JUDGEMENT AS TO THE
DEFENDENTS PARTNERS IN HEALTH
CARE ASSOCIATION, INC., AND GARY
L. KIEPER**

## FACTS FOR OBJECTION TO FINAL ORDER

The Defendant is pleading to the United States District Court Southern District of

Florida for understanding and consideration of the circumstantial evidence that

the Plaintiff has submitted.  With thousands of emails and documents that the

Plaintiff had in its procession, did they produce one document or email that

promoted "bait and switch" nor did they produce one document or email that

encouraged any misrepresentation of the product.  The Plaintiff did not find one

person that they disposed that would testify that Gary Kieper and/or PIHC

promoted the "bait and switch" theory that the Plaintiff alleges.  The Defendant

alleges that the Plaintiff did everything possible to inhibit the Defendant of

presenting proper evidence to this court that the product has a value and that

the Defendant did not in any way participate in a "Scam or Bait and Switch".  The

Defendant begs the court to please consider the facts as they are presented by

the Defendant and not twisted allegations submitted by the Plaintiff. The Plaintiff has presented an attitude of "Win At Any Expense" rather than having the Defendant judged by the truth of how he conducted his business. The Plaintiff continues to claim that the Defendant was selling a "Worthless Discount Card" when in fact the Defendant has many testimonies and documents that show absolutely the opposite. The testimonies were unsolicited and certainly would not have been obtained if the program PIHC/Defendant was selling was "worthless". The FACT is that the "Discount Card" that was being offered was being offered for FREE at the time and there wasn't a charge for it.

The Plaintiff continues to quote only one part of the Marketing Agreement between PHIC and it marketing partners. They dwell on the paragraph that states, "all marketing materials and sales presentations must be approved by the company". It is very obvious that United Solutions did not follow this requirement by running ads that were not approved but at the same time the agreement also states, "that they are responsible for complying with all Federal, State and local laws". Plaintiff could not produce one document or email that indicated that PIHC/Gary Kieper approved of any of United Solutions advertisements but can product documents that show: a) The Defendant's Customer Service Representatives did in fact call United Solutions posing as a consumer to insure that the product was not being misrepresented. The Defendant can prove that on numerous occasions that Customer Service

Representatives did listen to live broadcast of different radio stations given by United Solutions, hosted by Constanza, the President of United Solutions, to insure that no misleading statements were made. That when PIHC hired another CSR to monitor United Solutons's business and Constanza complained because of her cancellation, due almost 100% to the fact that we, PIHC called each and every member to make sure that they knew exactly what they had enrolled in. When Constanza complained, Gary Kieper didn't back down but turned up the heat even higher to insurance that all members knew exactly what they enrolled in. In the Declaration members of United Solutions claimed that they were instructed to call United Solutions for their customer service, where, United Solutions was trying to circumvent PIHC for monitoring this business. Mr. Ivens is also aware that as of September 1, 2014 United Solutions would have no longer been allowed to represent the Advantage Health Savings Program. That steps had already been taken to eliminate any further complaints regarding United Solutions and the Spanish Speaking market. The Defendant is not condoning the actions of United Solutions and its misrepresentation and false advertising but is defending itself against any acceptance of this false advertising and misrepresentation. The Plaintiff was aware that the intent of the Defendant was to find and depose each and every past and present employee of PIHC, TRI Resource Group and Senior Advantage of Wisconsin with regard to: a) training b) explanation of benefits c) how "Welcome Calls" were completed and d) how we handled any consumer that was the least bit iffy about the product it purchased.

The protocol was to immediately suspend their billing until any and all questions were answered to the consumers satisfaction.  This type of action certainly would not be done in the "Bait and Switch or Scam" that the Plaintiff claims.  The fact that we worked closely with the Department of Consumer Protection in the state of Wisconsin speaks for our integrity.  We will submit proof that this agency was provided with copies of sales scripts and marketing materials, which are the same ones that the Plaintiff removed from the Defendants corporate office.  The Plaintiff was also aware that as of Septmeber 1, 2014, United Solutions no longer would have been able to offer the Advantage Health Savings Discount Program through PIHC.  We had continued to hold training secessions and continued to receive calls for consumers regarding United Solutions.  We required sales and customer service personnel be terminated or we would not accept any further business from United Solutions.  At times we had suspended United Solutions from any additional new business until they did in fact retrain their sales people on the correct presentation of our product.  In the Declarations that the Plaintiff submitted to this court, it clearly states that sales/customer service people informed the consumer that it was United Solutions plan and at that point they took ownership of the plan. The fact remains that PIHC was not even discussed in the presentation.  This action, not discovered by PIHC until reading the Declarations, which if found earlier would have resulted in immediate termination, as it did when we found any fraudulent misrepresentation. Most of PIHC's marketers were also licensed insurance agents/agencies and they

conducted business as a licensed insurance agent. PIHC product was only used after all means of selling insurance were exhausted and even the Limited Benefit Health Insurance Plans, which were also offered by TRI Resource Groups licensed agents, were far too expensive for most consumer to afford. The Plaintiff as submitted a presentation using Cal Star insurance where the Defendant contracted with the company at a ZERO commission, which reduced the premiums by 40% of market and in most cases was still not affordable. These agent purchased internet leads of people looking for insurance because they sold insurance. The majority of the marketing agencies also sold health insurance, so why wouldn't they buy internet leads. The Plaintiff intent is to throw enough junk against the wall so it appears that the Defendant and his employees were participated in this "scam and bait and switch" theory that the Plaintiff has conjured up. Attachment 3 is a copy of a presentation and all information requested by the Department of Agriculture, Trade and Consumer Protection in June of 2012. What the Plaintiff hasn't acknowledged is that PIHC and Gary Kieper made a lot of changes to the program and procedures to add value to the Consumer and reduce cancellations. Gary Kieper and PIHC had established a good working relationship with the Department of Agriculture, Trade and Consumer Protection Agency. That communication include different action plans that PIHC and Gary Kieper were taking to reduce consumer complaints and to insure that the consumer knew exactly what they were enrolled in. The "Welcome Call" was established for that purpose and did serve an important part in taking control to

insure the consumer was not taken advantage of.  If at the time of our "Welcome

Call" the individual made mention of insurance, this was fully investigated and if

there was misrepresentation, PIHC immediately refunded 100% of the consumers

money including the "application fee".

To protect the consumer, our customer service reps would also immediately,

"inactivate" any member that hinted of cancellation or any misrepresentation.  If

PIHC or Gary Kieper were involved in trying to deceive the public or take

advantage of them, why would have Mr. Kieper have enforce this policy.
Accounts were only re-activated after a complete investigation and
acknowledgement of the member to continue their program.


The Plaintiff had access to the voice recording that were used by PIHC and other

marketers but only reference one that was had not been used in over a year.  The

recording that was used is:

1. The Defendant was not given ample time to prepare his defense in the TRO
   court appearance.  Defendant was served on August 28, 2014 and court
   order for appearance on September 4, 2014.  Defendant was served on a
   Thursday at approximately 12:00 PM and required at least 24 hours to read
   through the order.  Because this was also Labor Day weekend, Defendant
   could not retain an attorney until late afternoon on the following day,
   Friday August 29th, 2014.  This provided only Tuesday, September 2nd, and
   Wednesday, September 3rd to prepare a defense.  The Defendant was also
   not allowed to remove any records or documents from his corporate office
   to submit to the court in his defense.

2. The FTC attorney and the Receiver both misled the Defendant into believing that their intent was to allow the businesses to continue under certain conditions: FTC required that Defendant retain a qualified telemarketing "Consultant" and the Receiver required that the Defendant submit a reasonable business plan and fulfill the FTC requirement. Defendant and his legal counsel spent the better part of Wednesday, September 3, in securing a proposal from a qualified "Telemarketing Consultant", which was the first step required  by both the FTC and Receiver.  The Defendant's legal counsel, the FTC or the Receiver made the court aware of this action for consideration.

3. Due to the lack of time permitted between being served and the court date, the Defendant did not have proper time to seek qualified legal counsel. This was also inhibited by the fact it was a holiday weekend and the ability to find attorneys available to discuss this case.  Defendant legal counsel advised the Defendant that this was just a preliminary hearing and that he was not required to attend.  They also advised the Defendant that they were not concerned about submitting, "evidence" because it was only a preliminary hearing and not a hearing requiring evidence, which was a total misrepresentation.

## DISPUTE OF PLAINTIFFS ALLEGATION FOR SUMMARY JUDGEMENT

### Introduction and Background

The FTC and Gary Ivens is very good at deploying smoke and mirror allegations and if Defendant was involved in this bail-and-switch scam, one would certainly believe that Mr. Ivens could produce at least one individual that would attest to Mr. Kieper's involvement.  Defendant is

going to prove that he did not participate in any scam or bait-and-switch as alleged by the FTC. That Mr. Kieper did in fact run his business with the same integrity that he ran his insurance business for over 35 years. The Plaintiff alleges that any time a consumer claimed that he was lead to believe he bought health insurance, that Mr. Kieper went along with it or encouraged it, which is the furthest from the truth. The Plaintiff claims that payments ranging from $99 to several hundred were charged to the consumer. When in fact our programs, of which many were sold, started at as little as $30 and these also were the very same ones that had a high lapse rate. People just assumed some thing costing only $30 didn't have a prolonged value. We continued to upgrade the service our product would offer and as those upgrades were added the cost also was adjusted. Each and every service offered in our program was "labor intense" and contributed to the cost. We will enclose attachments of examples of value we offered to our membership. Mr. Ivens is stuck on "worthless medical card" and not on the whole picture of our program. First, let address the BBB rating of "F" given to PIHC and with that the ongoing eagerness of the FTC to close down and run any organization out of business that has anything to do with "Discount Medical Plans". The

BBB rated my company F with a total of 36 complaints closed with the BBB in last 3 years/ 1 closed in last 12 months. (See attachment 4)  You will also see that 24 are for Advertising/Sales Issues and 12 problems with product/service.  Considering the volume of business that the Plaintiff alleges we were producing (24,000) enrollment in 4 years (which is not an accurate number), this certainly does not appear to be earth scattering experience that would cause this court to "permanently pull the plug on the remnants of defendant Gary Kieper's bait-and-switch scam that lured consumers with promises of affordable health insurance but actually provided nearly valueless medical discount cards".  Defendant alleges that if the Plaintiff had such an "air tight, slam dunk case", then why: did Plaintiff withhold the access to documents and emails needed by the Defendant to depose his employees, customer service personnel and all sales people?  Why did the Plaintiff, with his slam dunk evidence, breach Gary Kieper's "attorney-client confidentiality by accessing emails between Gary Kieper and his attorney"?  Why does the Plaintiff believe that he should be privileged to emails between the Defendant and his attorney but in his response to "Plaintiff's Response to Defendant Kieper's Document Request", page 2, first line "would be subject

to the attorney-client and governmental deliberative process privileges and the work-product doctrine. The Plaintiff and their legal counsel appear to want it their way, regardless of the law. Why would the Plaintiff, who is the Federal government, not want to make sure that every chance is given for a "fair" trial for a United States citizen. This case isn't about one neighbor suing another because his dog crapped on is lawn. This case is about the integrity of a U. S. citizen and what is right and what is wrong. The Defendant has been stripped of all assets, was served with the TRO in August 28th, 2014 with a court date of September 4th, 2014. Made to leave his office immediately without the opportunity of any materials for a defense that needs to be satisfied 5 days of which this is over Labor Day Weekend. Is told by his subpar defense attorneys not to worry because it is only a Preliminary hearing and when the hearing is over, his attorney says, "we put on a good defense". No we didn't because we were not prepared to defend against anything because we were told by both Gary Ivens and Peter Russin that their intent was to allow the business to continue. If there is a master at "Bait-and-Switch" Gary Ivens has the gold medal because he has intentionally misled me for his own benefit. The Defendant's desire to stop this Summary Judgement and request a

trial by jury is the Defendant only way of seeking justice and the opportunity to seek damages from the FTC.  We are also attaching documents to show that the BBB is not what it is cracked up to be and in fact I personally met with the BBB in Milwaukee, WI regarding the BBB complaints and the majority of these were brought on by Steve Dorfman, United American Health Care.  We will attach documents that show that we worked with all government agencies in trying to bring fraud charges against this company and individual. The documents regarding the BBB: attachment 5 "Truth About the Better Business Bureau-Is BBB Membership Good for Your Company", attachment 6 "BBB Is a Racket, SoCal Law Firm Says in $200 Million Demand", attachment 7 "Better Bus. Bureau of Metro. Dallas v BH DFW, Inc. Court of Appeals of Texas, Fifth District, Dallas", attachment 8 "Court of Appeals" OPINION.  The following attachments will support the Defendants allegations that the FTC groups all Discount Medical Programs as scams and of no value, instead of making sure that each program is judged completely on its own merits.  Attachment 9 "FTC Works to Crack Down On Health Care "Discount" Plans", attachment 10 "Discount health plans under fire from FTC and states", (Gary Kieper was working with the state of Wisconsin), attachment 11 "U. S. states

work to shut down fake healthcare plans", attachment 12 "These health care plans were scams", attachment 13 "FTC Cracks Down On Bogus Medical Discount Plans". Mr. Kieper did meet with the BBB personally in Milwaukee to discuss how to better serve the consumer and was told by the BBB on that day, "we can make all of these complaints disappear and give you a favorable rating for around $10,000 and your continued membership with the BBB. Because I would not fall prey to their gangster style of bribery, each and every time someone would call the BBB they would not give a favorable opinion. Fact is that I called the BBB and told them that I had purchased a plan from Partners In Health Care out of Appleton, WI and asked their opinion. They immediately planted the seed that they were sure I was told it was insurance and when I denied that they asked whether or not the sales person used any insurance terms, like policy, claims or premiums and I said no. They continued to drill me on the sales tactics that were used and when they couldn't find anything to file a complaint on, they advised me to be careful. And to think for only $10,000 I could have had all of this go away and when the FTC called the BBB after investigating United Solutions, they would have receive an excellent report. To my knowledge the FTC has never received even

one complaint against Partners In Health Care, TRI Resource Group, Senior Advantage of Wisconsin or the Health Center. The investigation started because United Solutions ran misleading radio ads that were never approved by Gary Kieper, PIHC or any affiliate of Mr. Kieper's.

The following attachments will provide this court with evidence that the Advantage Health Savings Discount Program was not a "valueless, worthless" program. This evidence will show value to the members:

Attachment 14: Diabetic Comparison Pricing

Attachment 15: Weekly report Medical Bill Mediation- savings $41,777.91

Attachment 16: Weekly report Medical Bill Mediation- savings $2927.04

**We have additional reports that show consistently savings to our members**

Attachment 17: Weekly report of Medical Bill Mediation

Attachment 18: Member Risa Poniros saving $29,000 in one year

Attachment 19: JoAnn Hurtgen- Testimony couldn't afford her medications without our help

Attachment 20: Sandra Fryrear- "Also the prices of medications cost was unbelievable. Great service.

Attachment 21: Renee Wharton PIHC has great customer service and very affordable prices with their medical savings. Staff work hard to answer all questions and help establish a partnership in caring for your health

Attachment 22: Gail Masindo/John Barker I just want to share a conversation with you that John and I had earlier this morning. We were saying how much better the world would be if everyone was as great at customer service as you are. The last couple of months have been challenging ones for us, and your efforts have gone a long way to help us, both financially and emotionally. Whether by phone or email, you treat us like real people (rather than ananonymous number)  Two big thumbs up to you, your colleagues and the plan.

Attachment 23: Testimony from Maria Alent  (Please read)

Attachment 24: Testimony from Danna Alaniz (Please read)

Attachment 25:  Terri Phillips "Already she has saved me money on my blood strips. She also was very professional and knew just where to find my savings! Keep Her Forever.

Attachment 26: Testimony from Tina Laudahl (Please read)

Attachment 27: Testimony from Patricia Portnoy "PIHC is awesome! I always get the results I expect. Being in the Health Industry since 1985, I get the same treatment I used to give.  We are on the same page! I just want to thank everyone for their help. I have referred my friends to PIHC.

Attachment 28: Testimony Ruth Zufelt (Please read)

Attachment 29: Testimony Roger Marshall "I, Roger Marshall, also thought Partners In Health Care was a fraud until I started making payments and had care is when they really came through.  I would definitely encourage people to apply.

Attachment 30: Testimony from Sybil Davis (Please read)

Attachment 31: Larry McAliser "She has saved me over $17,000 plus a year.  WITHOUT her help I would have to probably sell my home, cause there's no way I could afford the medicines".

Attachment 32: Jan Bennett "I am newly enrolled member into PIHC Advantage Health Savings Program and I will be saving over $20,000 a year on my medications". (Please read the rest)

Attachment 33: Pamela Graber "Melissa has been able to save us $1685.00 a month, that would be a total savings of $20,228.00 a year"!!!

Attachment 34: Christmas Valley, OR " My first month being with PIHC, I have saved $459.00 a month.  My total savings for one years will be $5508.00. What a great program"!!

Attachment 35:  Testimony from Tabatha Nowell "I went to my local Food Lion Pharmacy and the generic prescription was $220.00 plus tax and the name brand was double that.  I call over to PIHC and spoke to a women named Melissa and told her my situation, she wa able to get me my medication for $16.00 dollars delivered to my front door step in 48 hours"{". (Please read the rest)

Attachment 36: Tracy Corkran "She has saved me hundreds of dollars by bidding my prescriptions".

Attachment 37: David Gawith "Since we've signed up with Partners In Health Care we have saved nearly $800 a month on prescriptions".

Attachment 38: Ken & Amy Murray "My wife and I really appreciated the hard work Ben put in to have Cascade Valley Hospital write off the $22,563.77 bill.  Thanks"

Attachment 39: Carolyn Rhoades "Jenna helped me with my hospital bills by working with the hospital and getting my bills a 100% paid.  I very much appreciate her help,  The amount of money I saved is $32,700.00".

Attachment 40: Hugh and Janie Jones "Partners in Health Care is such a blessing to both my husband and I.  Around October 2013 they saved me over $700.00 on my mammogram bill, thank God! Then in December 2013 Ben worked on a bill of my husband's and saved him a total of $1578.70.  What a great blessing. I truly don't know what we would do without Ben and the wonderful workers at Partners In Health Care. Thank you all".

Attachment 41: Flat Gap, KY "My name is Margaret Blanto, with PIHC and Dusty's help I was able to receive a 50% discount on my medical bills". (Please read the rest)

Attachment 42: William Freund "Dusty was able to help with my bills. She got me a 34% discount, that was a lot more than I expected and then help me set up a payment plan, that would fit into my budget. What a great company".

Attachment 43: Mary Ellen Cochran "I am so please and tickled pink, because I received a 50% discount on my bill and I have more that they

are working on for me right now. I never expected this kind of savings. I will be recommending PIHC to everyone she know!! Great job Dusty!!"

Attachment 44: Bettie Croft " and am a new member of PIHC. I am extremely happy with the service and what they are doing for me to save me money. PIHC accommodates its members in all ways, With PIHC I was able to save 50% on my doctor bills".

Attachment 45: Prescription Drug Savings- Rita Wolfthal savings $2234.16 yearly

Attachment 46: Prescription Drug Savings- Sherree Redmond savings $12,186.92 yearly

Attachment 47: Prescription Drug Savings- Carol Portocarrero savings $1225.78 yearly

Attachment 48: Prescription Drug Savings- James Neal savings $14,682.60 yearly

Attachment 49: Prescription Drug Savings- Christopher Miley savings $5720.88 yearly

Attachment 50: Prescription Drug Savings- Barbara Jean Gould savings $2581.36 yearly

Attachment 51: Prescription Drug Savings- Ilan Fedida savings $5523.24 yearly.

Attachment 52: Prescription Drug Savings- Marjorie A Banting savings $1850.00 yearly

Attachment 53: Prescription Drug Savings- Carol Banker savings $9598.32 yearly

Attachment 54: Prescription Drug Savings- Ruben Kabacoff savings $2000.52 yearly

Attachment 55: Prescription Drug Savings- Edward LePage savings $5644.84 yearly

Attachment 56: Prescription Drug Savings- Ruben Rios savings $8136.88 yearly

Attachment 57: Prescription Drug Savings- Bruce Gilchrist savings $3047.28 yearly

Attachment 58: Prescription Drug Savings- Leticia Torres savings $1658.32 yearly

Attachment 59: Prescription Drug Savings- Brenda Bray savings $1249.78 yearly

Attachment 60: Prescription Drug Savings-Randall Baker savings $11,005.32 yearly

Attachment 61: Prescription Drug Savings-Agnes Hill savings $5615.52 yearly

Attachment 62: Prescription Drug Savings-Dennis Harris savings $20,523.92 yearly

Attachment 63: Prescription Drug Savings-Betty Grieco savings $2864.20 yearly

Attachment 64: Prescription Drug Savings-Mintha Green savings $2991.12 yearly

Attachment 65: Prescription Drug Savings-David Cameron savings $4803.48 yearly

Attachment 66: Prescription Drug Savings-Grace S Chizar savings $6267.96 yearly

Attachment 67: Prescription Drug Savings-Anthony Carlson savings $17,411.64 yearly

Attachment 68: Prescription Drug Savings-Mary Hargrove savings $1444.80 yearly

Attachment 69: Prescription Drug Savings- Shirley Hayes savings $11,767.68 yearly

Attachment 70: Prescription Drug Savings-Johnny Ogden savings $2121.96 yearly

Attachment 71: Prescription Drug Savings- Bethany Maruzzi savings $4452.72 yearly

Attachment 72: Prescription Drug Savings-Brenda Marable savings $1371.24 yearly

Attachment 73: Prescription Drug Savings-Roger Marshall savings $8012.40 yearly

Attachment 74: Prescription Drug Savings-Beverly Morris savings $13,553.64 yearly

Attachment 75: Prescription Drug Savings-Donald Harrison savings $4178.64 yearly

Attachment 76: Prescription Drug Savings-Leland Wildes III savings $615.24 yearly

Attachment 77: Prescription Drug Savings-Gerald Tucker savings $6061.20 yearly

Attachment 78: Prescription Drug Savings-Ronald Schmitt savings $4747.92 yearly

Attachment 79: Prescription Drug Savings-Risa Poniros savings $26,824.20 yearly

Attachment 80: Prescription Drug Savings-Feances Paren savings $9540.24 yearly

Attachment 81: Prescription Drug Savings-Reginald Porter savings $2009.52 yearly

Attachment 82: Prescription Drug Savings-Lyn Oswalt savings $4568.70 yearly

These savings maybe useless or of no value to Mr. Ivens but to middle America they are substantial.  The Defendant has hundreds more of these to support its claim that the Advantage Health Savings Discount Program does and did have a high level of VALUE to our members.  In the FTC "Summary Judgement Request" Mr. Ivens states that we prayed on people with pre-existing conditions, prayed on them or help them?  I would certainly agree with the FTC that our program would be of no value to someone that was completely healthy.  Our program and training all evolved around whether or not we could save the member money and be beneficial to them, if not we would excuse ourselves and

move on to the next call.  All sales people were trained to "Uncover the Need" and if they couldn't then they should thank the person for their time and disconnect the call.  To further our point of VALUE the next set of attachments will be from members that tried to contact us after the FTC and Receiver assumed control of the corporate office.  This court needs to understand that these respondents had to go an extra step and find our website in order to send these emails.  God only knows how many others tried to reach us and never could and did not find our website to send these messages.  These messages are only for a short period of time because the server was shut down by the Receiver. The court needs to see that these requests for service and or wanting to cancel because they could not reach anyone.  It should be noted that NOT ONE OF THEM MENTION ANYTHING ABOUT BEING INSURANCE.  PIHC and the Defendant worked diligently and consistently on that problem.  The Defendant has never denied that some sales people did in fact misrepresent our product but they were also dealt with. Each and every occurrence was not over looked but the marketing agency and individual were reprimanded and in some cases immediately terminated.

Attachment 83: Valeria Frank- can afford the payments (not premiums)

Attachment 84: Arlene Mire – No mention of insurance-needs help

Attachment 85: Monica Beyale-cancel membership not insurance

Attachment 86: Karri Borad Dillow-want info or cards-no mention of insurance.

Attachment 87: Yadira Aguilar-looking for physician network

Attachment 88: Edith Todor-needs customer service-no mention of insurance

Attachment 89: Dana Boyes-cancel membership- not insurance

Attachment 90: Miriam Reyes-Needs help

Attachment 91: Victor Mendoza- needing dental network

Attachment 92: Vigo- no mention of insurance – membership

Attachment 93: Valeri Thomas-cancel membership-not insurance

Attachment 94: Marku Todor-unhappy with CS no mention of insurance

Attachment 95: Nathan Hughes-want to cancel and no mention of insurance

Attachment 96: Jason Fazio-cancel my membership-not insurance

Attachment 97: Brenda McKay- stop payment-no mention of insurance

Attachment 98: Everette Burton-need vision network

Attachment 99: Valeria Frank-member requesting prices on meds- not asking how much their insurance is paying

Attachment 100: Erica Lee-requesting CS no mention of insurance

Attachment 101: William Bechtel-cancel my Advantage Savings Program-not insurance policy

Attachment 102: Sherly Beck- asks about discounts not insurance

Attachment 103: Beverly Morris-needs meds ordered

Attachment 104: Beverly Morris- another request for a USELESS PLAN to furnish her with her medications

Attachment 105: Idalia Lepe- needs customer service

Attachment 106: Jackie Reddel: Needs customer service-no mention of insurance

Attachment 107: Janet Snow-needs physician network

Attachment 108: Nicole Iglio-member needs medications and repricing of medical bills

Attachment 109: Diane Weitz-asking about doctor and medications-not one word about insurance

Attachment 110: Edward Connor-cancel and no mention about insurance

Attachment 111: Babrahm-member using our services and not one word about insurance

Attachment 112: Sheryl Beck-member using our services and saving-no mention about insurance

Attachment 113: Darla Iniguez- cancel my service with Partners In Health Care-NOT MY INSURANCE

Attachment114: Darla Iniguez- another message cancelling my service not insurance

Attachment 115: Erick Pinales-member needing help and it is an emergency-nothing about an insurance policy

Attachment 116: Slvia Gyrion-requesting customer service and no mention about insurance

Attachment 117: Gale Claus- Bill Mediation and repricing service no mention of insurance

Attachment 118: Daris Adkins-asking for customer Service no mention of insurance

Attachment 119: Andrea Donoghue-thinks we are a scam because he cannot reach anyone-nothing about insurance

Attachment 120: Erick Pinales- needs CS no mention of insurance

Attachment 121: Erick Pinales- member needing service but unavailable to get help-MUST HAVE VALUE and no mention of insurance

Attachment 122: Silvana Peck-member requesting help with bills nothing regarding insurance

Attachment 123: Gladys Ramirez-needing customer service and unavailable-nothing regarding insurance

Attachment 124: Mr. Mack-need help and no mention of insurance

Attachment 125: Terry Clark-wants refund because no services provided-no mention of insurance

Attachment 126: Kuldip Kaur-cancelling Advantage Savings Program not any mention of insurance

Attachment 127: Basil Pinto-has a question about his payment and he is concerned-nothing about insurance

Attachment 128: Basil Pinto- another email wanting to make sure his payment made, doesn't want to lose his plan-nothing about insurance

Attachment 129: Peggy Kimple-FTC states that we did not inform consumers of the cancellation policy, this lady knows and nothing regarding insurance

Attachment 130: Daris Adkins-why do members keep calling and requesting service if our plan was as Mr. Ivens states "Useless", it certain appears nothing is further from the truth.

Attachment 131: Daris Adkins- again trying to get in contact and nothing regarding insurance

Attachment 132: Silvana Peck-this is the 3rd or 4th time this member is requesting service, why if the plan was "USELESS", it is because the plan The above attachments attest that PIHC and Gary Kieper did take the consumer complaint serious and did work diligently to stop any misrepresentation of the product, if not these emails would have been full of cancel my insurance policy because we cannot reach anyone. Instead these emails talked about the wanting service and or cancelling their membership.

The Plaintiff choose to depose marketing agencies that were terminated by Mr. Kieper in hopes of getting information that would support their allegations but instead found the principles of their organizations having a very high opinion of Mr. Kieper.  In fact they continually confirmed that Mr. Kieper's integrity was nothing but first

class.  Of course Mr. Ivens removed these statemets from depsositions by motion so that the court could be persuaded in the FTC's direction.

The Plaintiff is aware that the majority of the sales organizations were also licensed insurance agents.  The Plaintiff is compelled to convenience this court that the messages used were misleading, when in fact they were not.  Defendant had a company called GM Real Time Leads that produced health insurance leads and sold them on the open market.  Did in fact did some of PIHC marketers purchase these leads, absolutely, but to sell their mini-major medical polices not PIHC's plan.  Did some of the leads produced by GM Real Time Leads and sold to marketers become member of the Advantage Health Savings Discount Plan, absolutely, for many different reasons but usually because of the limited benefit offered by the mini-major medical plans for doctor office visits and prescription medication.  In these cases they would sell the Tel-a-doc and the prescription drugs services offered by PIHC to supplement where the mini-major medical was weak.  Did some of those leads also buy the entire program, absolutely, because of its value and inexpensive price.  Mr. Ivens is so much aware of this but driven to win, he ignores these facts.  The pre-recorded message that Mr. Ivens shares with this court hasn't been used in over a year and Mr. Ivens in aware of that fact but sharing with this court would not support his effort to win.  Here is the message that was used for over a

year:  IF YOU OR ANYONE IN YOUR FAMILY IS TAKING PRESCIRPTION MEDICATIONS AND PAYING FOR THEM, WE HAVE IMPORTANT INFORMATION FOR YOU. WE GUARANTEE THAT IN MOST CASES WE WILL DRASTICALLY REDUCE YOUR COST OR GET THEM FOR FREE.  TO DISCUSS OUR PROGRAM WITH A LIVE REPRESENTATIVE PRESS 1. THE CALL IS FREE, THE INFORMATION IS FREE AND YOU ARE UNDER NO OBLIGATION. OR PRESS 9 TO BE REMOVED.  Mr Ivens wants this court to believe that PIHC and its marketers misled consumer right from the beginning, which is not a true statement.  Nothing in the message insinuated insurance.  Attachment 133 is a verification script that did in fact tell the consumer "You do understand that this is not a Major Medical Policy or designed to replace a Major Medical insurance plan correct…and per the government (rather than saying the FTC) this is not classified as insurance.

The Plaintiff wants this court to believe that the Defendant abused the DNC registry and again abused the consumer.  The Plaintiff did ask the Defendant if he did match his list against the DNC and the Defendant answered no but also told Mr. Ivens that we had professionals who know the business remove the people that were on the DNC.  Once again Mr. Ivens doesn't mention that because then he could not throw more mud at the Defendant.  Attachment 134 is an email from Chris Francek to Paul@hrmarketing.biz addressing the DNC and that all

numbers were to be scrubbed against the DNC list. Attachment 135 shows on the bottom email data received from datamajorllc and the number of records 1.8 million and after the Fed DNC scrub we had 650958 records. After matching them against duplicates we had 153290 usable records. Attachment 136 on the top of the email show additional records received from datamajorllc and once again we start with 499976 and after the DNC scrub we had 303379 and after matching against duplicate records we had 206858 usable records.

Attachment 137 show an ongoing order of new Opt-in records from datamajorllc. Defendant did in fact match records against the Fed DNC and also against its own records to eliminate duplicate calls. The FTC also confiscated a 300 page manual from the call center in the corporate office. The manual was to run a predictive dialer, how to operate and load data. This dialer would have been operative as of September 3 and the robo dialer would no longer have been used. As always, PIHC and Gary Kieper were moving in a positive direction and getting in compliance with all state and federal laws.

As evidence that Gary Kieper did in fact police his marketing people and did not permit the misrepresentation of his product I have attaching documents for the courts review. Attachment 138 addressing cancellation Jesse and David with the healthenrollmentcenter. Shortly

after this email and receiving their written plan, which was not abided to by Jesse, he was terminated for not controlling his sales representatives. Attachment 139 addressing the cancellation rate of Sohail Hussain's office.  Again shortly after this email and our discussion Sohail's office was suspended from enrolling any new business until he had a personnel change and retraining of all sales representatives.  This suspension lasted for approximately 7 months and then he was monitored very closely from that day forward. Attachment 140 addressing the same issues with Clayton Husk and his business greatly improved from this day forward.  His problem was not insuring that the consumer knew when he went from selling insured products to non-insured products. He stopped selling PIHC product and concentrated solely on insured products.  Attachment 141 is a sales script for an insured product along with the verification script.  This was used by agents licensed with TRI Resource Group and marketer that were also licensed to sell insurance.

## DECLARATIONS SUBMITTED AS EVIDENCE
## NEEDING VERIFICATION AND EXPLANATIONS

1.  Kathy Lewis: PX 11, p.1 Either this person is really confused or she was led on my

the investigator on her facts. In paragraph 2 she boldly states that "In May 2014, I looked online for affordable health insurance and used the search term "health " using the internet search engine, Google. The search engine provided several websites. I found one website, whose address I do not remember, which asked for personal information for health insurance. I entered my personal information on the website. Paragraph 3: Later that same day, I received a call from a man who called himself Jason. I told Jason I was interested in purchasing medical insurance." Now please go to her BBB complaint PX11,p.5 and it says "I was looking for Medical insurance – found a listing for Advantage Health which was listed as being an Aetna product. called the number 866-779-0054 and spoke with a Jason. He said it was an open access product with Advantage Health again an Aetna product offered health, dental and vision coverage." The two statements are completely different which leads one to believe that the investigator or the BBB receptionist lead this consumer to the conclusion they wanted, NOT THE TRUTH. Secondly, the 866-779-0054 was a customer service line that would never been available to any sales people and most importantly it is a BOLD FACE LIE to insinuate that this individual could ever find anything on the internet that connected the Advantage Health Saving and Discount Program to Aetna. There isn't a snowballs chance in god creation that she found a listing for Advantage Health and Aetna on the same page. Is the rest of her statement creditable or did in fact she talk to a Jason from god knows where and confused that conversation with someone from the Health Center, this still needs to be

established by cross examination.

**2.** Anna McCormick: PX13, p.1 Paragraph 3 she states," I received a call from man who identified himself as Michael Vero from Partners In Health Care ("PIHC").

Mr. Vero told me he was calling in response to my online inquiry for health insurance. PIHC does not or never has had anyone by the name of Mr. Vero work for them. The she states, " I took the card to CVS to see how much I would have to pay for my prescriptions. The PIHC card offered no discount whatsoever at my local CVS". Page 11 of the Advantage Health Savings and Discount Program spells out exactly how to use the prescription drug programs and our Customer Service number is displayed all over the Fulfillment Booklet. She further states, "I called my doctor's office to see if they would accept the PIHC card and learned that they had never heard of PIHC and that I would have to pay for the visit in full when I checked in". Page 27 bullet 3 of our Fulfillment Booklet states, "If your physician or specialist is not listed in the network, we will nominate your provider and can have the contract in as little as 72 hours". No place does it encourage consumers to call their physician and ask about PIHC, PIHC is not the Discount Medical Provider Organization, AccessOne is the DMPO. On page 22 of the Fulfillment Booklet, second paragraph it states, "Your WellCard Health Identification card is enclosed in this PIHC welcome package. To find a participating provider in your area call Customer Service at 866-779-0054.

This information is also explained in detail when PIHC completes their Welcome Call. Because I do not have access to Enrollment 123, I cannot tell you who enrolled this individual and it is even more confusing in paragraph 9, line 6 when she states he is from New York, never had anyone from New York. When she did call Chris he is from PIHC's office but again without the benefit of the notes I cannot tell what the conversation was. Also did not attach the BBB complaint along with my answer probably because my answer to the complaint did not support their allegations.

3. Exia Monroe, Brett Olgin no copy of the BBB complaint and my response so it is very difficult to respond but would believe that the BBB complaint and response was not included because it would not support their allegations.

4. Raquel Garcia enrolled by United Solutions and answered a radio ad that was probably misleading, which is the reason United Solutions settled with the FTC. As already determined, United Solutions would tell their members to call their office which is why this ended up as a complaint with the BBB. Once we received the complaint we immediately refunded 100% of their money.

5. Regina Keel no BBB complaint or my answer attached to this declaration so once again it is difficult to determine the facts. Also without the Enrollment 123 it I cannot tell who enrolled this member and whether or not they also sold Health insurance. In paragraph 9, it is very obvious that PIHC Customer Service does not mislead consumers. Raqule Garcia has admitted that immediately the CSR informed Ms. Garcia that we do not sell health insurance.

6.   Eva Krahn PX 9, p.1, Robbin Krayer PX 10, p.1, Maria Avelar PX 1, p.1, Tanner Epp PX 5, p.1the Plaintiff did not attach a copy, why?  These allegations and how they were obtained cannot be disputed when the Plaintiff only provides information to support their case and not the facts.  The Defendant will acquire these records to support his case for trial.

7.   Ronda Boertman PX 2, p.1, paragraph 2 states, "my husband and I received a call from a company supposedly selling health insurance from the number 866-779-0054.  I was a bit surprised to receive the robocall, especially since I had not given our contact information for anyone to call us about health insurance".  Not only is Mrs Boertman and her husband surprise but the Defendant is also like wise very surprised as this number is an incoming WATT line only and is use 100% for Customer Service to our members.  It is very interesting how they, the Boertman's happen to choose that number or was it given to them by the investigator?  There is no way that the statement made above is true and accurate.  In paragraph 5, PX 2, p.2 they claim they were then transferred "to billing to get my credit card information", there is no such department and there is no way of transferring calls from the sales persons phone.  Paragraph 6 and 7 really are confusing.  In paragraph 6 they state, "On June 18, 2014 exactly 10 business days after the first charge, I received the plan information in the mail from PIHC".  Paragraph 7 states, "That same day, June 28, I called (866-779-0054) which is the number we received the initial call from and also is PIHC's customer service number listed on the cards".  That same day was 10 days later, one call

was on June 18th the second on June 28th. If all that is true in this declaration our company policy was to refund 100% of the money, no questions asked where supposedly Nick and Brad admitted that Nick lied. Why that didn't happen at this point is unknown and would have like to see the BBB complaint of this and my answer.

8. Michelle Catania PX3, p.1 Defendant would need to see the BBB complaint as well as his answer to the complaint. The answers are important to this court because they will include all of the notes that the Customer Service Reps included in each of these files. As you have see and will see, the CSR were required to take detailed notes.

9. Thomas Colon PX 4, p.1 paragraph 2 is totally a made up statement. According to the statement, paragraph 2 states, "In early 2013, I began receiving phone calls from Partners In Health Care ("PIHC") claiming to sell health insurance. At that time, my employer was Crowder Construction Company ("CCC") and CCC had provided me with health insurance. I ignored PIHC's phone calls since I already had coverage and was not looking for health insurance at that time. **PIHC HAS NEVER MADE CALLS TO PROSPECTS AND NONE OF THE INDEPENDENT CONTRACTED MARKEING PEOPLE USED PIHC TO IDENTIFY THEM SELVE. EACH COMPANY USED ITS OWN IDENTITY. SO THERE IS NO WAY THAT THIS STATEMENT STARTING OUT HIS DECLARATION IS ANYWARE NEAR THE TRUTH.** He may have received calls from Partners (SOMETHING) but it certainly was not from the Defendants company. Someone called him but it certainly was

not PIHC. He obviously did enroll in our program with someone and without the the notes in Enrollment 123, I cannot determine that. We did refund this consumer his entire amount.

The Defendant is asking the court to consider the information the Defendant has furnished here and also the validity of these Declarations. The Defendant has requested that the Plaintiff furnish the Defendant copies of the recorded conversations between the investigator and the member prior to taking the Declaration. The Plaintiff has responded, that those conversation were not recorded but yet at the same time the Plaintiff has encouraged this court to penalize the Defendant because he did not recorded any of the sales calls but only the Verifications. This is the same double standards that the Defendant has dealt with from day one. Why is it acceptable for an attorney employed by the federal government to totally ignore a Magistrate Judge Orazo-Reyes order? Mr Ivens was directly order to file an appropriate motion on January 6th, 2015 for a release of personal property, ie 1999 boat, so that Defendant could repay the Receiver $5500. The order by the Judge was also to allow any additional funds available after the repayment for Mr. Kieper's living expenses. Mr. Ivens claims he didn't have to follow the order because Judge Scola Jr. had already published his decision. Judge Scola Jr did in fact make his decision known but that was for the release of business funds and not personal. Mr. Ivens declared Magistrate Judge Orazo-Reyes order "moot".

The Plaintiff's attorneys have continued to interfere with the Defendants ability

to properly defend himself against the allegations.  In these Declarations there are statements made regarding the individuals trying to use the services and their doctor or pharmacy would not take them.  As previously stated each service provided has an explanation on how to us and if any questions to please call our customer service. When discussing how to get the most out of discounts to a physician, we again are explicit on how to and encourage the member to call our customer service for help.  The FTC Investigator said that she called PIHC and received a list of physician that she called and not one of them knew of the PIHC program.  First of all of this investigator would have talked to one of our CSR it would have been explained to her/he exactly how to select a provider. Attachment 142 is exactly how our CSR's would deploy physician lists to members. It tells them "**PRIMARY CARE PROVIDERS-PLEASE CHOOSE FOUR OR FIVE PROVIDERS FROM THIS LIST AND THEN CONTACT CUSTOMER SERVICE AT 866-779-0054.  WE WILL MAKE THE CALLS FOR YOU TO MAKE SURE THE ARE ACCEPTING NEW PATIENTS AT THIS TIME**".  We never left it to chance that the provider may not be in the network any longer.  Our experience dealing with


Discount Medical Providers Organizations is that they did not keep their provider lists current and we did not want our member to be inconvenienced, so we would also call the providers and confirm two things:

   a.  They were accepting new patience

b. They were still in the network and providing discounts to the members

Attachment 144  shows that PIHC and Gary Kieper did in fact even try to have

charges brought against Steve Dorfman for misrepresentation and theft.

Attachment 145 shows again that we worked with all organization to insure that

the consumer was not taken advantage of.  It also shows that all complaints filed

were not always as they appears.

Attachment 146 shows that we did terminate agency's that did misrepresent the

product.

The Defendant believes that he has shown this court that the allegation made by

the Plaintiff and Mr. Ivens alleged scam efforts, are meant to misled this court and

not to obtain justice.  The Defendant is requesting that the Request for Summary

Judgement be denied based on all of the above facts and that the Defendant has

opportunity to present his case to a jury of his peers. The Defendant also feels

that the severity of the "Restrictions" the FTC is seeking are inhumane at best and

based on all of the evidence presented here an "over kill" on Mr. Kieper.  This

court needs to please consider that Mr. Kieper was personally licensed in Health

and Life insurance since 1973.  That Mr. Kieper established to separate sales

organization both marketing products in the "Senior" market.  For years there

was more abuse in that market until the Insurance Departments joined together

to monitor the market more carefully.  Mr. Kieper had hired and trained sales

people in 36 different states and they all reported to his agency.  From 1973 until

2000 there were ZERO insurance department complaints filed against Mr. Kieper

or his insurance agency.  The FTC is asking this court to band Mr. Kieper from any

sale of any health product including, health insurance.  Mr. Kieper has made his

living helping people with their health insurance needs and he should not be

barred from this profession.  There is a saying you can't change the spots on a

leopard, Mr. Kieper has displayed, honesty, integrity, professionalism and

devotion to this industry, without any blemishes on his record.  Allowing this band

on Mr. Kieper would also banned him from ever getting licensed as an insurance

agent again.  Mr. Kieper did not fall short in the integrity of his product, attested

to by the testimonies and also the VALUE shown by the people that saved

thousands of dollars.

The Defendant would also like to advise the court of a physical address change,

this change was sent to the court in July of 2015 but for some reason not

recorded. **The new address is Gary Kieper 1340 Home Ave., Menasha, WI 54952**

Respectfully Submitted,

Gary Kieper
1340 Home Ave.
Menasha, WI 54952

I hereby certify that on February 2, 2016, I will send via Overnight delivery to
United States Judge Robert N Scola, Jr., Wilkie D Ferguson, Jr., United States
Courthouse, 400 North Miami Ave., Rm #12-3, Miami, FL 33128

I certify that on February 3, 2016 that I will send copies of this document to the
below listed:

Gary Ivens
Federal Trade Commission
600 Pennsylvania Ave. NW, CC-8528
Washington, DC 20580

Peter Russin
Meland Russin & Budwick, PA
200 South Biscayne Blvd. Suite 3200
Miami, FL 33131

Bruce S Rogow PA
500 East Broward Blvd., Suite 1930
Fort Lauderdale, FL 33394